JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Radio Music License Committee, Inc.
1616 Westgate Circle
Brentwood, Tennessee 37037

## DEFENDANTS
Global Music Rights, LLC
1100 Glendon Ave., Suite 2000
Los Angeles, California 90024

**(b)** County of Residence of First Listed Plaintiff **Williamson County, TN**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Los Angeles, CA**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Peter J. Mooney, White and Williams LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
(215) 864-7164

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                           *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 2, 26
Brief description of cause:
Seeking injunctive relief for violations of the federal antitrust laws.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE C. Darnell Jones, II
DOCKET NUMBER 2:12-cv-5807-CDJ

DATE
11/18/2016

SIGNATURE OF ATTORNEY OF RECORD
*Peter J. Mooney* (signature)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Radio Music License Committee, Inc., | : | CIVIL ACTION |
| v. | : | |
| Global Music Rights, LLC. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
 and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
 exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
 commonly referred to as complex and that need special or intense management by
 the court.  (See reverse side of this form for a detailed explanation of special
 management cases.)          (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.     ( )

| | | |
|---|---|---|
| November 18, 2016 | *Peter J. Mooney* (signature) | Radio Music License Committee, Inc. |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215.864.7164 | 215.789.7664 | MooneyP@whiteandwilliams.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

# UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  1616 Westgate Circle, Brentwood, Tennessee 37027

Address of Defendant:  1100 Glendon Ave., Suite 2000, Los Angeles, California 90024

Place of Accident, Incident or Transaction:  The United States, including in this district where certain of Plaintiff's members reside.
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐  No☒

Does this case involve multidistrict litigation possibilities?          Yes☐  No☒
*RELATED CASE, IF ANY:*
Case Number:  2:12-cv-5807-CDJ          Judge  C. Darnell Jones, II          Date Terminated:  07/25/2015

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
          Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
          Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
          Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
          Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Peter J. Mooney , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: November 18, 2016          _____          37078
                                 Attorney-at-Law                    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: November 18, 2016          _____          37078
                                 Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

### INFORMATION FORM

Name: _Peter J. Mooney_          Bar Id No.: _37078_

Firm: _White and Williams LLP_

Address: _1650 Market Street, One Liberty Place, Suite 1800_

_____

City: _Philadelphia_     State: _PA_   **Zip Code\*: 19103** _- **7395**_

Facsimile No: _215.789.7664_

Please return completed form to:

Michael E. Kunz
Clerk of Court
United States District Court
for the Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

- or -

FAX to:

(215) 597-6390
(267) 299-7135
(610) 434-6174

**\* Please include zip code and 4-digit extension number**

☐ Indicate here if you would like to receive information on the Pilot Fax Notice Program

☐ Indicate here if you would like to receive a Directory of Automated Services

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC.,<br><br>        Plaintiff,<br><br>      v.<br><br>GLOBAL MUSIC RIGHTS, LLC,<br><br>        Defendant. | Civil Action No. ___<br><br><br>**COMPLAINT** |

## SUMMARY OF CLAIMS

1.　　Defendant Global Music Rights, LLC ("GMR") is a new performing rights organization ("PRO") that grants radio stations and other consumers the right to perform works that GMR claims are owned by the music composers, authors, and publishers who are its affiliates.  In reality, GMR is an unlawful monopolist that is deploying a calculated scheme to extort the U.S. commercial radio industry.  GMR has implicitly threatened to start suing radio stations for copyright infringement beginning January 1, 2017 unless they agree to pay supracompetive rates for a license to play the copyrighted songs in GMR's repertory.

2.　　Although GMR has only been around since 2013, the fact that unregulated PROs, like GMR, violate the antitrust laws has been established for 75 years.  The two largest PROs, ASCAP and BMI, have been subject to judicially-monitored consent decrees since the U.S. Department of Justice ("DOJ") first sued them back in the 1940s.  Indeed, early this year, after conducting a two-year investigation, the DOJ refused to amend the consent decrees after finding

that they were still necessary to prevent the PROs from engaging in anticompetitive conduct. The third PRO, SESAC, succumbed to private rate regulation for the next 20 years after the radio industry sued it in 2012 for being a monopolist and this Court concluded that RMLC was likely to prevail on the merits. *See Radio Music License Comm., Inc. v. SESAC Inc.* ("*SESAC I*"), No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013); *Radio Music License Comm., Inc. v. SESAC, Inc.* ("*SESAC II*"), 29 F. Supp. 3d 487 (E.D. Pa. 2014).

3. GMR brazenly seeks to do exactly what got ASCAP, BMI and SESAC into so much trouble; it is trying to force the radio industry into paying exorbitant prices for a license to the musical works it claims are covered by its repertory, with a credible threat of financially ruinous copyright infringement litigation. Plaintiff Radio Music License Committee ("RMLC") brings this action on behalf of its members, comprising thousands of U.S. radio stations, to stop GMR's illegal activity.

4. GMR has been open and unapologetic about its unlawful objective. It strategically hand-picked a critical mass of songwriters and publishers and lured them away from ASCAP and BMI with a promise to pay them at least 30% more than ASCAP or BMI could pay them, because ASCAP and BMI are constrained by their consent decrees (and SESAC is similarly constrained by private rate regulation). GMR's goal was to create a small, but indispensable repertory of "must-have" musical works that radio stations, as a practical matter, could not avoid playing, so that those stations would have no choice but to purchase a license from GMR at whatever rate GMR demanded. GMR accomplished its goal. In the words of its founder, Irving Azoff: "We have a full roster of songwriters that **nobody can, shall we say, comfortably exist without**."

5.    GMR has doubled-down on its scheme by taking extra steps to insulate itself from any attempt that a radio station might make to try to "comfortably exist without" a GMR license. Not only has GMR aggregated rights to a "must have" repertory, but GMR also does not enable radio stations to determine reliably what works are in its repertory at any given time. Thus, even where a station is willing to try to operate without using GMR's "must have" repertory, GMR does not make available a feasible and reliable method that radio stations can use to determine, with any level of confidence, what works they would need to avoid playing in order to operate without risk of copyright infringement.

6.    GMR also does not offer the kind of blanket license to all the works in their repertories—with certain pro-competitive, efficiency benefits—that ASCAP and BMI offer, and which were central to ASCAP's and BMI's ability to survive antitrust challenges (albeit subject to consent decree and court oversight). Worse, GMR only controls 100% performance rights for a small percentage of its works. For most works in its repertory, GMR offers only to license a "fractional" interest in the work, not the whole work. For those "fractional rights," a license from GMR does not give radio stations the right to perform the work; they still must obtain a separate license from each of the other copyright owners. There are still other works in GMR's repertory that are jointly owned by multiple copyright holders and each has the right to license the full work. But GMR does not tell radio stations, in any reliable, transparent way, which of its works it has the full right to license and which works it only offers to license "fractionally," at any given time. Thus, radio stations have no way to determine what value, if any, a GMR license actually provides or whether they even truly need a license at all. This obfuscation is all intentional. GMR knows that if it were truly transparent about the works in its repertory, some radio stations may seek to avoid playing works that are not covered by their licenses from other

PROs and thus conclude that they do not need to purchase a GMR license. That, however, would be contrary to GMR's business model, so it has taken steps to make sure that stations cannot do so.

7.     Second, GMR has entered into *de facto* exclusive licenses with its affiliates that, as a practical matter, prevent radio stations from obtaining copyright licenses directly from those affiliates. GMR does not offer any type of "carve out" from the price of its blanket license. That means, if a radio station enters into a direct license with one of GMR's affiliates, or attempts to remove the works of individual GMR affiliates from its playlist, GMR will not provide the station a discount off of the price of the blanket license. No economically rational radio station would ever enter into a direct license with one of GMR's affiliates without a "carve-out" right because, otherwise, they would be paying twice for access to the same works. Similarly, it would make no sense to attempt to eliminate individual GMR affiliates' works from a station's playlist, if it did not result in any reduction in the license fee that GMR charges. Because it does not permit carve-out rights, GMR ensures that no station would ever directly license with its affiliates, or try to avoid playing any affiliate's works.

8.     Third, GMR has made clear that it will not offer  RMLC members any form of license other than a blanket license. It will not offer per-program licenses, adjustable fee blanket licenses or any other alternatives to its blanket license. ASCAP's and BMI's ability to engage in direct license transactions (facilitated by the fact they may only license on a non-exclusive basis on behalf of their members) and the availability of these alternatives to blanket license structures, are characteristics central to those PROs' success in surviving antitrust challenges; but GMR licensing offers no such pro-competitive features.

4

9.      Because radio stations cannot know for certain whether particular musical works are in GMR's repertory or whether any works purportedly in GMR's repertory may be played without obtaining additional licenses before doing so, and because GMR has ensured that radio stations have no practical or economically viable alternative to obtaining a blanket license from GMR, GMR derives, and imminently threatens to exert, immense monopoly power from the bundle of copyrighted music in its repertory.

10.     GMR's creation of a bottleneck to public-performance-right licenses for the works in its repertory contributes no efficiency benefits of any kind.  Instead, GMR imminently threatens to extract monopoly rents for copyrighted music that would otherwise be available at competitive rates and has cast a long shadow over RMLC's negotiations with ASCAP, BMI, and SESAC.

11.     Unless this Court grants RMLC the injunction it seeks for the benefit of RMLC's members, GMR will be able to exercise monopoly power in contravention of U.S. antitrust laws and at the expense of RMLC's members.

## JURISDICTION, VENUE, AND STANDING

12.     RMLC brings this action on behalf of its members pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin GMR's anticompetitive conduct and other violations of the law, and to recover the costs of this suit and reasonable attorneys' fees.

13.     This Court has subject-matter jurisdiction over the asserted claims under 28 U.S.C. § 1331 and 15 U.S.C. § 26.

14.     This Court has personal jurisdiction over the parties because GMR (i) has conducted business throughout the United States, including in this district; (ii) has substantial

contacts with this district; and (iii) is engaged in a campaign of monopolization that has affected or will affect a nationwide market for the sale of copyrighted musical works in GMR's repertory, which market includes this district.

15.     GMR entered into negotiations with RMLC with the intent and purpose of invoking the benefits and protections of Pennsylvania's laws by directing illegal licensing activity into this district, as shown by GMR's knowledge that:

a)     Philadelphia, located in this district, is the ninth largest radio market in the United States;

b)     over one hundred RMLC member stations reside in this district;

c)     one of the largest radio companies in the United States, Entercom Communications Corp., is headquartered in Bala Cynwyd in this district, is an RMLC member, and its Vice President, Treasurer and Controller Eugene Levin is a member of the RMLC Executive Committee that negotiated with GMR.

16.     During the relevant period GMR directed communications into this district promoting or otherwise offering its licenses for sale to radio stations within this district.

17.     During the relevant period GMR directed communications into this district informing stations of the risk of infringing works in its repertory or otherwise implicitly threating suit for infringement.

18.     On information and belief, during the relevant period, GMR transacted business and/or was found in this district by entering into licensing agreements with radio stations located in this district.

6

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because, during the relevant period, GMR transacted business and/or was found in this district, and/or because a substantial part of the events or omissions giving rise to this claim occurred in this district. GMR threatens imminently to force RMLC members that reside in this district (and elsewhere) to enter into unlawful and anticompetitive public-performance-right licenses and also threatens imminently to force those RMLC members to pay supracompetitive rates for those licenses. These RMLC members include, but are not limited to, (i) WCTO-FM Cumulus Media Holdings Inc. (Easton, PA); (ii) WEEX-AM Connoisseur Media LLC (Easton, PA); (iii) WIOV-FM Cumulus Media Holdings Inc. (Ephrata, PA); (iv) WIOV-AM Cumulus Media Holdings Inc. (Berks, PA); (v) WLEV-FM Cumulus Media Holdings Inc. (Allentown, PA); (vi) WLPA-AM Hall Communications Inc. (Lancaster, PA); (vii) WMGK-FM Beasley Broadcast Group (Philadelphia, PA); (viii) WMMR-FM Beasley Broadcast Group (Philadelphia, PA); (ix) WODE-FM Connoisseur Media LLC (Easton, PA); (x) WROZ-FM Hall Communications Inc. (Lancaster, PA); (xi) WTEL-AM Beasley Broadcast Group (Philadelphia, PA); (xii) WTKZ-AM Connoisseur Media LLC (Allentown, PA); (xiii) WWDB-AM Beasley Broadcast Group (Philadelphia, PA); (xiv) WBEN-FM Beasley Broadcast Group; and (xv) Entercom Communications Corp. (Bala Cynwyd, PA), all of which are licensed to broadcast and/or reside in the Eastern District of Pennsylvania.

## THE PARTIES

20.     Plaintiff RMLC is a 501(c)(6) non-profit corporation organized and existing under the laws of Tennessee, with a principal place of business at 1616 Westgate Circle, Brentwood, Tennessee, 37027.  RMLC's mission is to negotiate public-performance-right license fees with performing rights organizations for the benefit of its members and the commercial radio industry (some 10,000 radio stations).

21.     Defendant GMR is a for-profit corporation organized and existing under the laws of the state of Delaware and is registered as a corporation with the state of California, with a principal address of 1100 Glendon Avenue, Suite 2000, Los Angeles, California 90024.  GMR's registered agent in Delaware is Paracorp Incorporated, 2140 S. Dupont Highway, Camden, Delaware 19934.  GMR's registered agent in California is Leeann Hard, 201 Santa Monica Boulevard, Suite 480, Santa Monica, CA 90401.

## BACKGROUND

### Performing Rights Organizations and the Licensing of Copyrighted Music

22.     The owners of copyrights over musical works enjoy certain exclusive rights, including the right: (1) to publicly to perform their musical works, (2) to reproduce their works, and (3) to distribute copies or phonorecords of their works to the public.  Consumers who wish to use copyrighted musical works for any of these purposes, absent fair use or other exemption, must obtain the relevant copyright holder's permission.  Should they fail to secure a license, U.S. law provides for statutory damages of up to $150,000 *per infringed work.*

23.     Radio stations use a vast array of musical works.  They play feature music for the purpose of entertaining their listeners; they use sound bites as background material and as bridges between programming segments; they air third-party advertisements that may or may not

8

contain feature music; they introduce programs with musical themes; and they sometimes make use of ambient, or background, music, such as music broadcast during intermissions at live sporting events.

24.     To broadcast music without infringing intellectual-property rights, radio stations must obtain licenses.  Copyright holders have the right to directly license their works to radio stations, unless they have relinquished that right.  It also has been the practice in the music industry for decades for copyright holders to bestow licensing authority upon a common agent or society, which can negotiate with and grant permissions to music users on their behalf.  PROs have served this function in the music industry for a number of years, aggregating the rights to works and acting as intermediaries between consumers and copyright holders and purportedly offering "one-stop-shop" licenses for the public performance of groups of works.  For many years, there were only two major PROs for the U.S. music industry:  BMI and ASCAP.  A third PRO, SESAC, was a niche player and did not participate in major music markets until it recently embarked on an anticompetitive scheme similar to the one GMR—a recently formed fourth PRO—is now pursuing.

25.     Performing rights organizations can offer a range of different licenses to radio stations and other entities that publicly "perform" works.  The basic "blanket license" provides a licensee with the right to use any piece of music in the PRO's repertory without having to account for actual usage.  If a PRO charges a set periodic fee for such a license, "carve-out rights" (otherwise known as "adjustable-fee blanket licenses" or "AFBLs") would entitle licensees to discounts if they secure separate permissions directly from the copyright owners to musical works subsumed within the blanket license.  Another alternative license form known as a "per-program license" permits a licensee to use all songs in a PRO's repertory, but only for the

purpose of specific radio programming that is generally associated with an "all-talk" format. Fees for per-program licenses derive only from revenues associated with the relevant program, which fact allows radio stations to reduce their licensing costs by reducing the number of programs that make feature performances of music from a particular PRO's repertory.

26.     It is quite common that copyrighted musical works are co-owned by multiple copyright owners, such as where more than one person was involved in the composition or production of a song.  A default rule under copyright law provides that each joint author of a single work may grant a non-exclusive license to use the entire work without the consent of the other co-owners, provided that the licensor accounts for and pays over to his or her co-owners their pro-rata share of the proceeds.  But joint authors may depart from this default rule, and agree that each co-author will only license his or her fractional share of a single work.   In circumstances where a co-owner expressly grants such a fractional license, a music user must obtain a license from each of the co-owners (and/or from whoever the co-owners have assigned any portion of their rights) before the music user can play the work free from the threat of copyright infringement.

27.     PROs enter into license agreements with individuals who are composers, authors, and/or publishers of various songs.  The repertory of each PRO includes some works owned entirely by members or affiliates of that PRO, and some works that are co-owned with members or affiliates of other PROs.  Under governing copyright law and the grants of rights in the historic licenses secured by RMLC members from ASCAP and BMI, where songs are co-owned by affiliates of GMR and either or both of ASCAP and BMI, a radio station's license from ASCAP or BMI is sufficient to enable the station to publicly perform such co-owned works without a need to get a license from GMR.

28.     ASCAP and BMI blanket licenses to RMLC stations historically have been "full work" licenses, pursuant to which each PRO has provided a license to perform all of those works in its repertory without risk of infringement.  GMR has offered RMLC only a "fractional" license, which would require RMLC stations to obtain additional licenses from each of the copyright owners that own the remaining shares, either by obtaining a license from PROs that represent those other owners or by securing direct licenses from each of those other co-owners.

29.     ASCAP, founded in 1914, licenses the musical works of 585,000 songwriters, composers, and publishers, and has more than 10 million musical works in its repertory.  BMI, founded in 1939, licenses the works of more than 750,000 songwriters, composers, and publishers, and has nearly 12 million musical works in its repertory.  Both ASCAP and BMI are non-profit organizations.

30.     SESAC, founded in 1930 as the Society of European Stage Authors and Composers, is a self-described "selective organization" that, by design, has a much smaller number of affiliates and a much smaller repertory of works than either ASCAP or BMI.  SESAC operated as a niche PRO until it recently attempted to engage in anticompetitive actions that GMR now attempts to emulate.

**For More Than 70 Years, It Has Been Established That Unchecked PROs Harm Competition**

31.     For more than seventy years, it has been well established that performing rights organizations, without appropriate limitations, are inherently anticompetitive.  Composers, authors, and publishers of music are actual or potential horizontal competitors in licensing rights to their music.  In aggregating competing rightsholders' licensing decisions, PROs necessarily restrict price competition between horizontal competitors.  Safeguards in the form of antitrust law or regulatory oversight are crucial to prevent PROs from abusing the monopoly power that

can result from their acquiring licensing rights over competitors' copyrighted works.

32.     In 1941, the U.S. Department of Justice brought an antitrust lawsuit against ASCAP to challenge its blanket-licensing and related anticompetitive practices.   The Justice Department also sued BMI in the same year, similarly alleging antitrust violations on account of the PRO's blanket licensing.   Both ASCAP and BMI promptly signed consent decrees.   BMI entered into a new consent decree with the government in 1966.   Both ASCAP's and BMI's consent decrees with the Justice Department endure to this day.

33.     The Justice Department has modified those decrees from time to time since, most recently in 2001 for ASCAP and in 1994 for BMI.   As a result of those still-binding consent decrees, ASCAP and BMI: (i) must accept all qualified music composers and producers as affiliates; (ii) must not enter into exclusive contracts with their affiliates; (iii) must not insist that consumers take a blanket license; (iv) must offer consumers a genuine economic choice between a per-program license and a blanket license; (v) must offer consumers who apply in writing for licenses access to their repertories without exposure to copyright infringement, even in the absence of agreement on the license fees; and (vi) must accept the district court's determination of a reasonable fee in the event that they cannot agree upon a fee within 60 days.

### SESAC Agreed To Rate Regulation After RMLC Sued It and The Court Concluded that RMLC was Likely To Win

34.     A third PRO, SESAC, pursued a completely different business model than BMI and ASCAP.   Unlike those older PROs, SESAC structured itself as a for-profit entity.   SESAC, likely owing to its smaller size and historical niche focus, has not been subject to a government consent decree.   When the DOJ obtained the BMI and ASCAP decrees in the 1940s, SESAC did not control any meaningful bundle of copyrighted works and therefore did not exercise the type of monopoly power that BMI and ASCAP clearly possessed.   Unconstrained by any regulatory

decree, SESAC, after an ownership change, in the 1990s began to build an indispensable repertory of works, and subsequently eliminated price competition among its affiliates and willfully obtained a monopoly of its own. More specifically, under new management, SESAC in recent years began harming competition for essential copyrighted musical works when it began (1) strategically handpicking its affiliates so that it had exclusive licensing authority over a critical mass of musical works that U.S. radio stations could not reasonably avoid broadcasting; (2) obscuring the musical works within that repertory, making it impossible for broadcasters to determine with confidence what works were controlled by SESAC at any given point in time; (3) refusing to sell radio stations a non-blanket license; (4) threatening U.S. radio stations with hefty copyright infringement fines for broadcasting works in the SESAC repertory without a proper license; and (5) eliminating price competition between and among it and its affiliates by entering into *de facto* exclusive agreements with its affiliates that made it impractical for copyright owners to directly license their works to radio stations. Through those anticompetitive actions, SESAC leveraged its repertory of essential copyrighted works into immense monopoly power and began abusing that power by forcing U.S. radio stations to pay extortionist fees to avoid threatened copyright infringement fines.

35.    In October 2012, RMLC brought suit on behalf of its member radio stations to enjoin SESAC's violations of the antitrust laws, and to require SESAC to submit to a judicial rate-making procedure comparable to the one governing BMI and ASCAP under the DOJ consent decrees.   SESAC nevertheless persisted in its abusive practices during litigation by demanding radio stations enter into five-year contracts and imposing a massive and anticompetitive rate increase for its blanket license.  Stations that did not acquiesce in SESAC's demand by December 31, 2013 risked enterprise-destroying copyright infringement lawsuits.

36.     To prevent SESAC's supracompetitive rate increase from irreparably harming radio stations while litigation was pending, in November 2013, RMLC filed a motion to preliminarily enjoin SESAC from imposing those rate increases on RMLC's members. After a three-day evidentiary hearing, which included live testimony from fact witnesses and economic experts on both sides, U.S. Magistrate Judge Lynne A. Sitarski issued a report and recommendation concluding, among other things, that RMLC had shown a likelihood of successfully showing that SESAC violated Section 2 of the Sherman Act by monopolizing the market for the rights to publicly perform works in SESAC's repertory. *SESAC I*, 2013 WL 12114098, at *13-16.

37.     Although Judge Sitarski ultimately did not recommend issuing a preliminary injunction because she found that harm to radio stations from a rate increase could be compensated with money and therefore was not irreparable, in reaching her conclusion that RMLC had a likelihood of success on its Section 2 claim, she made several important findings. First, she concluded that SESAC's blanket license occupies its own product market, for which there are no substitutes. *Id.* at *10. Second, she found, as a matter of fact, "a radio station must buy a SESAC license" because the station cannot control all of the content it plays and cannot identify the songs in SESAC's repertory when SESAC makes it impractical to do so. *Id.* at *10, *19. Third, she found that the lack of a consent decree constraining SESAC from imposing supracompetitive prices on stations deprives consumers of the procompetitive benefits that a blanket license may produce. *Id.* at *18-19. The Court adopted Judge Sitarski's report and recommendation "in full" (except for one, non-material change to one paragraph). *See* Order, *Radio Music License Comm., Inc. v. SESAC Inc.*, Civ. A. No. 12-cv-5807 (E.D. Pa. Feb. 20, 2014), ECF No. 68.

14

38.    Following the preliminary injunction proceeding, the Court also denied SESAC's motion to dismiss. *See SESAC II*, 29 F. Supp. 3d at 502.  The Court found that the complaint "cogently portray[ed]" illegal monopolization in violation of Section 2 of the Sherman Act by alleging that "SESAC excludes competitors by obtaining a critical mass of must-have works, selling them exclusively in the blanket license format, discouraging direct licensing by refusing to offer carve-out rights and obscuring the works in its repertory." *Id.* at 501.

39.    Following the Court's denial of SESAC's motion to dismiss and the Court's adoption of Judge Sitarski's findings that RMLC was likely to succeed on its claim, in July 2015, RMLC and SESAC entered into a 20-year settlement agreement that prevents SESAC from imposing supracompetitive rates and restoring copyright owners' ability to competitively license their works directly to radio stations.  Under the agreement, SESAC and RMLC agreed to negotiate in good faith to set rates and licensing terms through the year 2037.  If negotiations fail, either party may elect to determine rates through binding arbitration, much like the rate court does under the consent decrees governing BMI and ASCAP.  Additionally, SESAC committed to provide greater transparency regarding the songs in its repertory and to cease entering into agreements with affiliates amounting to *de facto* exclusive licenses.

40.    SESAC engaged in a nearly identical course of anticompetitive conduct when licensing to U.S. television stations between 2007 and 2012.  SESAC settled allegations that those acts violated Sections 1 and 2 of the Sherman Act by paying $58.5 million to the television industry and by agreeing to an arbitration procedure to determine reasonable rates.  *See* Decl. in Supp. of Settlement, *Meredith Corp. v. SESAC LLC*, No. 09-cv-9177 (S.D.N.Y. Oct. 15, 2014), ECF No. 175, Ex. 1.  That settlement came after Judge Paul A. Engelmeyer of the Southern District of New York found evidence showing SESAC "engaged in an overall anti-competitive

course of conduct designed to eliminate meaningful competition to its blanket license," and monopolized the market for the performance rights to the music in its repertory. *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 196, 222 (S.D.N.Y. 2014).

41.     GMR now threatens to perpetrate the same harms to radio stations and competition that were the root of the RMLC and *Meredith* litigation against SESAC.

### GMR Has Copied SESAC's Unlawful Tactics

42.     GMR was founded in 2013 under the umbrella of Azoff MSG Entertainment, a joint venture between music-industry icon Irving Azoff's Azoff Music Management and the Madison Square Garden Company.  From its inception, GMR's goal has been to lure a relatively small but strategically selected group of coveted songwriters away from ASCAP and BMI with a promise to pay them at least 30% more than ASCAP, BMI (or, now, even SESAC) can pay them.  To fund this promise, GMR intends to force radio stations to pay exorbitant rates for licenses to the GMR repertory.  These are the same unlawful tactics that SESAC employed.

43.     GMR's management has consciously built a small but strategic client base of artists that radio stations cannot reasonably avoid playing to enable it to extract higher licensing fees.  Like SESAC, GMR intentionally affiliates with a smaller number of composers and publishers than does BMI or ASCAP so as to acquire maximum negotiating power with licensees, while requiring the minimum necessary affiliate royalty expense; thus, ensuring the maximum stream of profits into GMR coffers.

44.     GMR even copied SESAC's tactic of selecting executives.  In the decade prior to its litigation with RMLC, SESAC built its strategic repertory under the guidance of Pat Collins, who had a prior, longstanding tenure with ASCAP.  GMR similarly poached its Chief Executive, Randy Grimmett, from ASCAP, where he had served as an executive for 19 years.

45.     Guided by Grimmett's experience attracting popular artists to ASCAP and fueled by Azoff's public demands for larger artist royalty payments, GMR quickly amassed a bundle of an estimated 20,000 essential works, from approximately 100 songwriters.  That repertory includes works written or performed by stars Adele, Aerosmith, the Beatles, Bruno Mars, Jay-Z, Madonna, Pharrell Williams, Ryan Tedder, the Steve Miller Band, Taylor Swift, Tom Petty & The Heartbreakers, and U2, among many others.  In August 2016, Azoff described GMR's repertory as "a full roster of songwriters that nobody can, shall we say, comfortably exist without."

46.     Like SESAC had done, GMR also intentionally does not make it possible for radio stations to determine the necessary details about the works in its repertory.  Even if a station were willing to try to operate without using GMR's "must have" repertory, GMR does not provide radio stations with any reliable, transparent or timely way to determine, with confidence or any level of efficiency, which specific GMR works they would need to avoid playing at any given time in order to avoid the risk of copyright infringement.  GMR also does not identify which of its works it controls 100%, and which it licenses only fractionally but which are jointly controlled and licensable on a full-work basis from another PRO.  GMR also does not publicize (to radio stations or other licensees) information identifying who owns or controls the rights to perform the musical works embodied in new releases of sound recordings until weeks or months after release.  All of these actions make it effectively impossible for radio stations to avoid the risk of copyright infringement claims absent taking a license from GMR.

47.     Mimicking another SESAC tactic it employed before RMLC sued SESAC, GMR seeks to exploit the fact that it is currently the only PRO not subject to rate regulation (by decree or contract).  GMR lured its roster of "must have" songwriters from ASCAP and BMI with

promises of higher royalty payments (at least 30% higher) made possible because of the monopoly power derived from its bundle of essential works.  GMR knows that ASCAP, BMI and SESAC are powerless to compete with GMR for these affiliates, precisely because they are all rate-regulated to prevent anticompetitive abuses of their indisputable monopoly power. Because ASCAP, BMI and SESAC, by law and contract, cannot price gouge radio stations like GMR can do, ASCAP, BMI and SESAC lack the financial resources to meaningfully compete for affiliates with the unconstrained GMR.   The consent decrees and SESAC settlement agreement also impose other limitations on ASCAP, BMI and SESAC that allow the unregulated GMR to overpay its targeted affiliates, such as the fact that ASCAP, BMI and SESAC are each precluded from interfering with direct licensing by their affiliates.

48.     For example, in May 2016, ASCAP paid a $1.75 million fine to settle a contempt proceeding brought by the Department of Justice for ASCAP's violation of its consent decree. *See* U.S. Dep't of Justice, *Justice Department Settles Civil Contempt Claim against ASCAP for Entering into 150 Exclusive Contracts with Songwriters and Music Publishers* (May 12, 2016), *available    at*   https://www.justice.gov/opa/pr/justice-department-settles-civil-contempt-claim-against-ascap-entering-150-exclusive.  In order to try to compete more effectively for songwriter members, ASCAP had paid bonuses and incentives to a select subset of its members and, in order to protect that investment, had required those members to license their rights exclusively through ASCAP.  The DOJ concluded that this violated provisions in the consent decree that preclude any interference with a music user's right to directly license from the copyright owner without having to go through a PRO.  *See, e.g.*, Mem. in Supp. of United States' Unopposed Mot. to Enter Proposed Settlement Agreement & Order, *United States v. Am. Soc'y of Composers, Authors & Publishers*, Suppl. Case No. 41-1395 (DLC) (S.D.N.Y. May 12, 2016)

ECF No. 750. ASCAP had to void its exclusive contract provisions and pay a fine for its contempt. GMR's CEO Grimmett was at ASCAP and upon information and belief supervised the contracting practices that violated the consent decree.

49.   Prior to settling its lawsuit with RMLC, SESAC had also engaged in *de facto* exclusive dealing practices with affiliates that were designed to make it impractical for any radio station to obtain a direct license from any affiliate. These practices included refusing to offer carve-out rights to radio stations. SESAC knew that no economically rational station would directly license songs from a SESAC affiliate, unless the station received a discount off of SESAC's blanket license for those songs. Otherwise, the station would be paying twice for the rights to the same works. GMR is now doing the same thing. It does not offer carve-out rights, which effectively enforces *de facto* exclusive licensing arrangements with its affiliates.

**RMLC Seeks to Negotiate License Fees with PROs on Behalf of its Radio-Station Members and Has Attempted To Negotiate with GMR, Despite GMR's Abuses**

50.   Plaintiff RMLC is an association that represents the interests of the commercial radio industry with respect to obtaining public-performance-right licenses to copyrighted music. To this end, RMLC currently negotiates license fees with ASCAP and BMI, whose consent decrees provide for a definitive, time-tested, rate-setting process in federal court. RMLC likewise negotiates license fees with SESAC on behalf of RMLC's members, pursuant to a binding arbitration process required under a 20-year settlement agreement that resolved substantially similar claims to those alleged herein. RMLC seeks to obtain fair and reasonable license fees from PROs on behalf of radio stations, negotiates for per-program and blanket-license carve outs that allow stations to achieve further fee discounting, and aims to achieve the broadest possible licenses covering new-media applications, including HD multicasting and streaming. Approximately 10,000 terrestrial radio stations in the United States are currently

licensed in accordance with RMLC-negotiated industry licenses with ASCAP and BMI, and over 7,000 are participating in RMLC's first-ever binding rate arbitration with SESAC.

51.     GMR sought out RMLC to negotiate licensing terms and rates that could apply to RMLC's member pool of radio stations. In mid-2016, it became clear that GMR intended to perpetrate the exact harms that SESAC wrought on the industry, before SESAC agreed, in order to put a halt to RMLC's antitrust action, to subject itself to rate scrutiny for the next 20 years. In particular in the last two months, GMR has implicitly threatened to sue radio stations that do not quickly agree to its terms and purchase a license. GMR has emphasized January 1, 2017, as the deadline for obtaining a license because, as of that date, the stations' "licenses-in-effect" with ASCAP and BMI will cease to cover songs that have moved to GMR's repertory.

52.     Before joining GMR, all or virtually all of GMR's affiliates were members of ASCAP or BMI. In fact, the vast majority were affiliates of Grimmett's former firm ASCAP. When a writer or publisher withdraws from ASCAP or BMI, the PRO does not automatically lose the right to license radio stations for that writer's or publisher's works. If that were the case, stations that purchase ASCAP or BMI licenses would need to verify the contents of ASCAP or BMI's repertory every day to ensure they did not play a withdrawn work. To prevent that unmanageable situation, ASCAP and BMI have granted RMLC stations the right to continue to perform all works that were in PROs' repertories at the time their "licenses-in-effect" with RMLC were created, even if the artist or publisher purports to withdraw during the term of the RMLC license. Through this arrangement, radio stations have been able temporarily to perform a GMR affiliate's works, even without obtaining a GMR license, because the work is covered by the station's license-in-effect with the affiliate's prior PRO, *e.g.*, ASCAP or BMI. For a short time period, these licenses-in-effect have largely shielded radio stations from the risk of

infringing the works in GMR's repertory. But GMR has indicated to RMLC during the parties' licensing negotiations that, after these licenses-in-effect expire on December 31, 2016, GMR intends to pursue its remedies against radio stations that have not signed a license with GMR, meaning that stations without GMR licenses by January 1, 2017 will be at risk of potential infringement fines up to $150,000 per infringed work.

53.     While implicitly threatening litigation against stations that do not purchase a license, GMR demanded (and continues to demand) a supracompetitive price to perform its works. The DOJ noted in August that ASCAP and BMI charge "fees based roughly on their respective market share accounting for partial interests in the songs in their repertories." *See infra* ¶ 61. On information and belief, GMR's share of radio performances, based on a weighted percentage of total plays, is between 5% and 7.5%. GMR, by contrast, has demanded stations pay rates multiples higher than they would pay if ASCAP, BMI, or SESAC licensed the exact same number and quality of works: first, by calculating a "spin share" of U.S. radio music (i.e. the percentage of plays rather than the percentage of total works), and second, by multiplying that "spin share" by various undisclosed factors to create a claimed "value share" of roughly *double* (or more) its actual spin-share. GMR has also stated that it views its share as roughly 3x or 4x greater than SESAC, another PRO that collected a must-have set of works. Based on these assertions, GMR has demanded over $42 million for 2017 alone from a subset of RMLC's member stations representing only about 75-80% of total US radio revenues. That demand implies that GMR views its "value share" as more than 15% of U.S. radio. It is "take it or leave it" pricing fully divorced from market constraints.

54.     In addition, GMR only offers a fractional license. That means that, for a majority of the works within GMR's repertory, its blanket license would not protect a station from an

infringement lawsuit by the owners of the remaining fractions. Thus, even if a station pays for a GMR license, it still cannot play most of the works in GMR's repertory without fear of copyright infringement. So that means that GMR is demanding a much higher rate not only for fewer songs, but also for less (and uncertain) protection from an infringement lawsuit than would ever be possible under the rate-setting procedures that prevent the other three PROs from charging monopolistic prices.

55. To compound the problem, radio stations cannot confidently know which works are licensable by GMR at any given time, nor can they know what works they would need to avoid playing in order to avoid the risk of copyright infringement claims. Only an entity that wields tremendous monopoly power could compel radio stations to pay absurdly high prices for licenses of unknown scope and value. And that is exactly what GMR is doing to radio stations now.

56. GMR has also ratcheted up the supracompetitive nature of its prices by demanding annual rate increases on top of its already inflated base. The increases would occur regardless of whether GMR's repertory contained less frequently played works, or a smaller percentage of works controlled 100% by GMR.

57. In addition to these abusive pricing demands, during negotiations with RMLC, GMR also would not commit to allowing its affiliates to enter into direct licenses with radio stations; offering blanket-license carve outs for direct-licensing affiliates or for affiliates removed from stations' playlists; or offering per-program licenses or other alternatives to its blanket license.

58. In early November 2016, GMR definitively refused RMLC's offer to set an interim, reasonable royalty rate and have a neutral arbitrator set final rates.

59.     In sum, GMR refused to negotiate terms that would comply with core protections in the antitrust consent decrees and antitrust settlement agreement governing the other three PROs.  Nonetheless, because of the tremendous market power GMR wields, unless this Court issues the preliminary injunction that RMLC is seeking concurrently with this complaint, most radio stations will have no choice but to accede to GMR's demands before the end of the year because they cannot risk bankrupting themselves to defend copyright infringement claims.

**The DOJ Found that Fractional Licenses Like The Ones GMR Offers Do Not Provide Pro-Competitive Benefits**

60.     On the heels of SESAC's settlement agreement, the DOJ recently completed an investigation into the operation and effectiveness of the ASCAP and BMI consent decrees, and confronted the issue of whether those decrees permitted fractional-work licensing by ASCAP and BMI.  In 2014, both ASCAP and BMI requested various modifications to their consent decrees, and during its two-year investigation the DOJ examined the question of whether those decrees obligate ASCAP and BMI to offer full work licenses.

61.     The DOJ issued a statement regarding the closing of its investigation in August 2016, and concluded that the ASCAP and BMI consent decrees require the two PROs to offer only full work licenses to their repertories.  The DOJ declined to modify the consent decrees to allow either PRO to offer licenses that convey only fractional rights to the works in the ASCAP and BMI repertory and thus require licensees to obtain additional licenses to perform works only partially owned by each PRO's members or affiliates.  *See* U.S. Dep't of Justice, *Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees* at 3 (Aug. 4, 2016) ("DOJ Statement"), *available at* https://www.justice.gov/atr/file/882101/download.  The DOJ found that requiring ASCAP and BMI licenses to provide full-work licensing "is compelled by the language and intent of the

decrees and years of interpretations by federal courts." *Id.* at 11.  In particular, "only full-work licensing achieves the benefits that underlie the courts' descriptions of ASCAP's and BMI's licenses"—most notably, "allow[ing] the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations.*" *Id.* at 12 (quoting *BMI v. CBS, Inc.*, 441 U.S. 1, 21-22 (1979)).  The DOJ emphasized that fractional licenses offer none of these benefits, explaining "they would not provide *immediate* use of covered compositions; users would need to obtain additional licenses before using many of the covered compositions," and they "would *not* avoid the delay of additional negotiations, because users would need to clear rights from additional owners of fractional interests in songs" before performing any works in either PRO's repertories. *Id.*[1]

62.   GMR does not operate under a consent decree, and therefore it is not bound by the DOJ's finding that ASCAP or BMI must offer full-work licenses to the works in their repertories.  But the fact that GMR does not offer radio stations full-work blanket licenses drains its blanket licenses of the supposed efficiencies and pro-competitive benefits of ASCAP and BMI blanket licenses, while increasing rather than decreasing the aggregate number of required license transactions, thus increasing transactional inefficiency.  Coupled with the absence of a consent decree prohibiting GMR's *de facto* exclusive licensing practices, GMR's blanket license lacks the fundamental characteristics that allowed the ASCAP and BMI blanket licenses to survive antitrust scrutiny.

## GMR HAS WILLFULLY ACQUIRED A MONOPOLY OR, AT LEAST, IS INTENTIONALLY TRYING TO ACHIEVE A MONOPOLY

---

[1] BMI petitioned the Southern District of New York judge with jurisdiction over its decree for a declaratory judgment that the BMI consent decree did not require BMI to grant full-work licenses.  On September 16, 2016, the court granted BMI's request for declaratory relief.  The DOJ filed a notice of appeal on November 11, 2016.

63.     GMR has launched a sustained, anticompetitive campaign to create a bottleneck to essential copyrighted musical works.   Unconstrained by any regulatory decree or court-approved settlement agreement, GMR has built an indispensable repertory by strategically constructing its affiliate base, has eliminated price competition among its affiliates and has willfully obtained a monopoly.   Purporting to be the sole purveyor of rights to essential copyrighted works, GMR threatens to exploit and maintain this monopoly by forcing radio stations and other consumers to enter into licensing agreements, from which GMR imminently threatens to extract monopoly prices.   GMR's construction of an artificial bottleneck creates no off-setting benefits to consumers or to larger society.

64.     GMR has achieved a monopoly, or, at a minimum, is intentionally attempting to achieve a monopoly, through a carefully orchestrated strategy of exclusionary conduct.

65.     First, GMR makes it impractical, and in many cases impossible, for radio stations to avoid playing at least some music in GMR's repertory.   It accomplishes this goal in a number of ways:

a.     GMR handpicks and reaches agreement with its affiliates to ensure that its repertory encompasses both a broad spectrum of prominent music as well as a critical mass of exclusive (*i.e.*, wholly controlled) works, thus ensuring that it has licensing authority over music that radio stations and other consumers, as a practical matter, cannot avoid playing.

b.     GMR simultaneously (1) threatens radio stations and other consumers with huge copyright infringement fines for performing works in the GMR repertory without a license and (2) leaves radio stations unable to determine with reliability the works to which it has licensing authority.   GMR has stated publicly

that any business without a GMR license that plays works in its repertory could be vulnerable to $150,000 penalties for each song performed, and has indicated that it is prepared to pursue infringement actions to protect the interests of its affiliates. Yet GMR does not provide an accurate or complete list of works that fall in its repertory, or the ownership shares of those works, at any given period of time.

    c.    GMR's affiliates both understand and consent to the purpose of GMR's scheme—that is, to obtain and share among GMR and its affiliates supracompetitive fees that those affiliates could not otherwise obtain. These affiliates understand that each other affiliate's mutual participation is key to the success of GMR's anticompetitive conduct. Indeed, GMR itself publicly touts each new member that joins its scheme.

    d.    As a result of GMR's carefully orchestrated structure with its affiliates, radio stations have no choice but to obtain a license from GMR. GMR has publicly stated as much, explaining that ASCAP, BMI, and SESAC are separate and distinct from GMR, and that licenses with these other PROs do not grant a radio station authorization to publicly perform the copyrighted music of GMR's songwriters, composers, and publishers.

66.    Second, to avoid regulatory constraints of the kind that prevent ASCAP and BMI from using their positions as intermediaries to extract monopoly rents, GMR deliberately maintains a membership that is much smaller than those of ASCAP and BMI. As GMR's founder has explained, "ASCAP and BMI have hundreds of thousands of members. We'll probably have 100. . . . It's about how much market share those 100 control, and returning the

ability of those 100 to control what happens, especially with their digital licensing." By contracting with copyright holders of sufficiently prominent musical works as to be indispensable to consumers, but by limiting the number of its affiliates to create the false impression that GMR is a small player in the music industry, GMR has achieved or is likely to achieve a monopoly free of any consent decree.

67.     Third, to ensure that it is the monopoly seller of licenses to its affiliates' copyrighted music, GMR enters into *de facto* exclusive contracts with its members.  GMR accomplishes this exclusivity by preventing, as a practical matter, direct licensing between consumers and its members.  Specifically, GMR does not offer anything other than blanket licenses to radio stations, and does not offer either per-program or carve-out licenses.  Forced to purchase blanket licenses, radio stations have no incentive to enter into direct licensing agreements that would require them to pay twice for the same rights, nor to avoid playing the works of any individual GMR affiliates.

**GMR Has Achieved Or Is Likely To Achieve its Monopoly Through Exclusionary Practices**

68.     GMR has willfully acquired and/or imminently threatens to obtain monopoly power in the market for licensing the copyrighted musical works in its repertory.  It has not done so on the basis of growth or development as a consequence of a superior product, business acumen, or historic accident; it has done so by using its for-profit status to enable it to share monopoly rents with select affiliates.

69.     GMR has willfully acquired and/or imminently threatens to obtain monopoly power by effectively refusing to deal at any reasonable, market-based price with radio stations and other consumers that wish to purchase anything other than a fixed-fee blanket license.  GMR does not allow carve-out rights or offer per-program licenses, which makes it uneconomical for

consumers to acquire licenses directly from copyright holders. Its refusal to deal creates a monopoly bottleneck, through which GMR imminently threatens to charge monopoly prices.

70.     GMR has willfully acquired and/or imminently threatens to obtain monopoly power by entering into *de facto* exclusive contracts, and thus acquiring sole licensing rights to indispensable musical works. By restricting competition between the copyright holders of such works, GMR can and does threaten to charge monopoly prices, thus enabling GMR to pay its affiliates greater average royalties than the consent-decree-limited ASCAP and BMI, or settlement-agreement-constrained SESAC, can offer.

71.     GMR has willfully acquired and/or imminently threatens to obtain monopoly power because it has taken steps to assemble a "must have" catalog and to ensure that radio stations can never know, with any confidence, precisely which works are in the GMR repertory at any given time, and what GMR's licensing share of those works is at any given time.

## GMR'S MARKET POWER

### Relevant Product Market

72.     The relevant product market is licenses to the copyrighted musical compositions and performances in GMR's repertory. GMR has created a monopoly in this market by bundling a unique set of copyrighted musical works, for which, by its own admission, no adequate substitutes exist. By maintaining exclusive licensing authority over that bundle, GMR has created and imminently threatens to exploit bottleneck access to licenses covering those collectively essential musical works.

73.     By GMR's own telling, licenses sold by ASCAP, BMI, and SESAC are not reasonably interchangeable with those that GMR sells, and so GMR's repertory occupies its own market. A radio station cannot substitute a license from ASCAP, BMI, or SESAC for a license

from GMR because there are a critical number of works in GMR's repertory for which GMR controls 100% of the public performance rights (the "GMR exclusive works"). Even if a radio station were to obtain licenses from ASCAP, BMI, **and** SESAC, it still would not have the right to play the GMR exclusive works. Thus, a license from another PRO is not a substitute for a license from GMR and the other PROs are not in the same market as GMR.

74.     The only potential competitors to GMR for these exclusive works are GMR's own affiliates. By virtue of being members of the GMR cartel and as a result of GMR's exclusionary practices, however, those copyright holders will not or cannot compete with GMR. If GMR were to raise prices by five to ten percent above marginal cost, consumers of GMR licenses, including RMLC members, could not look to ASCAP's, BMI's, SESAC's, or others' licenses as substitutes. This is because GMR, by refusing to grant carve-out rights and per-program licenses, has exclusive rights to a critical number of musical works that terrestrial radio stations cannot, as a practical matter, avoid playing or—in the words of GMR's founder—"that nobody can . . . comfortably exist without." A critical number of musical works lying in GMR's repertory are therefore indispensable. Because ASCAP, BMI, and SESAC do not offer licenses to those essential copyrights (or will no longer once licenses-in-effect expire at the end of 2016), and GMR exercises *de facto* exclusive control over its affiliates' works, they do not constrain GMR's pricing power over those intellectual-property rights.

75.     Absent relief from this Court, radio stations will have little choice but to agree to a licensing agreement with GMR and to pay the extortionate rates that GMR is demanding. As GMR states publicly, an infringement suit is a course of action that GMR will pursue to protect the interests of its music creators and publishers, and any station that does not agree to its demands may be subject to statutory damages for $150,000 for at least each GMR exclusive

work performed. In its discussions with RMLC during the two months preceding this suit in particular, GMR has repeatedly indicated that, beginning January 1, 2017, it is prepared to take action against radio stations that play music in its repertory without a license from GMR.

76.     Supply-side substitution—entry into the market by potential competitors—does not constrain GMR's monopoly power because GMR has the *de facto* exclusive ability to license the essential musical works in its repertory. As GMR intends to share part of its monopoly profits with its affiliates, no other PRO can successfully lure significant numbers of GMR members away from GMR. In fact, the opposite is true, as industry observers have noted that GMR "has lured clients with the promise that it can wring royalties that are as much as 30 percent higher from radio stations and online outlets than they can get through ASCAP or BMI." As GMR's founder has stated, "We at GMR believe in higher rates." There is no effective prospect of competitive pricing pressure from the other existing PROs, because their rates are all regulated (ASCAP and BMI by consent decree; SESAC by settlement agreement). Moreover, even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts, the GMR cartel would remain in full effect so long as GMR maintained control over a critical mass of "must have" or "can't avoid" works. And because GMR could replace lost affiliates with new members that it lures away from other PROs, it could continue to acquire exclusive licensing rights over a critical mass of indispensable works even if some affiliates departed for a new entrant. There is little likelihood of GMR losing affiliates to existing PROs based on price; because ASCAP, BMI, and SESAC are price constrained, they cannot meaningfully compete with GMR for affiliates. And any potential new entrant would not be a substitute for a GMR license, in any event, because it would by definition have a different repertory of works. So it could not constrain GMR's prices for its own unique repertory.

Meaningful entry into the market of GMR-repertory works is therefore impossible, and cannot limit GMR's ability to charge monopoly prices.

**Relevant Geographic Market**

77.     The relevant geographic market is the United States.  GMR does not limit its sales to any one part of the country, but sells licenses to RMLC members and to other consumers all over the United States.

**GMR's Monopoly Power**

78.     **100-percent market share:**  As GMR possesses 100 percent of the relevant market, GMR has monopoly power.  GMR imminently threatens to exercise that power, and absent injunctive relief, will succeed in profitably selling at supracompetitive prices without suffering a loss of demand or a diversion of sales toward ASCAP, BMI, SESAC, or a third-party competitor.    As set forth above, barriers to entry are not just high, they are virtually insurmountable.

79.     **No Regulation, Consent Decree, Or Settlement Agreement Constrains GMR's Pricing:**  In obtaining exclusive rights to a critical mass of copyrighted musical works that are collectively indispensable, by offering consumers no option other than a blanket-license, and by imposing *de facto* exclusive-dealing requirements on its affiliates, GMR has acquired and/or imminently threatens to achieve a monopoly over the music in its repertory.   Unlike ASCAP, BMI, and SESAC, GMR is subject to no regulatory oversight or court-ordered settlement agreement that constrains its pricing power.  As a result, GMR can and will exercise unfettered monopoly power.

80.     **Entry Barriers Protect GMR's Monopoly:**  Entry barriers in the form of GMR's exclusive contracts and GMR's ability to share part of its monopoly profits with its cartel

affiliates enable it profitably to charge supracompetitive prices without being constrained by the threat of entry.

**Direct Evidence of GMR's Monopoly Power**

81.    GMR's demands during negotiations with RMLC are direct evidence of its monopoly power.  Before GMR acquired its repertory of essential works, RMLC member stations had the ability to play all or most of those works through their licenses with ASCAP and BMI.  Because of GMR's unlawful practices, radio stations are forced once again to license the same works, only this time for prices far greater than what ASCAP, BMI, or SESAC could charge.  The rate-setting procedures governing those PROs should ensure that their rates are competitive.  Instead of charging a comparable price for its license, GMR demands rates many multiples higher than stations would pay if any of the other PROs attempted to license the same quantity and quality of songs.  Writers and publishers sign with GMR specifically because GMR can charge a supracompetitive price and because they expect to receive a part of those monopoly rents in the form of royalty payments.  Despite GMR's demands of supracompetitive prices, the remaining PROs cannot undercut GMR because its repertory is without substitute.  Radio stations are also unable to shift their business entirely to the other PROs because (1) GMR's repertory contains a critical mass of essential works that stations must be able to play to stay competitive, (2) many stations do not have total control over the songs they play and thus may risk infringement from the inadvertent broadcast of music in the GMR repertory; (3) the exact contents of GMR's repertory at any given time are unknown so stations cannot even try to program around those songs, and (4) the risk of foregoing a license to the GMR repertory is the real and imminent threat of an infringement lawsuit.  Under those conditions, many RMLC member stations will have no choice but to purchase GMR's license at the supracompetitive

prices that GMR is demanding before January 1, 2017, and to continue to purchase that license every year at ever increasing prices until a court establishes a rate-setting procedure like the ones that govern ASCAP, BMI, and SESAC.

82. GMR's demanded yearly rate increases provide additional direct evidence of its monopoly power. During negotiations with RMLC, GMR negotiators demanded that stations' licensing rates increase in both 2018 and 2019. Those increases are monopoly rents unassociated with any warranted improvement in GMR's repertory or product offerings. For the reasons described above, U.S. radio stations will be forced to pay those rates, or risk being fined $150,000 per infringed work.

## GMR'S UNLAWFUL AND ANTICOMPETITIVE ACTIVITIES

83. GMR has engaged or imminently threatens to engage in a variety of illegal and anticompetitive practices, including price fixing and exclusionary conduct aimed at securing and maintaining monopoly power.

### GMR Fixes Prices to the Musical Compositions in its Repertory

84. But for GMR's exclusionary conduct, GMR's affiliates would have the ability through direct licenses to offer RMLC's members access to the same copyrighted works that GMR offers through a blanket license. GMR and its affiliates are therefore horizontal competitors within the meaning of the antitrust laws. Were they to compete with one another, the price of public-performance licenses would naturally fall and the quantity of such licenses sold would increase.

85. GMR and its affiliates have agreed to allow GMR to aggregate and sell rights to its affiliates' copyrighted music exclusively through blanket licenses, thus eliminating price competition among and between GMR and its members. By refusing to allow carve-out rights or

per-program licenses, GMR and its affiliates have agreed to make it uneconomical for consumers to negotiate direct licenses from the affiliates. This practice eliminates any price competition among GMR's affiliates, as well as between GMR and its affiliates.

86.     Other than to eliminate competition and obtain monopoly power, it is against GMR's affiliates' self-interest to force RMLC's members to enter into blanket licenses with GMR as the only practical option to obtain access to the affiliates' copyrighted works. The affiliates' unadulterated self-interest would lead them to maintain maximum flexibility to negotiate the best possible license fee for their work, including the ability to negotiate direct licenses with individual RMLC members.

87.     GMR therefore functions as a naked cartel, and the blanket-license fee that it imminently threatens to charge amounts to a form of price fixing between horizontal competitors. GMR's cartel pricing weakens any existing benefits of the ASCAP/BMI/SESAC paradigm and will not generate any off-setting benefits not already available in the marketplace; nor will regulation or competitive pressures constrain GMR's power over price.

## GMR Artificially Inflates the Value of Its Blanket License By Licensing The Fractional Works In Its Repertory As Though They Were Full Shares

88.     GMR exercises its monopoly power in order to extract inflated licensing fees that far exceed its affiliates' underlying ownership rights. It does so in two ways. First, GMR controls full public performance rights to only a small fraction of works in its repertory, but it only offers fractional licenses to a significant percentage of its repertory, meaning that a radio station cannot perform those works without obtaining additional licenses from other PROs and/or the co-owners of those works.

89.     Second, GMR does not provide radio stations a way to determine reliably which of the works in its repertory it licenses on full versus fractional bases at any given time. A radio

station that seeks access to GMR's indispensable repertory must therefore agree to pay extortionate royalty fees that vastly overstate the rights conferred on that licensee. If stations had a way to ascertain reliably at all times which of GMR's works in its repertory are fully versus fractionally licensed by GMR, a radio station could make the informed choice as to whether GMR's blanket royalty fee demands are justified. Because GMR does not provide this information in a reliable and up-to-date manner, a radio station cannot determine which works it can perform without a GMR license or without risking an infringement suit from an unknown co-owner, and must accede to GMR's royalty demands.

90.      GMR therefore threatens to leverage its price fixing and monopolistic scheme to extract above-market royalty payments from licensees, and obtaining a blanket license from GMR does not even entitle licensees the right to perform each covered work without risk of penalties for infringement. The fact that radio stations are forced to accede to GMR's rate demands without getting full benefits and without even being able to assess the true value of what they are buying is further direct evidence of GMR's immense monopoly power.

**GMR Has Entered Into Exclusive-Dealing Contracts**

91.      GMR enters into *de facto* exclusive contracts with its affiliates, thus foreclosing any direct licensing between consumers and its copyright-holder affiliates.

92.      Because GMR does not offer any viable alternative to its blanket license, no radio station has an incentive to acquire individual licenses directly from copyright holders or to reduce or eliminate plays of GMR affiliates' works. Absent a carve-out right, any direct license that a consumer acquired would have no effect on GMR's blanket-license fee, but would entail an additional royalty burden on the consumer. If radio stations purchase blanket licenses from GMR, therefore, they necessarily lack any incentive to acquire direct licenses from GMR

affiliates. As alleged in Paragraph 65, it is not possible for radio stations to obtain licenses directly from GMR affiliates and to forego dealing with GMR. Similarly, the lack of carve-out rights eliminates any economic incentive to avoid playing the works of less than all GMR affiliates (even if GMR offered a reliable means to determine what that would entail). By acquiring licensing rights over handpicked, indispensable musical works, and by foreclosing any direct licensing between its affiliates and consumers, or any prospect for a carve-out discount, GMR achieves *de facto* exclusive licensing rights.

**GMR Has Refused To Deal With Radio Stations On Other Than A Blanket Basis**

93. GMR has not offered to deal with RMLC members that wish to purchase music from its repertory other than on a blanket basis. GMR has ignored RMLC's request to negotiate for blanket-license carve-out rights or per-program licenses. GMR also will not deal with RMLC or its members unless those potential licensees pay monopolistic prices resulting from its anticompetitive conduct, as opposed to competitive prices. These refusals constitute an exclusionary practice, foster GMR's monopoly and quash competition.

## GMR HAS A SPECIFIC INTENT TO MONOPOLIZE
## THE RELEVANT MARKET

94. GMR has monopolized the market for copyrighted music in its repertory with the specific intent of securing monopoly power and charging supracompetitive prices. In refusing to deal with consumers who seek blanket-license carve-out rights or per-program licenses, in entering into *de facto* exclusive contracts with its affiliates, and in imminently threatening to extract monopoly rents from consumers, GMR has been motivated by neither efficiency nor any other procompetitive factor. GMR's principal objective is willfully to acquire and to maintain monopoly power. Indeed, GMR's founder has admitted that it has gathered a "full roster of songwriters that nobody can, shall we say, comfortably exist without," and that "[w]e at GMR

believe in higher rates." And GMR has been public about its intention to extract monopoly rents from licensees so that it can pay its affiliates at least 30% more than any other PRO.

95.     As alleged in Paragraphs 65 and 66, GMR strategically hand-picks a relatively small number of affiliates simultaneously to create an essential repertory of musical works and to maintain a sufficiently small profile to avoid regulatory oversight.   GMR undertakes these actions with the specific intent of achieving and maintaining a monopoly.

### INJURY TO COMPETITION

96.     GMR's price fixing and monopolization imminently threaten to cause serious harm to the competitive process.  If left unchecked, GMR's anticompetitive conduct will cause RMLC's members and other consumers to pay monopoly overcharges for musical compositions that would otherwise be available at competitive prices.   Such supracompetitive fees will generate unjustified wealth transfers from consumers to cartel members, and inefficiently distort behavior both in the market for GMR's repertory of copyrighted music and beyond.

**Higher Prices**

97.     By forming a cartel with its affiliate copyright holders, by creating a bottleneck to the copyrighted musical works in its repertory, and by ensuring that certain of the copyrighted works to which it has exclusive rights are indispensable to consumers, GMR has eliminated competition and achieved monopoly power.  GMR imminently threatens to exercise that power by extracting monopoly rents from RMLC members and from other consumers.  ASCAP and BMI charge "fees based roughly on their respective market share accounting for partial interests in the songs in their repertories." DOJ Statement at 11.  GMR's pricing demands differ from those competitive pricing practices in two important ways.  First, GMR demands prices far in excess of what stations would pay if the exact same works were held in the repertories of

ASCAP, BMI, or SESAC. In particular, GMR has demanded rates roughly *two to three times* the value of their share of copyrighted performances by unilaterally concluding that undisclosed factors make its repertory more valuable than if other PROs licensed the exact same songs. Those undisclosed factors, in fact, are merely the fact that GMR possesses monopoly power, and its tactics are nothing new. SESAC engaged in the same hold-up practices before agreeing to settle the antitrust lawsuit against it (after receiving an indication that it was likely to lose the suit) by submitting to a rate-setting procedure. Second, many songs in GMR's repertory are only partially licensed by GMR, and thus GMR's blanket license by itself offers the user no protection against infringement lawsuits with respect to those works.

98.    GMR also demands that radio stations' rates increase beyond these already supracompetitive levels. GMR threatens to lock in its monopoly profits for years to come by demanding that stations enter into licenses with rates that increase in both 2018 and 2019. Those increases are pure monopolist rents unassociated with any improvement in GMR's product.

99.    GMR's scheme threatens to lead to higher prices on an industry-wide level, far beyond GMR and its repertory. In recent months, RMLC has also sought to reach an agreement on license rates with other PROs; the PROs have made clear that they will try to extract higher license fees from radio stations, if those stations give in to GMR's demands and pay GMR's extortionate fees. In the ongoing RMLC/SESAC arbitration proceedings (as provided by the their settlement agreement), SESAC held GMR out as a model for its own rate demands and is seeking to compel production of GMR's license agreements. Moreover, ASCAP and BMI have sought "most-favored nation" or "reopener" clauses with RMLC in the event that RMLC's member stations agree to pay the demanded GMR royalty amounts. Indeed, BMI has stated that its preference is to wait until RMLC enters into an agreement with GMR so that it can use the

resulting fee as a benchmark in its rate court. Thus, if GMR succeeds in imposing its artificially inflated rates, radio stations could be forced to pay monopoly rents to these regulated PROs as well.

100.     Market prices that increase directly because of monopolization or attempted monopolization constitute a paradigmatic injury to competition.

## Restricted Consumer Choice

101.     GMR's monopoly scheme has allowed the company to secure exclusive rights to essential copyrighted musical works. Were it not for GMR's ongoing and imminently threatened antitrust violations, RMLC members and other consumers could instead obtain licenses to those works from alternative sources. GMR's antitrust violations have foreclosed potential competitors (including its own affiliates) from licensing indispensable copyrighted musical works, thus extinguishing consumer choice and injuring the competitive process.

102.     GMR's anticompetitive conduct has also limited consumer choice as to the form of license to copyrighted musical works. By providing radio stations with a Hobson's choice between a blanket license and no license from GMR at all, GMR denies consumers the option of per-program licenses, blanket carve-out rights, per-play licenses, or licenses solely for music appearing in commercial advertising. GMR's illegal behavior has deprived consumers of the choice that competition would have bestowed upon them.

## Reduction in Consumer Efficiency

103.     GMR's anticompetitive conduct also causes significant inefficiency because it only offers fractional licenses and does not control 100% of public performance rights for a significant percentage of its repertory. A radio station cannot immediately use these partially controlled compositions until it also obtains the additional licenses it needs from the co-owners

of those works or the PROs to which those co-owners have licensed their rights. GMR exacerbates this inefficiency because it does not reliably disclose which of its works it partially licenses at any given moment.

**ANTITRUST INJURY TO RMLC'S MEMBERS**

104. RMLC's members have suffered or imminently will suffer injury of the type that the antitrust laws were intended to prevent and that flows from that which makes GMR's acts unlawful.

105. Monopolization that eliminates competition between rivals and that causes consumers to pay supracompetitive prices epitomize the kind of injury that the antitrust laws were intended to prevent. Absent injunctive relief, RMLC's members will be forced either to attempt to remove an essential set of works from their playlists, causing significant business disruption and irreparable loss of goodwill and a reduction of choice to their own consumers, or to purchase licenses directly from GMR and pay monopoly prices on account of GMR's anticompetitive conduct. Moreover, absent injunctive relief, even if RMLC's members obtain licenses from GMR, those licenses would only confer partial public performance rights to many of the works in GMR's repertory and would require RMLC's members to obtain additional licenses to play those works or risk catastrophic infringement suits. RMLC's members' injury therefore flows from that which makes GMR's behavior unlawful. Absent an injunction, RMLC's members face an unabated imminent threat of continued future injury in the form of having to pay supracompetitive prices and being subjected to a risk of copyright infringement liability.

**ASSOCIATIONAL STANDING**

106. RMLC is a trade association whose objective is to achieve fair and reasonable

40

license fees from PROs (including ASCAP, BMI, SESAC, and GMR) on behalf of its radio station members. As such, RMLC has standing to bring the present action on behalf of its members.

107. RMLC's members consist of approximately 7,300 U.S. radio stations involved in the business of terrestrial radio broadcasting. Another 2,500 stations are "bound" by the terms of RMLC-negotiated licenses with ASCAP and BMI and, thereby, also pay RMLC court-mandated fees to assist with operational expenses. Some 7,300 radio stations are represented by RMLC in pending binding rate arbitration with SESAC. RMLC's membership is open to all U.S. terrestrial radio stations or groups of radio stations "under direct or indirect common control." RMLC's member stations pay dues to RMLC and have the right to resign their membership.

108. Many of RMLC's members face an imminent, concrete, and particularized injury in the form of being forced either to attempt to forego essential works or to contract with GMR and pay artificially high licensing fees for performance rights to the GMR repertory due to GMR's anticompetitive behavior. When radio stations lose the protection of their current ASCAP and BMI licenses-in-effect on January 1, 2017, they must either (1) purchase a license from GMR; (2) attempt to stop playing works in GMR's repertory, which is not an option for reasons discussed above; or (3) continue playing the works and face the imminent prospect of enterprise-threatening infringement lawsuits. When SESAC imposed the exact same Hobson's choice on RMLC's member stations only four years ago, Judge Sitarski recognized that "a radio station must buy a SESAC license." *SESAC I*, 2013 WL 12114098, at *10. The same is true here, where radio stations must purchase a GMR license before January 2017. As described above, GMR has consistently demanded prices far in excess of what a radio station would pay to license the same works at competitive prices from other PROs. GMR has demanded rates that

41

are not reasonably tethered to the quantity or quality of songs in its repertory; worse, many of those songs are partially licensed by GMR, which provides no assurance against the threat of infringement of those works at any price. Furthermore, GMR demands licenses that will increase in rate yearly, regardless of the quantity or quality of songs in GMR's repertory. RMLC's members face an imminent threat of harm as RMLC and its members currently negotiate possible licensing terms with GMR. If RMLC does not receive any relief, radio stations will have to choose between acceding to GMR's demands by entering into anticompetitive licensing agreements, attempting to remove essential works from their repertories (which is likely impossible) and suffering irreparable losses of customer goodwill, or risking suit for copyright infringement.

109.    Injunctive relief prohibiting GMR's anticompetitive conduct and establishing a negotiation process through which the parties could agree upon a fair and reasonable licensing fee would prevent continued injury to RMLC's members.

110.    This suit is germane to RMLC's purpose. RMLC has been negotiating licenses with PROs on behalf of the radio industry since 1935, when it was still a part of the National Association of Broadcasters, and negotiated the first industry-wide licensing agreement between ASCAP and radio stations. RMLC's mission statement declares that one of its objectives is "to achieve fair and reasonable license fees with the music licensing organizations . . . on behalf of radio stations." RMLC's bylaws also authorize it to negotiate licenses and "to perform such acts to accomplish its purposes as the Corporation may determine to be appropriate." Additionally, RMLC's corporate charter declares as the first of the "purposes for which the corporation is formed" "[t]o promote the common business interests of commercial radio stations . . . and, in

particular, to represent the interests of the commercial radio industry on music licensing matters."

111.   RMLC's claims do not require the individual participation of each of its members to obtain the relief that it seeks.  RMLC seeks only injunctive relief, not damages.  GMR has violated and imminently threatens to violate the antitrust laws by employing common licensing practices that affect virtually all of RMLC members.  RMLC can establish the illegality of these practices through evidence of GMR's conduct that is common to its members.

**COUNT I**
**Monopolization**
**in Violation of Section 2 of the Sherman Act**

112.   RMLC repeats and realleges each and every allegation of this complaint.

113.   GMR has willfully acquired and imminently threatens to maintain monopoly power in the market for licensing the copyrighted musical works in its repertory.  GMR has done so through a series of exclusionary practices that are capable of foreclosing, and that have in fact foreclosed, equally or more efficient competitors.

114.   By refusing to deal with radio stations other than by providing a blanket license with no per-program or carve-out alternatives, GMR forecloses licensing competition with other PROs and with its constituent affiliates.  Because of GMR's unlawful agreements with its affiliates, and because GMR does not reliably disclose the full content of its repertory or the ownership interests it possesses in each work in its repertory, RMLC's members have no practical or economically viable alternative to GMR's blanket license.  This refusal to deal has enabled GMR to acquire and threatens to allow GMR to entrench its monopoly in the licensing of music within its repertory.

115.    GMR has entered into *de facto* exclusive contracts with its affiliates that make it economically irrational for them to grant direct licenses to RMLC's members.  These exclusive contracts exclude competition in the licensing of the copyrighted works owned by GMR's affiliates and enhance GMR's monopoly power.

116.    GMR has abused and threatens to continue abusing its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, in order to obtain licensing agreements with RMLC's members at anticompetitive rates.

117.    Through its predatory campaign, GMR has violated Section 2 of the Sherman Act by willfully monopolizing the market for the copyrighted works within its repertory.

118.    GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.  Among other things, RMLC's members imminently must choose between attempting to forego essential musical works (which is likely impossible) and suffering the loss of customer goodwill, or contracting with GMR to pay higher fees for access to copyrighted works in the GMR repertory than they otherwise would have paid in the absence of GMR's unlawful conduct.

119.    An injunction is necessary to remedy the continuing violation.

## COUNT II
### Attempted Monopolization
### in Violation of Section 2 of the Sherman Act

120.    RMLC repeats and realleges each and every allegation of this complaint.

121.    GMR has attempted to monopolize the market for licensing the copyrighted musical works in its repertory by engaging in predatory and anticompetitive conduct with a specific intent to monopolize that market, and there is a dangerous probability that GMR will achieve monopoly power.

122.    GMR has engaged in a variety of predatory and anticompetitive conduct. It has strategically acquired rights to must-have works to ensure that radio stations must agree to its anticompetitive and predatory licensing demands. GMR has further destroyed competition by committing its affiliates to *de facto* exclusive licensing terms. At the same time, GMR does not reliably make available information for licensees to allow them to determine which works fall within GMR's repertory, or which works GMR licenses fully versus only partially. As a result, GMR has demanded and threatens to extract supracompetitive licensing fees far in excess of the actual value of its affiliates' aggregate share of public performances.

123.    GMR has displayed a specific intent to monopolize the market for licensing the copyrighted works in its repertory. None of its practices have any legitimate business justification other than to foreclose competition with other PROs and their affiliates and to extract supracompetitive licensing fees from radio stations that have no practical or viable alternative to accepting GMR's blanket license. GMR's practices are not related to any efficiency-enhancing goal. Instead, GMR has rejected various efficiency-enhancing alternatives to its blanket licenses such as carve-out rights or per-program licenses, and it does not permit its affiliates to directly license their works. The public admissions by GMR's founder that GMR has amassed a "full roster of songwriters that nobody can, shall we say, comfortably exist without," and that "[w]e at GMR believe in higher rates" only underscore GMR's specific intent to monopolize.

124.    To the extent GMR has not already achieved monopoly power, there is a dangerous probability that it imminently will do so. GMR has achieved a 100% market share in the relevant market for the works in its repertory, and it has also engaged in a variety of anticompetitive practices by creating a repertory of indispensable works that GMR refuses to

45

license except on a blanket basis.  GMR has ensured that there are insurmountable barriers to entering its market because it has engaged in practices designed to pay its affiliates more than any rate-regulated PRO can afford.  Radio stations face the imminent threat that GMR will be able successfully to exercise its market power by forcing them to enter into anticompetitive licensing agreements or suffer the devastating consequences of refusing such a license.

125.   GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.

126.   An injunction is necessary to remedy the continuing violation.

## RELIEF SOUGHT

WHEREFORE RMLC respectfully requests the following relief:

A.   That GMR's unlawful conduct be declared, adjudicated, and decreed a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.   That RMLC be awarded mandatory injunctive relief in the form of: (i) requiring GMR to issue licenses on application and to submit to a judicial rate-making procedure comparable to what the consent decrees regulating ASCAP's and BMI's behavior impose; (ii) establishing a process, during the judicial rate-making procedure, for the court to enter an appropriate order of disgorgement from GMR into a constructive trust of all moneys received from licensees above the judicially determined reasonable rate, and for distribution of that money pro rata to impacted radio stations, (iii) enjoining GMR from entering into *de facto* exclusive contracts with copyright holders; (iv) requiring GMR to make available economically viable alternatives to blanket licenses, such as per-program licenses,

46

blanket carve-out fees, and commercial-only licenses; and (v) requiring GMR to offer only full-work licenses.

C.    That RMLC be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

D.    That RMLC be awarded such additional relief as the Court may deem proper.

Dated: November 18, 2016

Peter J. Mooney
WHITE & WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Telephone: (215) 864-7164
Facsimile: (215) 789-7664
Email: mooneyp@whiteandwilliams.com

Margaret M. Zwisler (*pro hac vice* to be filed)
DC245951
Jennifer L. Giordano (*pro hac vice* to be filed)
DC496746
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-1092
Facsimile:  (202) 637-2201
Email:  Margaret.Zwisler@lw.com
Email:  Jennifer.Giordano@lw.com

Alfred C. Pfeiffer, Jr. (*pro hac vice* to be filed)
CA120965
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
Email:  Al.Pfeiffer@lw.com