UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL MUSIC RIGHTS, LLC,<br><br>Defendant. | Civil Action No. 16-6076<br><br><br>**FIRST AMENDED COMPLAINT** |

## SUMMARY OF CLAIMS

1.      Defendant Global Music Rights, LLC ("GMR") is a new performing rights organization ("PRO") that grants radio stations and other consumers the right to perform works that GMR claims are owned by the music composers, authors, and publishers who are its affiliates.  In reality, GMR is an unlawful monopolist that is deploying a calculated scheme to extort the U.S. commercial radio industry.  GMR implicitly threatened to start suing radio stations for copyright infringement unless they agreed to pay supracompetive rates for a license to play the copyrighted songs in GMR's repertory, so radio stations had no choice but to pay the rates that GMR unilaterally set and demanded.

2.      Although GMR has only been around since 2013, the fact that unregulated PROs, like GMR, violate the antitrust laws has been established for 75 years.  The two largest PROs, ASCAP and BMI, have been subject to judicially-monitored consent decrees since the U.S. Department of Justice ("DOJ") first sued them back in the 1940s.  Indeed, in August 2016, after

conducting a two-year investigation, the DOJ refused to amend the consent decrees after finding that they were still necessary to prevent the PROs from engaging in anticompetitive conduct. The third PRO, SESAC, succumbed to private rate regulation for the next 20 years after the radio industry sued it in 2012 for being a monopolist and this Court concluded that RMLC was likely to prevail on the merits. *See Radio Music License Comm., Inc. v. SESAC Inc.* ("*SESAC I*"), No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013); *Radio Music License Comm., Inc. v. SESAC, Inc.* ("*SESAC II*"), 29 F. Supp. 3d 487 (E.D. Pa. 2014).

3.     GMR brazenly seeks to do exactly what got ASCAP, BMI and SESAC into so much trouble; it is forcing the radio industry into paying exorbitant prices for a license to the musical works it claims are covered by its repertory, with a credible threat of financially ruinous copyright infringement litigation.  Plaintiff Radio Music License Committee ("RMLC") brings this action on behalf of its members, comprising thousands of U.S. radio stations, to stop GMR's illegal activity.

4.     GMR has been open and unapologetic about its unlawful objective.  It strategically hand-picked a critical mass of songwriters and publishers and lured them away from ASCAP and BMI with a promise to pay them at least 30% more than ASCAP or BMI could pay them, because ASCAP and BMI are constrained by their consent decrees (and SESAC is similarly constrained by private rate regulation).  GMR's goal was to create a small, but indispensable repertory of "must-have" musical works that radio stations, as a practical matter, could not avoid playing, so that those stations would have no choice but to purchase a license from GMR at whatever rate GMR demanded.  GMR accomplished its goal.  In the words of its founder, Irving Azoff:  "We have a full roster of songwriters that **nobody can, shall we say, comfortably exist without**."

2

5.    GMR has doubled-down on its scheme by taking extra steps to insulate itself from any attempt that a radio station might make to try to "comfortably exist without" a GMR license. Not only has GMR aggregated rights to a "must have" repertory, but GMR also does not enable radio stations to determine reliably what works are in its repertory at any given time. Thus, even where a station is willing to try to operate without using GMR's "must have" repertory, GMR does not make available a feasible and reliable method that radio stations can use to determine, with any level of confidence, what works they would need to avoid playing in order to operate without risk of copyright infringement.

6.    GMR also does not offer the kind of blanket license to all the works in their repertories—with certain pro-competitive, efficiency benefits—that ASCAP and BMI offer, and which were central to ASCAP's and BMI's ability to survive antitrust challenges (albeit subject to consent decree and court oversight). Worse, GMR only controls 100% performance rights for a small percentage of its works. For most works in its repertory, GMR offers only to license a "fractional" interest in the work, not the whole work. For those "fractional rights," a license from GMR does not give radio stations the right to perform the work; they still must obtain a separate license from each of the other copyright owners. But GMR is not upfront about this issue in its marketing. In marketing its license, GMR misrepresents the true value of the license by telling music users that the license allows them to play *all* of the songs in GMR's repertory without the need to obtain any other authorizations. That is false.

7.    There are still other works in GMR's repertory that are jointly owned by multiple copyright holders and each has the right to license the full work. But GMR is not transparent about this in its marketing either. Rather, GMR identifies lists of artists that it claims have songs in GMR's repertory, without making clear that some of those artists have jointly owned works

3

that radio stations may have the ability to play by virtue of their licenses with other PROs.  The band Anthrax, for example, publicly chastised GMR in an open letter in December 2016 for misrepresenting the extent to which Anthrax songs were in GMR's repertory.  Again, GMR's behavior is intentional and designed to insulate and grow its unlawful market power.  GMR does not tell radio stations, in any reliable, transparent way, which of its works it has the full right to license and which works it only offers to license "fractionally," at any given time.  Thus, radio stations have no way to determine what value, if any, a GMR license actually provides or whether they even truly need a license at all.  This obfuscation is all intentional.  GMR knows that if it were truly transparent about the works in its repertory, some radio stations may seek to avoid playing works that are not covered by their licenses from other PROs and thus conclude that they do not need to purchase a GMR license.  That, however, would be contrary to GMR's business model, so it has taken steps to make sure that stations cannot do so.

8.     Second, in its original complaint, RMLC alleged that GMR has entered into *de facto* exclusive licenses with its affiliates that, as a practical matter, prevent radio stations from obtaining copyright licenses directly from those affiliates because GMR does not offer any type of "carve out" from the price of its blanket license and thus it would be economically irrational for any radio station to enter into such a direct license.  But GMR apparently has now admitted that, unlike all the other PROs, it actually has express exclusive licenses with its affiliates— meaning that GMR and its affiliates have each agreed, by express contract, that the affiliate cannot enter into a direct license with radio stations.  Whether the contracts are expressly or *de facto* exclusive, they contribute improperly to GMR's immense monopoly power.

9.     Third, GMR has made clear that it will not offer RMLC members any form of license other than a blanket license.  It will not offer per-program licenses, adjustable fee blanket

licenses or any other alternatives to its blanket license. A radio station's ability to engage in direct license transactions with ASCAP and BMI affiliates (and ASCAP and BMI's ability to license only on a non-exclusive basis on behalf of their members) and the availability of these alternatives to blanket license structures, are characteristics central to those PROs' success in surviving antitrust challenges; but GMR licensing offers no such pro-competitive features.

10.     Because radio stations cannot know for certain whether particular musical works are in GMR's repertory at any given time or whether any works purportedly in GMR's repertory may be played without obtaining additional licenses before doing so, and because GMR has ensured that radio stations have no actual or, at a minimum, economically viable alternative to obtaining a blanket license from GMR, GMR improperly derives immense monopoly power from the bundle of copyrighted music in its repertory.

11.     GMR's creation of a bottleneck to public-performance-right licenses for the works in its repertory contributes no efficiency benefits of any kind. Instead, GMR has extracted and will continue to extract monopoly rents for copyrighted music that would otherwise be available at competitive rates.

12.     RMLC seeks an injunction for the benefit of RMLC's member stations so that GMR cannot continue to exercise monopoly power in contravention of U.S. antitrust laws and at the expense of RMLC's members.

**JURISDICTION, VENUE, AND STANDING**

13.     RMLC brings this action on behalf of its members pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin GMR's anticompetitive conduct and other violations of the law, and to recover the costs of this suit and reasonable attorneys' fees.

14.    This Court has subject-matter jurisdiction over the asserted claims under 28 U.S.C. § 1331 and 15 U.S.C. § 26.

15.    This Court has personal jurisdiction over GMR because GMR (i) has conducted business in Pennsylvania, including in this district; (ii) has had substantial contacts with Pennsylvania, including with this district; (iii) is engaged in a campaign of unlawful monopolization that has affected and will continue to affect businesses in Pennsylvania, including in this district; (iv) has purposefully directed its tortious activities at businesses in Pennsylvania, including in this district; and (v) the claims alleged arise of out GMR's contacts with Pennsylvania, including in this district.

16.    GMR engaged in activities with RMLC and with RMLC members with the intent and purpose of invoking the benefits and protections of Pennsylvania's laws by directing illegal monopolistic activity into the Commonwealth and this district, as evidenced by the following:

a)    During communications and meetings with RMLC before RMLC filed its original complaint on November 18, 2016, GMR believed that the RMLC was acting, and GMR intended for RMLC to act, as a representative of RMLC member stations.  As such, GMR intended for RMLC to convey GMR's anticompetitive threats and demands to RMLC's member stations, including stations located in Pennsylvania and this district, and RMLC had no choice but to do so;

b)    While GMR has been imposing its anticompetitive scheme on RMLC member stations, GMR has known that many of those stations are located in Pennsylvania, including in this district;

c)      More than 250 RMLC member stations are located in Pennsylvania, with approximately 50 of those located within this district.    Indeed, Philadelphia, located in this district, is the ninth largest radio market in the United States.    Thus, since before RMLC filed its original complaint, GMR has been knowingly and intentionally imposing a tortious anticompetitive scheme on hundreds of radio stations in Pennsylvania, including many in this district, and GMR's tortious scheme continues today;

d)      Before RMLC filed its original complaint, GMR specifically directed a written anticompetitive demand at RMLC member stations in this district, as well as in other districts throughout Pennsylvania and the United States;

e)      Before RMLC filed its original complaint, GMR made anticompetitive demands directly to the owners of radio stations located in Pennsylvania, and in this district;

f)      By way of example, GMR's Randy Grimmett has acknowledged that, before RMLC filed its original complaint, GMR conveyed its anticompetitive demands directly to RMLC via direct discussions with Eugene Levin, the Vice President, Treasurer, and Controller of Entercom Communications, as well as with John VerStandig, the owner of Verstandig Broadcasting, and Susanna Lowy, Senior Vice President and Deputy General Counsel of CBS Broadcasting on behalf of CBS Radio. Entercom is currently the fourth largest radio broadcasting company in the United States, is incorporated in Pennsylvania, and is headquartered in

7

Bala Cynwyd, Pennsylvania. CBS Radio is also one of the largest radio broadcasters in the United States; it owns and operates 117 radio stations, including ten in Pennsylvania (six of which are in Philadelphia). VerStandig Broadcasting is headquartered in Greencastle, Pennsylvania and operates three stations in the Commonwealth;

g)    Before RMLC filed its original complaint, GMR entered into an anticompetitive agreement to license at least 30 radio stations located in Pennsylvania that are owned or operated by iHeartMedia, including 14 stations located in this district. This contract has contributed to, and threatens to continue to contribute to, the unlawful monopolistic prices that GMR is imposing on other RMLC member stations. GMR has stated that the terms of its licensing arrangements with iHeartMedia stations permit these stations to take advantage of any remedies that the RMLC is able to obtain through this litigation;

h)    After RMLC filed its original complaint, GMR continued to pursue its tortious anticompetitive scheme against RMLC member stations, including against stations located in Pennsylvania and in this district;

i)    If RMLC had not filed its original complaint on November 18, 2016, many RMLC member stations, including stations located in this district would have been forced to capitulate to GMR's anticompetitive demands. This is proven by the fact that many RMLC member stations, including stations located in this district, subsequently had no choice but to sign the

anticompetitive interim license with GMR at the price that GMR unilaterally demanded, as described in paragraphs 60-62 below;

j)      The following stations, among others, ended up purchasing the interim license from GMR: (1) Entercom (on behalf of stations located in Pennsylvania), (2) Verstandig Broadcasting (on behalf of stations located in Pennsylvania); (3) Cumulus Media (on behalf of stations located in Pennsylvania and this district, including (i) WCTO-FM Cumulus Media Holdings Inc. (Easton, PA); (ii) WIOV-FM Cumulus Media Holdings Inc. (Ephrata, PA); (iii) WIOV-AM Cumulus Media Holdings Inc. (Berks, PA); (iv) WLEV-FM Cumulus Media Holdings Inc. (Allentown, PA)); (4) CBS Radio (on behalf of stations located in Pennsylvania and this district, including (i) WOGL-FM (Philadelphia, PA); (ii) WTDY-FM (Philadelphia, PA); and (iii) WXTU-FM (Philadelphia, PA)).

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), 15 U.S.C. § 22, and 15 U.S.C. § 26 because, during the relevant period, GMR transacted business in this district, because a substantial part of the events or omissions giving rise to this claim occurred in this district, and/or because GMR resides in this district. GMR has forced and will continue to force RMLC members that reside in this district (and elsewhere) to enter into unlawful and anticompetitive public-performance-right licenses and has forced and will continue to force those RMLC member stations to pay supracompetitive rates for those licenses.

## THE PARTIES

18.     Plaintiff RMLC is a 501(c)(6) non-profit corporation organized and existing under the laws of Tennessee, with a principal place of business at 1616 Westgate Circle, Brentwood, Tennessee, 37027.  RMLC's mission is to negotiate public-performance-right license fees with performing rights organizations for the benefit of its members and the commercial radio industry (some 10,000 radio stations).

19.     Defendant GMR is a for-profit limited liability company organized and existing under the laws of the state of Delaware and is registered as an LLC with the state of California, with a principal address of 1100 Glendon Avenue, Suite 2000, Los Angeles, California 90024. GMR's registered agent in Delaware is Paracorp Incorporated, 2140 S. Dupont Highway, Camden, Delaware 19934.  GMR's registered agent in California is Leeann Hard, 201 Santa Monica Boulevard, Suite 480, Santa Monica, CA 90401.

## BACKGROUND

### Performing Rights Organizations and the Licensing of Copyrighted Music

20.     The owners of copyrights over musical works enjoy certain exclusive rights, including the right: (1) to publicly perform their musical works, (2) to reproduce their works, and (3) to distribute copies or phonorecords of their works to the public.  Consumers who wish to use copyrighted musical works for any of these purposes, absent fair use or other exemption, must obtain the relevant copyright holder's permission.  Should they fail to secure a license, U.S. law provides for statutory damages of up to $150,000 *per infringed work.*

21.     Radio stations use a vast array of musical works.  They play feature music for the purpose of entertaining their listeners; they use sound bites as background material and as bridges between programming segments; they air third-party advertisements that may or may not

contain feature music; they introduce programs with musical themes; and they sometimes make use of ambient, or background, music, such as music broadcast during intermissions at live sporting events.

22.     To broadcast music without infringing intellectual-property rights, radio stations must obtain licenses.  Copyright holders have the right to directly license their works to radio stations, unless they have relinquished that right.  It also has been the practice in the music industry for decades for copyright holders to bestow licensing authority upon a common agent or society, which can negotiate with and grant permissions to music users on their behalf.  PROs have served this function in the music industry for a number of years, aggregating the rights to works and acting as intermediaries between consumers and copyright holders and purportedly offering "one-stop-shop" licenses for the public performance of groups of works.  For many years, there were only two major PROs for the U.S. music industry:  BMI and ASCAP.  A third PRO, SESAC, was a niche player and did not participate in major music markets until it recently embarked on an anticompetitive scheme similar to the one GMR—a recently formed fourth PRO—is now pursuing.

23.     Performing rights organizations can offer a range of different licenses to radio stations and other entities that publicly "perform" works.  The basic "blanket license" provides a licensee with the right to use any piece of music in the PRO's repertory without having to account for actual usage.  If a PRO charges a set periodic fee for such a license, "carve-out rights" (otherwise known as "adjustable-fee blanket licenses" or "AFBLs") would entitle licensees to discounts if they secure separate permissions directly from the copyright owners to musical works subsumed within the blanket license.  Another alternative license form known as a "per-program license" permits a licensee to use all songs in a PRO's repertory, but only for the

purpose of specific radio programming that is generally associated with an "all-talk" format. Fees for per-program licenses derive only from revenues associated with the relevant program, which fact allows radio stations to reduce their licensing costs by reducing the number of programs that make feature performances of music from a particular PRO's repertory.

24.      It is quite common that copyrighted musical works are co-owned by multiple copyright owners, such as where more than one person was involved in the composition or production of a song.  A default rule under copyright law provides that each joint author of a single work may grant a non-exclusive license to use the entire work without the consent of the other co-owners, provided that the licensor accounts for and pays over to his or her co-owners their pro-rata share of the proceeds.  But joint authors may depart from this default rule, and agree that each co-author will only license his or her fractional share of a single work.   In circumstances where a co-owner expressly grants such a fractional license, a music user must obtain a license from each of the co-owners (and/or from whoever the co-owners have assigned any portion of their rights) before the music user can play the work free from the threat of copyright infringement.

25.      PROs enter into license agreements with individuals who are composers, authors, and/or publishers of various songs.  The repertory of each PRO includes some works owned entirely by members or affiliates of that PRO, and some works that are co-owned with members or affiliates of other PROs.  Under governing copyright law and the grants of rights in the historic licenses secured by RMLC members from ASCAP and BMI, where songs are co-owned by affiliates of GMR and either or both of ASCAP and BMI, a radio station's license from ASCAP or BMI is sufficient to enable the station to publicly perform such co-owned works without a need to get a license from GMR.

26.     ASCAP and BMI blanket licenses to RMLC stations historically have been "full work" licenses, pursuant to which each PRO has provided a license to perform all of those works in its repertory without risk of infringement.   GMR has offered RMLC stations only a "fractional" license, which would require RMLC stations to obtain additional licenses from each of the copyright owners that own the remaining shares, either by obtaining a license from PROs that represent those other owners or by securing direct licenses from each of those other co-owners.

27.     ASCAP, founded in 1914, licenses the musical works of 585,000 songwriters, composers, and publishers, and has more than 10 million musical works in its repertory.  BMI, founded in 1939, licenses the works of more than 750,000 songwriters, composers, and publishers, and has nearly 12 million musical works in its repertory.  Both ASCAP and BMI are non-profit organizations.

28.     SESAC, founded in 1930 as the Society of European Stage Authors and Composers, is a self-described "selective organization" that, by design, has a much smaller number of affiliates and a much smaller repertory of works than either ASCAP or BMI.  SESAC operated as a niche PRO until it recently attempted to engage in anticompetitive actions that GMR now attempts to emulate.

**For More Than 70 Years, It Has Been Established That Unchecked PROs Harm Competition**

29.     For more than seventy years, it has been well established that performing rights organizations, without appropriate limitations, are inherently anticompetitive.   Composers, authors, and publishers of music are actual or potential horizontal competitors in licensing rights to their music.  In aggregating competing rightsholders' licensing decisions, PROs necessarily restrict price competition between horizontal competitors.  Safeguards in the form of antitrust

law or regulatory oversight are crucial to prevent PROs from abusing the monopoly power that can result from their acquiring licensing rights over competitors' copyrighted works.

30.     In 1941, the U.S. Department of Justice brought an antitrust lawsuit against ASCAP to challenge its blanket-licensing and related anticompetitive practices.  The Justice Department also sued BMI in the same year, similarly alleging antitrust violations on account of the PRO's blanket licensing.  Both ASCAP and BMI promptly signed consent decrees.  BMI entered into a new consent decree with the government in 1966.  Both ASCAP's and BMI's consent decrees with the Justice Department endure to this day.

31.     The Justice Department has modified those decrees from time to time since, most recently in 2001 for ASCAP and in 1994 for BMI.  As a result of those still-binding consent decrees, ASCAP and BMI: (i) must accept all qualified music composers and producers as affiliates; (ii) must not enter into exclusive contracts with their affiliates; (iii) must not insist that consumers take a blanket license; (iv) must offer consumers a genuine economic choice between a per-program license and a blanket license; (v) must offer consumers who apply in writing for licenses access to their repertories without exposure to copyright infringement, even in the absence of agreement on the license fees; and (vi) must accept the district court's determination of a reasonable fee in the event that they cannot agree upon a fee within 60 days.

**SESAC Agreed To Rate Regulation After RMLC Sued It and The Court Concluded that RMLC was Likely To Win**

32.     A third PRO, SESAC, pursued a completely different business model than BMI and ASCAP.  Unlike those older PROs, SESAC structured itself as a for-profit entity.  SESAC, likely owing to its smaller size and historical niche focus, has not been subject to a government consent decree.  When the DOJ obtained the BMI and ASCAP decrees in the 1940s, SESAC did not control any meaningful bundle of copyrighted works and therefore did not exercise the type

of monopoly power that BMI and ASCAP clearly possessed. Unconstrained by any regulatory decree, SESAC, after an ownership change, in the 1990s began to build an indispensable repertory of works, and subsequently eliminated price competition among its affiliates and willfully obtained a monopoly of its own. More specifically, under new management, SESAC in recent years began harming competition for essential copyrighted musical works when it began (1) strategically handpicking its affiliates so that it had exclusive licensing authority over a critical mass of musical works that U.S. radio stations could not reasonably avoid broadcasting; (2) obscuring the musical works within that repertory, making it impossible for broadcasters to determine with confidence what works were controlled by SESAC at any given point in time; (3) refusing to sell radio stations a non-blanket license; (4) threatening U.S. radio stations with hefty copyright infringement fines for broadcasting works in the SESAC repertory without a proper license; and (5) eliminating price competition between and among it and its affiliates by entering into *de facto* exclusive agreements with its affiliates that made it impractical for copyright owners to directly license their works to radio stations. Through those anticompetitive actions, SESAC leveraged its repertory of essential copyrighted works into immense monopoly power and began abusing that power by forcing U.S. radio stations to pay extortionist fees to avoid threatened copyright infringement fines.

33.     In October 2012, RMLC brought suit on behalf of its member radio stations to enjoin SESAC's violations of the antitrust laws, and to require SESAC to submit to a judicial rate-making procedure comparable to the one governing BMI and ASCAP under the DOJ consent decrees. SESAC nevertheless persisted in its abusive practices during litigation by demanding radio stations enter into five-year contracts and imposing a massive and anticompetitive rate increase for its blanket license. Stations that did not acquiesce in SESAC's

demand by December 31, 2013 risked enterprise-destroying copyright infringement lawsuits.

34.    To prevent SESAC's supracompetitive rate increase from irreparably harming radio stations while litigation was pending, in November 2013, RMLC filed a motion to preliminarily enjoin SESAC from imposing those rate increases on RMLC's members. After a three-day evidentiary hearing, which included live testimony from fact witnesses and economic experts on both sides, U.S. Magistrate Judge Lynne A. Sitarski issued a report and recommendation concluding, among other things, that RMLC had shown a likelihood of successfully showing that SESAC violated Section 2 of the Sherman Act by monopolizing the market for the rights to publicly perform works in SESAC's repertory. *SESAC I*, 2013 WL 12114098, at *13-16.

35.    Although Judge Sitarski ultimately did not recommend issuing a preliminary injunction because she found that harm to radio stations from a rate increase could be compensated with money and therefore was not irreparable, in reaching her conclusion that RMLC had a likelihood of success on its Section 2 claim, she made several important findings. First, she concluded that SESAC's blanket license occupies its own product market, for which there are no substitutes. *Id.* at *10. Second, she found, as a matter of fact, "a radio station must buy a SESAC license" because the station cannot control all of the content it plays and cannot identify the songs in SESAC's repertory when SESAC makes it impractical to do so. *Id.* at *10, *19. Third, she found that the lack of a consent decree constraining SESAC from imposing supracompetitive prices on stations deprives consumers of the procompetitive benefits that a blanket license may produce. *Id.* at *18-19. The Court adopted Judge Sitarski's report and recommendation "in full" (except for one, non-material change to one paragraph). *See* Order,

*Radio Music License Comm., Inc. v. SESAC Inc.*, Civ. A. No. 12-cv-5807 (E.D. Pa. Feb. 20, 2014), ECF No. 68.

36.    Following the preliminary injunction proceeding, the Court also denied SESAC's motion to dismiss. *See SESAC II*, 29 F. Supp. 3d at 502. The Court found that the complaint "cogently portray[ed]" illegal monopolization in violation of Section 2 of the Sherman Act by alleging that "SESAC excludes competitors by obtaining a critical mass of must-have works, selling them exclusively in the blanket license format, discouraging direct licensing by refusing to offer carve-out rights and obscuring the works in its repertory." *Id.* at 501.

37.    Following the Court's denial of SESAC's motion to dismiss and the Court's adoption of Judge Sitarski's findings that RMLC was likely to succeed on its claim, in July 2015, RMLC and SESAC entered into a 20-year settlement agreement that prevents SESAC from imposing supracompetitive rates and restoring copyright owners' ability to competitively license their works directly to radio stations. Under the agreement, SESAC and RMLC agreed to negotiate in good faith to set rates and licensing terms through the year 2037. If negotiations fail, either party may elect to determine rates through binding arbitration, much like the rate court does under the consent decrees governing BMI and ASCAP. Additionally, SESAC committed to provide greater transparency regarding the songs in its repertory and to cease entering into agreements with affiliates amounting to *de facto* exclusive licenses.

38.    SESAC engaged in a nearly identical course of anticompetitive conduct when licensing to U.S. television stations between 2007 and 2012. SESAC settled allegations that those acts violated Sections 1 and 2 of the Sherman Act by paying $58.5 million to the television industry and by agreeing to an arbitration procedure to determine reasonable rates. *See* Decl. in Supp. of Settlement, *Meredith Corp. v. SESAC LLC*, No. 09-cv-9177 (S.D.N.Y. Oct. 15, 2014),

ECF No. 175, Ex. 1. That settlement came after Judge Paul A. Engelmeyer of the Southern District of New York found evidence showing SESAC "engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license," and monopolized the market for the performance rights to the music in its repertory. *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 196, 222 (S.D.N.Y. 2014).

39.    GMR is now perpetrating, and threatens to continue to perpetrate, the same harms to radio stations and competition that were the root of the RMLC and *Meredith* litigation against SESAC.

**GMR Has Copied SESAC's Unlawful Tactics**

40.    GMR was founded in 2013 under the umbrella of Azoff MSG Entertainment, a joint venture between music-industry icon Irving Azoff's Azoff Music Management and the Madison Square Garden Company. GMR is owned by Azoff MSG Entertainment, Randy Grimmett, its Chief Executive Officer, and some of GMR's own songwriter-affiliates.

41.    From its inception, GMR's goal has been to lure a relatively small but strategically selected group of coveted songwriters away from ASCAP and BMI with a promise to pay them at least 30% more than ASCAP, BMI (or, now, even SESAC) can pay them. To fund this promise, GMR needs and intends to force radio stations to pay exorbitant rates for licenses to the GMR repertory. These are the same unlawful tactics that SESAC employed.

42.    GMR's management has consciously built a small but strategic client base of artists that radio stations cannot reasonably avoid playing to enable it to extract higher licensing fees. Like SESAC, GMR intentionally affiliates with a smaller number of composers and publishers than does BMI or ASCAP so as to acquire maximum negotiating power with licensees, while requiring the minimum necessary affiliate royalty expense; thus, ensuring the

maximum stream of profits into GMR coffers.  GMR has chosen to represent only a select, handpicked group of songwriters.  GMR is not willing to represent the vast majority of ASCAP, BMI and SESAC affiliates, even if those affiliates want to join GMR.

43.    GMR even copied SESAC's tactic of selecting executives.  In the decade prior to its litigation with RMLC, SESAC built its strategic repertory under the guidance of Pat Collins, who had a prior, longstanding tenure with ASCAP.  GMR similarly poached its Chief Executive, Randy Grimmett, from ASCAP, where he had served as an executive for 19 years.

44.    Guided by Grimmett's experience attracting popular artists to ASCAP and fueled by Azoff's public demands for larger artist royalty payments, GMR quickly amassed a bundle of more than 26,000 essential works, from more than 70 songwriters.  That repertory includes works written or performed by stars Adele, Aerosmith, the Beatles, Bruno Mars, Jay-Z, Madonna, Pharrell Williams, Ryan Tedder, the Steve Miller Band, Taylor Swift, Tom Petty & The Heartbreakers, and U2, among many others.  In August 2016, Azoff described GMR's repertory as "a full roster of songwriters that nobody can, shall we say, comfortably exist without."

45.    Like SESAC had done, GMR also intentionally does not make it possible for radio stations to determine the necessary details about the works in its repertory.  Even for those few stations that may be willing to try to operate without using GMR's "must have" repertory, GMR does not provide any reliable, transparent or timely way to determine, with confidence or any level of efficiency, which specific GMR works they would need to avoid playing at any given time in order to avoid the risk of copyright infringement.  GMR makes clear that its repertory changes on a continual basis.  Indeed, it is continuing to add new artists.  For example, it announced the signing of the Prince catalog in January 2017 after RMLC filed its original

complaint. GMR also makes clear that there may be delays in reporting its covered works, as well as inaccuracies in the information that it provides. GMR refuses to provide any guarantee or warranty concerning the accuracy, completeness, timeliness or reliability of the repertory information that it provides and tells music users that they proceed at their own risk of copyright infringement if they try to rely on GMR's repertory information. GMR also does not identify which of its works it controls 100%, and which it licenses only fractionally but which are jointly controlled and licensable on a full-work basis from another PRO. GMR also does not publicize (to radio stations or other licensees) information identifying who owns or controls the rights to perform the musical works embodied in new releases of sound recordings until weeks or months after release. All of these actions make it effectively impossible for at least the vast majority of radio stations to avoid the risk of copyright infringement claims absent taking a license from GMR. Even the few stations that may try to avoid a GMR license by trying to avoid GMR music can never have complete confidence due to GMR's failure to provide accurate and up-to-date data, and thus operate under a continuously looming infringement threat.

46. Mimicking another SESAC tactic it employed before RMLC sued SESAC, GMR seeks to exploit the fact that it is currently the only PRO not subject to rate regulation (by decree or contract). GMR lured its roster of "must have" songwriters from ASCAP and BMI with promises of higher royalty payments (at least 30% higher) made possible because of the monopoly power derived from its bundle of essential works. GMR knows that ASCAP, BMI and SESAC are powerless to compete with GMR for these affiliates, precisely because they are all rate-regulated to prevent anticompetitive abuses of their indisputable monopoly power. Because ASCAP, BMI and SESAC, by law and contract, cannot price gouge radio stations like GMR can do, ASCAP, BMI and SESAC lack the financial resources to meaningfully compete

for affiliates with the unconstrained GMR. The consent decrees and SESAC settlement agreement also impose other limitations on ASCAP, BMI and SESAC that allow the unregulated GMR to overpay its targeted affiliates, such as the fact that ASCAP, BMI and SESAC are each precluded from interfering with direct licensing by their affiliates.

47.    For example, in May 2016, ASCAP paid a $1.75 million fine to settle a contempt proceeding brought by the Department of Justice for ASCAP's violation of its consent decree. *See* U.S. Dep't of Justice, *Justice Department Settles Civil Contempt Claim against ASCAP for Entering into 150 Exclusive Contracts with Songwriters and Music Publishers* (May 12, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-settles-civil-contempt-claim-against-ascap-entering-150-exclusive. In order to try to compete more effectively for songwriter members, ASCAP had paid bonuses and incentives to a select subset of its members and, in order to protect that investment, had required those members to license their rights exclusively through ASCAP. The DOJ concluded that this violated provisions in the consent decree that preclude any interference with a music user's right to directly license from the copyright owner without having to go through a PRO. *See, e.g.*, Mem. in Supp. of United States' Unopposed Mot. to Enter Proposed Settlement Agreement & Order, *United States v. Am. Soc'y of Composers, Authors & Publishers*, Suppl. Case No. 41-1395 (DLC) (S.D.N.Y. May 12, 2016) ECF No. 750. ASCAP had to void its exclusive contract provisions and pay a fine for its contempt. GMR's CEO Grimmett was at ASCAP and upon information and belief supervised the contracting practices that violated the consent decree.

48.    Prior to settling its lawsuit with RMLC, SESAC had also engaged in *de facto* exclusive dealing practices with affiliates that were designed to make it impractical for any radio station to obtain a direct license from any affiliate. These practices included refusing to offer

21

carve-out rights to radio stations. SESAC knew that no economically rational station would directly license songs from a SESAC affiliate, unless the station received a discount off of SESAC's blanket license for those songs. Otherwise, the station would be paying twice for the rights to the same works. GMR is now doing either the same thing or something even worse. It is either *expressly* prohibiting direct licensing by contract or, at a minimum, it is ensuring *de facto* exclusivity by refusing to offer carve-out rights. As the ASACP example illustrates, ASCAP, BMI and SESAC cannot compete with GMR for affiliates because, in order to avoid antitrust violations, they operate under legal business constraints that GMR currently does not.

## RMLC Seeks to Negotiate License Fees with PROs on Behalf of its Radio-Station Members and Has Attempted To Negotiate with GMR, Despite GMR's Abuses

49.     Plaintiff RMLC is an association that represents the interests of the commercial radio industry with respect to obtaining public-performance-right licenses to copyrighted music. To this end, RMLC currently negotiates license fees with ASCAP and BMI, whose consent decrees provide for a definitive, time-tested, rate-setting process in federal court. RMLC likewise negotiates license fees with SESAC on behalf of RMLC's members, pursuant to a binding arbitration process required under a 20-year settlement agreement that resolved substantially similar claims to those alleged herein. RMLC seeks to obtain fair and reasonable license fees from PROs on behalf of radio stations, negotiates for per-program and blanket-license carve outs that allow stations to achieve further fee discounting, and aims to achieve the broadest possible licenses covering new-media applications, including HD multicasting and streaming. Approximately 10,000 terrestrial radio stations in the United States are currently licensed in accordance with RMLC-negotiated industry licenses with ASCAP and BMI, and over 7,000 are participating in RMLC's first-ever binding rate arbitration with SESAC.

50.     GMR sought out RMLC to negotiate licensing terms and rates that could apply to RMLC's member pool of radio stations.  It became clear that GMR intended to perpetrate the exact harms that SESAC wrought on the industry, before SESAC agreed, in order to put a halt to RMLC's antitrust action, to subject itself to rate scrutiny for the next 20 years.  In particular in the two months preceding RMLC's original complaint, GMR implicitly threatened to sue radio stations that did not quickly agree to its terms and purchase a license.  GMR emphasized January 1, 2017, as the deadline for obtaining a license because, as of that date, the stations' "licenses-in-effect" with ASCAP and BMI would cease to cover songs that had moved to GMR's repertory.

51.     Before joining GMR, all or virtually all of GMR's affiliates were members of ASCAP or BMI.  In fact, the vast majority were affiliates of Grimmett's former employer ASCAP.  When a writer or publisher withdraws from ASCAP or BMI, the PRO does not automatically lose the right to license radio stations for that writer's or publisher's works.  If that were the case, stations that purchase ASCAP or BMI licenses would need to verify the contents of ASCAP or BMI's repertory every day to ensure they did not play a withdrawn work.  To prevent that unmanageable situation, ASCAP and BMI granted RMLC stations the right to continue to perform all works that were in PROs' repertories at the time their "licenses-in-effect" with RMLC were created, even if the artist or publisher purports to withdraw during the term of the RMLC license.  Through this arrangement, radio stations were able temporarily to perform a GMR affiliate's works, even without obtaining a GMR license, because the work was covered by the station's license-in-effect with the affiliate's prior PRO, *e.g.*, ASCAP or BMI.  For a short time period, these licenses-in-effect largely shielded radio stations from the risk of infringing the works in GMR's repertory.  But GMR indicated to RMLC during the parties' licensing negotiations that, after these licenses-in-effect expired on December 31, 2016, GMR intended to

pursue its remedies against radio stations that have not signed a license with GMR, meaning that stations without GMR licenses by January 1, 2017 would be at risk of potential infringement fines up to $150,000 per infringed work.

52.     While implicitly threatening litigation against stations that do not purchase a license, GMR demanded (and continues to demand) a supracompetitive price to perform its works. The DOJ noted in August that ASCAP and BMI charge "fees based roughly on their respective market share accounting for partial interests in the songs in their repertories." *See infra* ¶ 65. On information and belief, GMR's share of radio performances, based on a weighted percentage of total plays, is between 5% and 7.5%. GMR, by contrast, has demanded stations pay rates multiples higher than they would pay if ASCAP, BMI, or SESAC licensed the exact same number and quality of works: first, by calculating a "spin share" of U.S. radio music (i.e. the percentage of plays rather than the percentage of total works), and second, by multiplying that "spin share" by various undisclosed factors to create a claimed "value share" of roughly *double* (or more) its actual spin-share. GMR has also stated that it views its share as roughly 3x or 4x greater than SESAC, another PRO that collected a must-have set of works. Based on these assertions, GMR demanded over $42 million for 2017 alone from a subset of RMLC's member stations representing only about 75-80% of total US radio revenues. (At that time, GMR had already signed a license agreement with iHeartMedia, the largest radio broadcaster in the U.S., with over 850 radio stations and representing an estimated 25% of radio industry revenues.) GMR's demand to RMLC implies that GMR views its "value share" as more than 15% of U.S. radio. It is "take it or leave it" pricing fully divorced from market constraints.

53.     In addition, GMR only offers a fractional license. That means that, for a majority of the works within GMR's repertory, its blanket license would not protect a station from an

infringement lawsuit by the owners of the remaining fractions. Thus, even if a station pays for a GMR license, it still cannot play most of the works in GMR's repertory without fear of copyright infringement. So that means that GMR is demanding a much higher rate not only for fewer songs, but also for less (and uncertain) protection from an infringement lawsuit than would ever be possible under the rate-setting procedures that prevent the other three PROs from charging monopolistic prices.

54.     To compound the problem, radio stations cannot confidently know which works are licensable by GMR at any given time, nor can they know, with any confidence, what works they would need to avoid playing in order to avoid the risk of copyright infringement claims. Only an entity that wields tremendous monopoly power could compel radio stations to pay absurdly high prices for licenses of unknown scope and value. And that is exactly what GMR is doing to radio stations now.

55.     GMR also ratcheted up the supracompetitive nature of its prices by demanding annual rate increases on top of its already inflated base. The increases would occur regardless of whether GMR's repertory contained less frequently played works, or a smaller percentage of works controlled 100% by GMR.

56.     In addition to these abusive pricing demands, during negotiations with RMLC, GMR also would not commit to allowing its affiliates to enter into direct licenses with radio stations; offering blanket-license carve outs for direct-licensing affiliates or for affiliates removed from stations' playlists; or offering per-program licenses or other alternatives to its blanket license.

57.     In early November 2016, GMR definitively refused RMLC's offer to set an interim, reasonable royalty rate and have a neutral arbitrator set final rates.

58.     In sum, GMR refused to negotiate terms that would comply with core protections in the antitrust consent decrees and antitrust settlement agreement governing the other three PROs.  Nonetheless, because of the tremendous market power GMR wields, GMR's refusal left RMLC no choice but to file this lawsuit and to seek emergency preliminary injunctive relief before the December 31, 2016 deadline.  RMLC did so on November 18, 2016.

59.     When RMLC filed its original complaint on November 18, 2016, it said that, unless this Court issued the preliminary injunction that RMLC was seeking concurrently with the complaint, most radio stations would have no choice but to accede to GMR's demands because they could not risk bankrupting themselves to defend copyright infringement claims.  And that is what happened.

60.     On November 23, 2016, the Court referred RMLC's preliminary injunction motion against GMR to Magistrate Judge Sitarski for an evidentiary hearing.  Magistrate Judge Sitarski promptly ordered the parties to try to agree on a way to resolve the issues raised by the preliminary injunction motion before the December 31 deadline.  ECF No. 9.  To obviate RMLC's pending preliminary injunction motion, GMR ultimately agreed to offer radio stations an interim license that would last for nine months while this litigation plays out, but that would not prejudice either side (nor RMLC member stations) from seeking relief based on a claim that the interim license rates are too high or too low.  RMLC and GMR expressly agreed that despite the agreement, they each "reserve their respective right to seek a retroactive fee adjustment in future licenses or as a result of the current litigations."  GMR unilaterally dictated the price for the interim license (it was not subject to negotiation) and GMR would only agree to offer the license on the condition that RMLC agreed to withdraw its motion for preliminary injunction.

61.     On December 24, 2016, RMLC announced to its members the terms of the interim license that GMR had agreed to offer them, and thereafter withdrew its preliminary injunction motion without prejudice.  Under the terms of the interim license, GMR gave radio stations until January 31, 2017 to sign up for the license and stated that it would not pursue copyright infringement claims against any stations before January 31.  Lacking any choice, RMLC member stations were forced to accept GMR's unilaterally-dictated terms for that interim license, and many purchased the interim license.  Still other RMLC member stations contacted GMR before January 31 in an effort to purchase the interim license, but GMR did not respond to them to them before January 31.  For stations that did not purchase an interim license, GMR continues to demand supracompetitive rates for a non-interim license.

62.     The price that GMR unilaterally dictated for the interim license, and the price that RMLC's member stations are currently paying for that interim license is supracompetitve and is a direct result of GMR's unlawful monopoly power.  However, pursuant to the agreement between the parties to settle RMLC's motion for preliminary injunction, RMLC's member stations are not permitted to pursue damages arising out of the interim license at this time.  As the parties agreed, all RMLC member stations may do so later, if as a result of this litigation, the price of the interim license is determined to have been too high as the product of GMR's unlawful exercise of its monopoly power.

63.     Apart from the interim license, more than 1,100 radio stations across the country owned by iHeartMedia and Townsquare Media (both members of the RMLC) have signed longer-term, non-interim licenses with GMR.  GMR signed those license agreements before GMR offered the interim license to the rest of RMLC's members on December 24, 2016.  At least the iHeartMedia agreement affected the prices that GMR demanded from radio stations

before RMLC filed its original complaint, in that it caused them to be even higher. Both agreements affected the prices that GMR unilaterally dictated for its interim license, and both agreements will continue to cause the unlawful monopoly prices that GMR demands from other RMLC member stations to be even higher. GMR has stated that the terms of both the iHeart and Townsquare contracts contain provisions that would permit both iHeart and Townsquare to obtain the benefits of any remedies that RMLC is able to achieve through this lawsuit.

**The DOJ Found that Fractional Licenses Like The Ones GMR Offers Do Not Provide Pro-Competitive Benefits**

64.     On the heels of SESAC's settlement agreement, the DOJ recently completed an investigation into the operation and effectiveness of the ASCAP and BMI consent decrees, and confronted the issue of whether those decrees permitted fractional-work licensing by ASCAP and BMI. In 2014, both ASCAP and BMI requested various modifications to their consent decrees, and during its two-year investigation the DOJ examined the question of whether those decrees obligate ASCAP and BMI to offer full work licenses.

65.     The DOJ issued a statement regarding the closing of its investigation in August 2016, and concluded that the ASCAP and BMI consent decrees require the two PROs to offer only full work licenses to their repertories. The DOJ declined to modify the consent decrees to allow either PRO to offer licenses that convey only fractional rights to the works in the ASCAP and BMI repertory and thus require licensees to obtain additional licenses to perform works only partially owned by each PRO's members or affiliates. *See* U.S. Dep't of Justice, *Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees* at 3 (Aug. 4, 2016) ("DOJ Statement"), *available at* https://www.justice.gov/atr/file/882101/download. The DOJ found that requiring ASCAP and BMI licenses to provide full-work licensing "is compelled by the language and intent of the

decrees and years of interpretations by federal courts." *Id.* at 11.  In particular, "only full-work licensing achieves the benefits that underlie the courts' descriptions of ASCAP's and BMI's licenses"—most notably, "allow[ing] the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations.*" *Id.* at 12 (quoting *BMI v. CBS, Inc.*, 441 U.S. 1, 21-22 (1979)).  The DOJ emphasized that fractional licenses offer none of these benefits, explaining "they would not provide *immediate* use of covered compositions; users would need to obtain additional licenses before using many of the covered compositions," and they "would *not* avoid the delay of additional negotiations, because users would need to clear rights from additional owners of fractional interests in songs" before performing any works in either PRO's repertories. *Id.*[1]

66.     GMR does not operate under a consent decree, and therefore it is not bound by the DOJ's finding that ASCAP or BMI must offer full-work licenses to the works in their repertories.  But the fact that GMR does not offer radio stations full-work blanket licenses drains its blanket licenses of the supposed efficiencies and pro-competitive benefits of ASCAP and BMI blanket licenses, while increasing rather than decreasing the aggregate number of required license transactions, thus increasing transactional inefficiency.  Coupled with the absence of a consent decree prohibiting GMR's express and/or *de facto* exclusive licensing practices, GMR's blanket license lacks the fundamental characteristics that allowed the ASCAP and BMI blanket licenses to survive antitrust scrutiny.

---

[1] BMI petitioned the Southern District of New York judge with jurisdiction over its decree for a declaratory judgment that the BMI consent decree did not require BMI to grant full-work licenses.  On September 16, 2016, the court granted BMI's request for declaratory relief.  The DOJ filed a notice of appeal on November 11, 2016.  That appeal is currently pending.

## GMR HAS WILLFULLY ACQUIRED A MONOPOLY OR,
## AT LEAST, IS INTENTIONALLY TRYING TO ACHIEVE A MONOPOLY

67.     GMR has launched a sustained, anticompetitive campaign to create a bottleneck to essential copyrighted musical works.   Unconstrained by any regulatory decree or court-approved settlement agreement, GMR has built an indispensable repertory by strategically constructing its affiliate base, has eliminated price competition among its affiliates and has willfully obtained a monopoly.   Purporting to be the sole purveyor of rights to essential copyrighted works, GMR has exploited and maintained this monopoly by forcing radio stations and other consumers to enter into licensing agreements, from which GMR has extracted and will continue to extract monopoly prices.   GMR's construction of an artificial bottleneck creates no off-setting benefits to consumers or to larger society.

68.     GMR has achieved a monopoly, or, at a minimum, is intentionally attempting to achieve a monopoly, through a carefully orchestrated strategy of exclusionary conduct.

69.     First, GMR makes it impractical, and in many cases impossible, for at least the vast majority of radio stations to avoid playing at least some music in GMR's repertory.   It accomplishes this goal in a number of ways:

a)     GMR handpicks and reaches agreement with its affiliates to ensure that its repertory encompasses both a broad spectrum of prominent music as well as a critical mass of exclusive (*i.e.*, wholly controlled) works, thus ensuring that it has licensing authority over music that most radio stations and other consumers, as a practical matter, cannot avoid playing.

b)     GMR simultaneously (1) threatens radio stations and other consumers with huge copyright infringement fines for performing works in the GMR repertory without a license and (2) leaves radio stations unable to

determine with reliability the works to which it has licensing authority. GMR has stated publicly that any business without a GMR license that plays works in its repertory could be vulnerable to $150,000 penalties for each song performed, and has indicated that it is prepared to pursue infringement actions to protect the interests of its affiliates. Yet GMR does not provide an accurate or complete list of works that fall in its repertory, or the ownership shares of those works, at any given period of time.

c)      GMR's affiliates both understand and consent to the purpose of GMR's scheme—that is, to obtain and share among GMR and its affiliates supracompetitive fees that those affiliates could not otherwise obtain. Indeed, some affiliates are part owners of GMR itself. These affiliates understand that each other affiliate's mutual participation is key to the success of GMR's anticompetitive conduct. Indeed, GMR itself publicly touts each new member that joins its scheme.

d)      As a result of GMR's carefully orchestrated structure with its affiliates, at least the vast majority of radio stations have no choice but to obtain a license from GMR. GMR has publicly stated as much, explaining that ASCAP, BMI, and SESAC are separate and distinct from GMR, and that licenses with these other PROs do not grant a radio station authorization to publicly perform the copyrighted music of GMR's songwriters, composers, and publishers.

70.     Second, to avoid regulatory constraints of the kind that prevent ASCAP and BMI from using their positions as intermediaries to extract monopoly rents, GMR deliberately maintains a membership that is much smaller than those of ASCAP and BMI.  As GMR's founder has explained, "ASCAP and BMI have hundreds of thousands of members.  We'll probably have 100. . . .  It's about how much market share those 100 control, and returning the ability of those 100 to control what happens, especially with their digital licensing."  By contracting with copyright holders of sufficiently prominent musical works as to be indispensable to consumers, but by limiting the number of its affiliates to create the false impression that GMR is a small player in the music industry, GMR has achieved or is likely to achieve a monopoly free of any consent decree.

71.     Third, to ensure that it is the monopoly seller of licenses to its affiliates' copyrighted music, GMR enters into exclusive contracts with its members that expressly prevent radio stations from being able to directly license copyrights from GMR's affiliates.  Even if not all of the affiliate contracts contain express exclusivity, GMR accomplishes the same goal *de facto* by preventing, as a practical matter, direct licensing between consumers and its members.  Specifically, GMR does not offer anything other than blanket licenses to radio stations, and does not offer either per-program or carve-out licenses.  Forced to purchase blanket licenses, radio stations have no incentive to enter into direct licensing agreements that would require them to pay twice for the same rights, nor to avoid playing the works of any individual GMR affiliates.

**GMR Has Achieved Or Is Likely To Achieve its Monopoly Through Exclusionary Practices**

72.     GMR has willfully acquired and/or imminently threatens to obtain monopoly power in the market for licensing the copyrighted musical works in its repertory.  It has not done so on the basis of growth or development as a consequence of a superior product, business

acumen, or historic accident; it has done so by using its for-profit status to enable it to share monopoly rents with select affiliates.

73.   GMR has willfully acquired and/or imminently threatens to obtain monopoly power by effectively refusing to deal at any reasonable, market-based price with radio stations and other consumers that wish to purchase anything other than a fixed-fee blanket license.  GMR either expressly prohibits direct licensing or, at a minimum, ensures that it will not happen by refusing to allow carve-out rights or to offer per-program licenses, which makes it uneconomical for consumers to acquire licenses directly from copyright holders.  Its refusal to deal creates a monopoly bottleneck, through which GMR has charged and will continue to charge monopoly prices.

74.   GMR has willfully acquired and/or imminently threatens to obtain monopoly power by entering into exclusive (or *de facto* exclusive) contracts with its affiliates, and thus acquiring sole licensing rights to indispensable musical works.  By restricting competition between the copyright holders of such works, GMR can and does threaten to charge monopoly prices, thus enabling GMR to pay its affiliates greater average royalties than the consent-decree-limited ASCAP and BMI, or settlement-agreement-constrained SESAC, can offer.

75.   GMR has willfully acquired and/or imminently threatens to obtain monopoly power because it has taken steps to assemble a "must have" catalog and to ensure that radio stations can never know, with any confidence, precisely which works are in the GMR repertory at any given time, and what GMR's licensing share of those works is at any given time.

## GMR'S MARKET POWER

### Relevant Product Market

76.     The relevant product market is licenses to the copyrighted musical compositions and performances in GMR's repertory.  GMR has created a monopoly in this market by bundling a unique set of copyrighted musical works, for which, by its own admission, no adequate substitutes exist.  GMR increases the power of its bundling by refusing to disclose, on a reliable real-time basis, the full content of its repertory or the ownership interests it possesses in each work in its repertory.  By maintaining exclusive licensing authority over that bundle, GMR has created and imminently threatens to exploit bottleneck access to licenses covering those collectively essential musical works.

77.     By GMR's own telling, licenses sold by ASCAP, BMI, and SESAC are not reasonably interchangeable with those that GMR sells, and so GMR's repertory occupies its own market.  A radio station cannot substitute a license from ASCAP, BMI, or SESAC for a license from GMR because there are a critical number of works in GMR's repertory for which GMR controls 100% of the public performance rights (the "GMR exclusive works").  Even if a radio station were to obtain licenses from ASCAP, BMI, **and** SESAC, it still would not have the right to play the GMR exclusive works.  Thus, a license from another PRO is not a substitute for a license from GMR and the other PROs are not in the same market as GMR.

78.     The only potential competitors to GMR for these exclusive works are GMR's own affiliates.  By virtue of being members of the GMR cartel and as a result of GMR's exclusionary practices, however, those copyright holders will not and/or cannot compete with GMR; they will not directly license their copyrights to radio stations.  (And because GMR does not reliably disclose the contents of its repertory in real time, stations would not even know which direct

licenses to seek anyway.) Thus, stations cannot substitute individual direct copyright licenses for a license to the GMR repertory.

79.    If GMR were to raise prices by five to ten percent above marginal cost, consumers of GMR licenses, including RMLC members, could not look to ASCAP's, BMI's, SESAC's, or others' licenses as substitutes. This is because GMR, either by virtue of its express exclusivity agreements with its affiliates and/or by refusing to grant carve-out rights and per-program licenses, has exclusive rights to a critical number of musical works that at least the vast majority of terrestrial radio stations cannot, as a practical matter, avoid playing or—in the words of GMR's founder—"that nobody can . . . comfortably exist without." A critical number of musical works lying in GMR's repertory are therefore indispensable. Because ASCAP, BMI, and SESAC do not offer licenses to those essential copyrights, and GMR exercises exclusive control over its affiliates' works, they do not constrain GMR's pricing power over those intellectual-property rights.

80.    Absent relief from this Court, radio stations will have little choice but to continue to agree to a licensing agreement with GMR and to continue to pay the extortionate rates that GMR demands. As GMR states publicly, an infringement suit is a course of action that GMR will pursue to protect the interests of its music creators and publishers, and any station that does not agree to its demands may be subject to statutory damages for $150,000 for at least each GMR exclusive work performed. GMR has repeatedly made clear to RMLC, including in the months leading up to RMLC filing its original complaint, that GMR is prepared to take action against radio stations that play music in its repertory without a license from GMR.

81.    Supply-side substitution—entry into the market by potential competitors—does not constrain GMR's monopoly power because GMR has the exclusive ability to license the

35

essential musical works in its repertory. As GMR intends to share part of its monopoly profits with its affiliates, no other PRO can successfully lure significant numbers of GMR members away from GMR. In fact, the opposite is true, as industry observers have noted that GMR "has lured clients with the promise that it can wring royalties that are as much as 30 percent higher from radio stations and online outlets than they can get through ASCAP or BMI." As GMR's founder has stated, "We at GMR believe in higher rates." There is no effective prospect of competitive pricing pressure from the other existing PROs, because their rates are all regulated (ASCAP and BMI by consent decree; SESAC by settlement agreement). Moreover, even if a hypothetical new PRO entrant could induce some GMR affiliates to defect at the end of their contracts, the GMR cartel would remain in full effect so long as GMR maintained control over a critical mass of "must have" or "can't avoid" works. And because GMR could replace lost affiliates with new members that it lures away from other PROs, it could continue to acquire exclusive licensing rights over a critical mass of indispensable works even if some affiliates departed for a new entrant. But the reality is that there is little likelihood of GMR losing affiliates to existing PROs or potential new entrants based on price. Because ASCAP, BMI, and SESAC are price constrained, they cannot meaningfully use monopoly rents, as GMR does, to compete with GMR for affiliates. And any potential new entrant, acting lawfully and not anticompetitively, similarly could not compete meaningfully with GMR because it would not have access to the supracompetitive monopoly rents that GMR intends to use to fund its acquisition of affiliates and would not engage in anticompetitive exclusive dealing. In any event, a potential new entrant would not be a substitute for a GMR license because it would by definition have a different repertory of works, a license to which would not be a substitute for a license from GMR. So it could not constrain GMR's prices for its own unique repertory.

Meaningful entry into the market of GMR-repertory works is therefore impossible, and cannot limit GMR's ability to charge monopoly prices.

**Relevant Geographic Market**

82.    The relevant geographic market is the United States.  GMR does not limit its sales to any one part of the country, but sells licenses to RMLC members and to other consumers all over the United States.

**GMR's Monopoly Power**

83.    **100-percent market share:**  As GMR possesses 100 percent of the relevant market, GMR has monopoly power.  GMR has exercised and will continue to exercise that power, and absent injunctive relief, will succeed in profitably selling at supracompetitive prices without suffering a loss of demand or a diversion of sales toward ASCAP, BMI, SESAC, or a third-party competitor.  As set forth above, barriers to entry are not just high, they are virtually insurmountable.

84.    **No Regulation, Consent Decree, Or Settlement Agreement Constrains GMR's Pricing:**  In obtaining exclusive rights to a critical mass of copyrighted musical works that are collectively indispensable, by offering consumers no option other than a blanket-license, and by imposing exclusive-dealing requirements on its affiliates, GMR has acquired and/or imminently threatens to achieve a monopoly over the music in its repertory.  Unlike ASCAP, BMI, and SESAC, GMR is subject to no regulatory oversight or court-ordered settlement agreement that constrains its pricing power.  As a result, GMR can and will exercise unfettered monopoly power.

85.    **Entry Barriers Protect GMR's Monopoly:**  Entry barriers in the form of GMR's exclusive contracts and GMR's ability to share part of its monopoly profits with its cartel

affiliates enable it profitably to charge supracompetitive prices without being constrained by the threat of entry.

**Direct Evidence of GMR's Monopoly Power**

86.    GMR's demands during negotiations with RMLC, to which almost all member stations would have had to accede absent this lawsuit, are direct evidence of its monopoly power. Before GMR acquired its repertory of essential works, RMLC member stations had the ability to play all or most of those works through their licenses with ASCAP and BMI.  Because of GMR's unlawful practices, radio stations are forced once again to license the same works, only this time for prices far greater than what ASCAP, BMI, or SESAC could charge.   The rate-setting procedures governing those PROs should ensure that their rates are competitive.   Instead of charging a comparable price for its license, GMR demands rates many multiples higher than stations would pay if any of the other PROs attempted to license the same quantity and quality of songs.    Writers and publishers sign with GMR specifically because GMR can charge a supracompetitive price and because they expect to receive a part of those monopoly rents in the form of royalty payments.  Despite GMR's demands of supracompetitive prices, the remaining PROs cannot undercut GMR because its repertory is without substitute.  Radio stations are also unable to shift their business entirely to the other PROs because (1) GMR's repertory contains a critical mass of essential works that stations must be able to play to stay competitive, (2) many stations do not have total control over the songs they play and thus may risk infringement from the inadvertent broadcast of music in the GMR repertory; (3) the exact contents of GMR's repertory at any given time are unknown so virtually all stations cannot even try to program around those songs, and (4) the risk of foregoing a license to the GMR repertory is the real and imminent threat of an infringement lawsuit.   Under those conditions, many RMLC member

stations had no choice but to purchase the interim license at the supracompetitive prices that GMR unilaterally dictated and will be forced to continue to purchase licenses from GMR (including when the interim licenses expire on September 30, 2017) at ever increasing prices until a court establishes a rate-setting procedure like the ones that govern ASCAP, BMI, and SESAC.

87.     GMR's demanded yearly rate increases provide additional direct evidence of its monopoly power.  During negotiations with RMLC, GMR negotiators demanded that stations' licensing rates increase in both 2018 and 2019.  Those increases are monopoly rents unassociated with any warranted improvement in GMR's repertory or product offerings.  For the reasons described above, U.S. radio stations will be forced to pay those rates, or risk being fined $150,000 per infringed work.

## GMR'S UNLAWFUL AND ANTICOMPETITIVE ACTIVITIES

88.     GMR has engaged or imminently threatens to engage in a variety of illegal and anticompetitive practices, including price fixing and exclusionary conduct aimed at securing and maintaining monopoly power.

### GMR Fixes Prices to the Musical Compositions in its Repertory

89.     But for GMR's exclusionary conduct, GMR's affiliates would have the ability through direct licenses to offer RMLC's members access to the same copyrighted works that GMR offers through a blanket license.  GMR and its affiliates are therefore horizontal competitors within the meaning of the antitrust laws.  Were they to compete with one another, the price of public-performance licenses would naturally fall and the quantity of such licenses sold would increase.

90.     Since GMR's creation in 2013, commercial radio stations generally have not felt the need to enter into direct licenses with copyright holders because the rates that they have paid ASCAP and BMI have been established under the protections of the ASCAP and BMI consent decrees. And, with respect to SESAC, the litigation that RMLC filed in 2012 was designed to, and ultimately achieved, similar mechanisms to help assure that radio stations would pay reasonable rates for access to SESAC works. Because GMR is not subject to any similar type of rate-court oversight and is demanding supracompetitive fees for its blanket license, and because GMR refuses to offer any alternative to its blanket license, such as the per-program or All Talk licenses that ASCAP, BMI and SESAC offer to stations, the prospect of direct licensing or an adjustable fee blanket license are options that radio stations need and that should be available to them.

91.     As an example, during RMLC's negotiations with ASCAP and BMI that resulted in court-approved settlements in 2012, RMLC agreed to forgo the option of an adjustable-fee blanket license for stations in exchange for price concessions on ASCAP and BMI blanket licenses. ASCAP and BMI both did not want to add the adjustable fee blanket license to their flexible licenses because they believed that new technology would make it much easier for radio stations to negotiate direct licenses with songwriters and they were afraid of the growth potential of direct licenses. (The ASCAP and BMI consent decrees forbid the PROs from prohibiting direct licensing.) The ASCAP and BMI court-approved blanket license prices effective as of January 1, 2010 through December 31, 2016 show that the ability to direct license, and the option of an adjustable fee blanket license, have value to radio stations and that direct licensing is a credible potential avenue of competition between and among a PRO and its affiliates. GMR has foreclosed both the ability of its affiliates to direct license and also the option for radio

stations to purchase an adjustable fee blanket license (or another alternative to the blanket license), and thus has foreclosed competition.

92.     GMR and its affiliates have agreed to allow GMR to aggregate and sell rights to its affiliates' copyrighted music exclusively and also only through blanket licenses, thus eliminating price competition among and between GMR and its members.  By agreeing to make GMR the exclusive licensor of their copyrights and by refusing to allow carve-out rights or per-program licenses, GMR and its affiliates have agreed to make it either impossible or, at a minimum, uneconomical for consumers to negotiate direct licenses from the affiliates.  This practice eliminates any price competition among GMR's affiliates, as well as between GMR and its affiliates.

93.     Other than to eliminate competition and obtain monopoly power, it is against GMR's affiliates' self-interest to force RMLC's members to enter into blanket licenses with GMR as the only option to obtain access to the affiliates' copyrighted works.  The affiliates' unadulterated self-interest would lead them to maintain maximum flexibility to negotiate the best possible license fee for their work, including the ability to negotiate direct licenses with individual RMLC members.

94.     GMR therefore functions as a naked cartel, and the blanket-license fee that it imminently threatens to charge amounts to a form of price fixing between horizontal competitors.  GMR's cartel pricing weakens any existing benefits of the ASCAP/BMI/SESAC paradigm and will not generate any off-setting benefits not already available in the marketplace; nor will regulation or competitive pressures constrain GMR's power over price.

**GMR Artificially Inflates the Value of Its Blanket License By Licensing The Fractional Works In Its Repertory As Though They Were Full Shares**

95.     GMR exercises its monopoly power in order to extract inflated licensing fees that far exceed its affiliates' underlying ownership rights.  It does so in two ways.  First, GMR controls full public performance rights to only a small fraction of works in its repertory, but it only offers fractional licenses to a significant percentage of its repertory, meaning that a radio station cannot perform those works without obtaining additional licenses from other PROs and/or the co-owners of those works.

96.     Second, GMR does not provide radio stations a way to determine reliably which of the works in its repertory it licenses on full versus fractional bases at any given time.  A radio station that seeks access to GMR's indispensable repertory must therefore agree to pay extortionate royalty fees that vastly overstate the rights conferred on that licensee.  If stations had a way to ascertain reliably at all times which of GMR's works in its repertory are fully versus fractionally licensed by GMR, a radio station could make the informed choice as to whether GMR's blanket royalty fee demands are justified.   Because GMR does not provide this information in a reliable and up-to-date manner, a radio station cannot determine which works it can perform without a GMR license or without risking an infringement suit from an unknown co-owner, and at least the vast majority have no choice but to accede to GMR's royalty demands.

97.     GMR therefore has leveraged and will continue to leverage its price fixing and monopolistic scheme to extract above-market royalty payments from licensees, and obtaining a blanket license from GMR does not even entitle licensees the right to perform each covered work without risk of penalties for infringement.  The fact that radio stations are forced to accede to GMR's rate demands without getting full benefits and without even being able to assess the true value of what they are buying is further direct evidence of GMR's immense monopoly power.

**GMR Has Entered Into Exclusive-Dealing Contracts**

98.     GMR enters into express and/or *de facto* exclusive contracts with its affiliates, thus foreclosing any direct licensing between consumers and its copyright-holder affiliates.

99.     Because GMR does not offer any viable alternative to its blanket license, even if GMR affiliates were permitted to direct license (and GMR appears to have admitted that they are not), no radio station has an incentive to acquire individual licenses directly from copyright holders or to reduce or eliminate plays of GMR affiliates' works.  Absent a carve-out right, any direct license that a consumer acquired would have no effect on GMR's blanket-license fee, but would entail an additional royalty burden on the consumer.  If radio stations purchase blanket licenses from GMR, therefore, they necessarily lack any incentive to acquire direct licenses from GMR affiliates (if it were even possible to do so).  As alleged in Paragraph 69, it is not possible for radio stations to obtain licenses directly from GMR affiliates and to forego dealing with GMR.  Similarly, the lack of carve-out rights eliminates any economic incentive to avoid playing the works of less than all GMR affiliates (even if GMR offered a reliable means to determine what that would entail).  By acquiring licensing rights over handpicked, indispensable musical works, and by foreclosing any direct licensing between its affiliates and consumers, or any prospect for a carve-out discount, GMR achieves exclusive licensing rights.

**GMR Has Refused To Deal With Radio Stations On Other Than A Blanket Basis**

100.    GMR has not offered to deal with RMLC members that wish to purchase music from its repertory other than on a blanket basis.  GMR has ignored RMLC's request to negotiate for blanket-license carve-out rights or per-program licenses.  GMR also will not deal with RMLC or its members unless those potential licensees pay monopolistic prices resulting from its

anticompetitive conduct, as opposed to competitive prices.   These refusals constitute an exclusionary practice, foster GMR's monopoly and quash competition.

## GMR HAS A SPECIFIC INTENT TO MONOPOLIZE
## THE RELEVANT MARKET

101.   GMR has monopolized the market for copyrighted music in its repertory with the specific intent of securing monopoly power and charging supracompetitive prices.  In refusing to deal with consumers who seek blanket-license carve-out rights or per-program licenses, in entering into express and/or *de facto* exclusive contracts with its affiliates, and in imminently threatening to continue to extract monopoly rents from consumers, GMR has been motivated by neither efficiency nor any other procompetitive factor.  GMR's principal objective is willfully to acquire and to maintain monopoly power.  Indeed, GMR's founder has admitted that it has gathered a "full roster of songwriters that nobody can, shall we say, comfortably exist without," and that "[w]e at GMR believe in higher rates."  And GMR has been public about its intention to extract monopoly rents from licensees so that it can fund its promise to pay its affiliates at least 30% more than any other PRO.

102.   As alleged in Paragraphs 69 and 70, GMR strategically hand-picks a relatively small number of affiliates simultaneously to create an essential repertory of musical works and to maintain a sufficiently small profile to avoid regulatory oversight.  GMR undertakes these actions with the specific intent of achieving and maintaining a monopoly.

## INJURY TO COMPETITION

103.   GMR's price fixing and monopolization has caused and will continue to cause serious harm to the competitive process.  If left unchecked, GMR's anticompetitive conduct will continue to cause RMLC's members and other consumers to pay monopoly overcharges for musical compositions that would otherwise be available at competitive prices.   Such

44

supracompetitive fees will generate unjustified wealth transfers from consumers to cartel members, and inefficiently distort behavior both in the market for GMR's repertory of copyrighted music and beyond.

**Higher Prices**

104.   By forming a cartel with its affiliate copyright holders, by creating a bottleneck to the copyrighted musical works in its repertory, and by ensuring that certain of the copyrighted works to which it has exclusive rights are indispensable to consumers, GMR has eliminated competition and achieved monopoly power.   GMR has exercised and will continue to exercise that power by extracting monopoly rents from RMLC members and from other consumers. ASCAP and BMI charge "fees based roughly on their respective market share accounting for partial interests in the songs in their repertories."   DOJ Statement at 11.   GMR's pricing demands differ from those competitive pricing practices in two important ways.   First, GMR demands prices far in excess of what stations would pay if the exact same works were held in the repertories of ASCAP, BMI, or SESAC.   Indeed, most of GMR's works *were* previously in the repertories of ASCAP and BMI and, when they were, radio stations paid far less to play them than GMR now demands.   In particular, GMR has demanded rates roughly *two to three times* the value of their share of copyrighted performances by unilaterally concluding that undisclosed factors make its repertory more valuable than if other PROs licensed the exact same songs (or when other PROs actually did license many of those same songs).   Those undisclosed factors, in fact, are merely the fact that GMR possesses monopoly power, and its tactics are nothing new. SESAC engaged in the same hold-up practices before agreeing to settle the antitrust lawsuit against it (after receiving an indication that it was likely to lose the suit) by submitting to a rate-setting procedure.   Second, many songs in GMR's repertory are only partially licensed by GMR,

and thus GMR's blanket license by itself offers the user no protection against infringement lawsuits with respect to those works, even though GMR's marketing misleadingly suggests otherwise.

105.   GMR also demands that radio stations' rates increase beyond these already supracompetitive levels.  GMR threatens to lock in its monopoly profits for years to come by demanding that stations enter into licenses with rates that increase in both 2018 and 2019.  Those increases are pure monopolist rents unassociated with any improvement in GMR's product.  But absent relief from this Court, virtually all radio stations will have no choice by to pay them.

106.   GMR's scheme threatens to lead to higher prices on an industry-wide level, far beyond GMR and its repertory.  Other PROs have made clear that they will try to extract higher license fees from radio stations, if those stations give in to GMR's demands and pay GMR's extortionate fees.  For example, in the ongoing RMLC/SESAC arbitration proceedings (as provided by the their settlement agreement), SESAC held GMR out as a model for its own rate demands and compelled production of GMR's license agreements to support its arguments.  Moreover, in its January 2017 rate court petition for a determination of licensing fees, BMI has asserted that it "expects that final benchmark agreements between RMLC Stations and GMR will support an increase in final rates to BMI."  Thus, if GMR succeeds in imposing its artificially inflated rates, radio stations could be forced to pay monopoly rents to these regulated PROs as well.

107.   Market prices that increase directly because of monopolization or attempted monopolization constitute a paradigmatic injury to competition.

**Restricted Consumer Choice**

108.   GMR's monopoly scheme has allowed the company to secure exclusive rights to

essential copyrighted musical works.  Were it not for GMR's ongoing and imminently threatened antitrust violations, RMLC members and other consumers could instead obtain licenses to those works from alternative sources.   GMR's antitrust violations have foreclosed potential competitors (including its own affiliates) from licensing indispensable copyrighted musical works, thus extinguishing consumer choice and injuring the competitive process.

109.   GMR's anticompetitive conduct has also limited consumer choice as to the form of license to copyrighted musical works.  By providing radio stations with a Hobson's choice between a blanket license and no license from GMR at all, GMR denies consumers the option of per-program licenses, blanket carve-out rights, per-play licenses, or licenses solely for music appearing in commercial advertising.  GMR's illegal behavior has deprived consumers of the choice that competition would have bestowed upon them.

**Reduction in Consumer Efficiency**

110.   GMR's anticompetitive conduct also causes significant inefficiency because it only offers fractional licenses and does not control 100% of public performance rights for a significant percentage of its repertory.  A radio station cannot immediately use these partially controlled compositions until it also obtains the additional licenses it needs from the co-owners of those works or the PROs to which those co-owners have licensed their rights.  GMR exacerbates this inefficiency because it does not reliably disclose which of its works it partially licenses at any given moment, and misleadingly suggests in marketing that its license permits radio stations to play all works without the need for any other licenses.

## ANTITRUST INJURY TO RMLC'S MEMBERS

111.    RMLC's members have suffered or imminently will suffer injury of the type that the antitrust laws were intended to prevent and that flows from that which makes GMR's acts unlawful.

112.    Monopolization that eliminates competition between rivals and that causes consumers to pay supracompetitive prices epitomize the kind of injury that the antitrust laws were intended to prevent.  Absent injunctive relief, RMLC's members will be forced either to attempt to remove an essential set of works from their playlists, causing significant business disruption and irreparable loss of goodwill and a reduction of choice to their own consumers, or to continue to purchase licenses directly from GMR and pay monopoly prices on account of GMR's anticompetitive conduct.  Moreover, absent injunctive relief, even if RMLC's members continue to obtain licenses from GMR, those licenses only confer partial public performance rights to many of the works in GMR's repertory and require RMLC's members to obtain additional licenses to play those works or risk catastrophic infringement suits.   RMLC's members' injury therefore flows from that which makes GMR's behavior unlawful.  Absent an injunction, RMLC's members face an unabated imminent threat of continued future injury in the form of having to pay supracompetitive prices and being subjected to a risk of copyright infringement liability.

## ASSOCIATIONAL STANDING

113.    RMLC is a trade association whose objective is to achieve fair and reasonable license fees from PROs (including ASCAP, BMI, SESAC, and GMR) on behalf of its radio station members.  As such, RMLC has standing to bring the present action on behalf of its members.

48

114.     RMLC's members consist of approximately 7,300 U.S. radio stations involved in the business of terrestrial radio broadcasting.  Another 2,500 stations are "bound" by the terms of RMLC-negotiated licenses with ASCAP and BMI and, thereby, also pay RMLC court-mandated fees to assist with operational expenses.  Rate courts in the Southern District of New York have approved these fees.  Some 7,300 radio stations are represented by RMLC in pending binding rate arbitration with SESAC.  RMLC's membership is open to all U.S. terrestrial radio stations or groups of radio stations "under direct or indirect common control."  RMLC's member stations pay dues to RMLC and have the right to resign their membership.

115.     Many of RMLC's members face an imminent, concrete, and particularized injury in the form of being forced either to attempt to forego essential works or to continue to contract with GMR and pay artificially high licensing fees for performance rights to the GMR repertory due to GMR's anticompetitive behavior.  If a station does not purchase a license from GMR, its only options are to  (1) attempt to stop playing works in GMR's repertory, which is not an option for at least the vast majority of radio stations for reasons discussed above; or (2) continue playing the works and face the imminent prospect of enterprise-threatening infringement lawsuits.  When SESAC imposed the exact same Hobson's choice on RMLC's member stations only four years ago, Judge Sitarski recognized that "a radio station must buy a SESAC license." *SESAC I*, 2013 WL 12114098, at *10.  The same is true here, where virtually all radio stations must continue to purchase a GMR license.  As described above, GMR has consistently demanded prices far in excess of what a radio station would pay to license the same works at competitive prices from other PROs.  GMR has demanded rates that are not reasonably tethered to the quantity or quality of songs in its repertory; worse, many of those songs are partially licensed by GMR, which provides  no  assurance  against  the  threat  of  infringement  of  those  works  at  any  price.

Furthermore, GMR demands licenses that will increase in rate yearly, regardless of the quantity or quality of songs in GMR's repertory. If RMLC does not receive any relief, radio stations will have to choose between continuing to accede to GMR's demands by continuing to enter into anticompetitive licensing agreements, attempting to remove essential works from their repertories (which is likely impossible for most if not all) and suffering irreparable losses of customer goodwill, or risking suit for copyright infringement.

116.   Injunctive relief prohibiting GMR's anticompetitive conduct and establishing a negotiation process through which the parties could agree upon a fair and reasonable licensing fee would prevent continued injury to RMLC's members.

117.   This suit is germane to RMLC's purpose. RMLC has been negotiating licenses with PROs on behalf of the radio industry since 1935, when it was still a part of the National Association of Broadcasters, and negotiated the first industry-wide licensing agreement between ASCAP and radio stations. RMLC's mission statement declares that one of its objectives is "to achieve fair and reasonable license fees with the music licensing organizations . . . on behalf of radio stations." RMLC's bylaws also authorize it to negotiate licenses and "to perform such acts to accomplish its purposes as the Corporation may determine to be appropriate." Additionally, RMLC's corporate charter declares as the first of the "purposes for which the corporation is formed" "[t]o promote the common business interests of commercial radio stations . . . and, in particular, to represent the interests of the commercial radio industry on music licensing matters."

118.   RMLC's claims do not require the individual participation of each of its members to obtain the relief that it seeks. RMLC seeks only injunctive relief, not damages. GMR has violated and imminently threatens to continue to violate the antitrust laws by employing common

licensing practices that affect virtually all of RMLC members. RMLC can establish the illegality of these practices through evidence of GMR's conduct that is common to its members.

## COUNT I
## Monopolization
## in Violation of Section 2 of the Sherman Act

119.   RMLC repeats and realleges each and every allegation of this complaint.

120.   GMR has willfully acquired and imminently threatens to maintain monopoly power in the market for licensing the copyrighted musical works in its repertory. GMR has done so through a series of exclusionary practices that are capable of foreclosing, and that have in fact foreclosed, equally or more efficient competitors.

121.   By refusing to deal with radio stations other than by providing a blanket license with no per-program or carve-out alternatives, GMR forecloses licensing competition with other PROs and with its constituent affiliates. Because of GMR's unlawful agreements with its affiliates, and because GMR does not reliably disclose the full content of its repertory or the ownership interests it possesses in each work in its repertory, RMLC's members have no practical or economically viable alternative to GMR's blanket license. This refusal to deal has enabled GMR to acquire and threatens to allow GMR to entrench its monopoly in the licensing of music within its repertory.

122.   GMR has entered into express and/or *de facto* exclusive contracts with its affiliates that make it impossible, or at least economically irrational, for them to grant direct licenses to RMLC's members. These exclusive contracts exclude competition in the licensing of the copyrighted works owned by GMR's affiliates and enhance GMR's monopoly power.

123.   GMR has abused and threatens to continue abusing its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, in order to obtain licensing agreements with RMLC's members at anticompetitive rates.

124.   Through its predatory campaign, GMR has violated Section 2 of the Sherman Act by willfully monopolizing the market for the copyrighted works within its repertory.

125.   GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.   Among other things, RMLC's members must continue to choose between attempting to forego essential musical works (which is likely impossible for most if not all) and suffering the loss of customer goodwill, or continuing to contract with GMR to pay higher fees for access to copyrighted works in the GMR repertory than they otherwise would have paid in the absence of GMR's unlawful conduct.

126.   An injunction is necessary to remedy the continuing violation.

## COUNT II
### Attempted Monopolization
### in Violation of Section 2 of the Sherman Act

127.   RMLC repeats and realleges each and every allegation of this complaint.

128.   GMR has attempted to monopolize the market for licensing the copyrighted musical works in its repertory by engaging in predatory and anticompetitive conduct with a specific intent to monopolize that market, and there is a dangerous probability that GMR will achieve monopoly power.

129.   GMR has engaged in a variety of predatory and anticompetitive conduct.   It has strategically acquired rights to must-have works to ensure that radio stations must agree to its anticompetitive and predatory licensing demands.   GMR has further destroyed competition by committing its affiliates to express and/or *de facto* exclusive licensing terms.   At the same time,

GMR does not reliably make available information for licensees to allow them to determine which works fall within GMR's repertory, or which works GMR licenses fully versus only partially. As a result, GMR has demanded and threatens to extract supracompetitive licensing fees far in excess of the actual value of its affiliates' aggregate share of public performances.

130.   GMR has displayed a specific intent to monopolize the market for licensing the copyrighted works in its repertory. None of its practices have any legitimate business justification other than to foreclose competition with other PROs and their affiliates and to extract supracompetitive licensing fees from radio stations that have no practical or viable alternative to accepting GMR's blanket license. GMR's practices are not related to any efficiency-enhancing goal. Instead, GMR has rejected various efficiency-enhancing alternatives to its blanket licenses such as carve-out rights or per-program licenses, and it does not permit its affiliates to directly license their works. The public admissions by GMR's founder that GMR has amassed a "full roster of songwriters that nobody can, shall we say, comfortably exist without," and that "[w]e at GMR believe in higher rates" only underscore GMR's specific intent to monopolize.

131.   To the extent GMR has not already achieved monopoly power, there is a dangerous probability that it imminently will do so. GMR has achieved a 100% market share in the relevant market for the works in its repertory, and it has also engaged in a variety of anticompetitive practices by creating a repertory of indispensable works that GMR refuses to license except on a blanket basis. GMR has ensured that there are insurmountable barriers to entering its market because it has engaged in practices designed to pay its affiliates more than any rate-regulated PRO can afford. Radio stations face the imminent threat that GMR will be

able successfully to exercise its market power by forcing them to enter into anticompetitive licensing agreements or suffer the devastating consequences of refusing such a license.

132.    GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.

133.    An injunction is necessary to remedy the continuing violation.

## RELIEF SOUGHT

WHEREFORE RMLC respectfully requests the following relief:

A.      That GMR's unlawful conduct be declared, adjudicated, and decreed a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.      That RMLC be awarded mandatory injunctive relief in the form of: (i) requiring GMR to issue licenses on application and to submit to a judicial rate-making procedure comparable to what the consent decrees regulating ASCAP's and BMI's behavior impose; (ii) establishing a process, during the judicial rate-making procedure, for the court to enter an appropriate order of disgorgement from GMR into a constructive trust of all moneys received from licensees (including from the interim license) above the judicially determined reasonable rate, and for distribution of that money pro rata to impacted radio stations, (iii) enjoining GMR from entering into express and *de facto* exclusive contracts with copyright holders; (iv) requiring GMR to make available economically viable alternatives to blanket licenses, such as per-program licenses, blanket carve-out fees, and commercial-only licenses; (v) requiring GMR to offer only full-work licenses; and (iv) prohibiting GMR from instituting (in its own name or that of its affiliates) any copyright infringement proceedings against any U.S. commercial

radio station during the pendency of its copyright misuse, i.e., until such time as GMR has offered, and stations have had a full and fair opportunity to consider, a license from GMR at a rate determined to be reasonable pursuant to judicial rate-making procedures comparable to what the consent decrees regulating ASCAP's and BMI's behavior impose.

C.   That RMLC be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

D.   That RMLC be awarded such additional relief as the Court may deem proper.


Dated: February 10, 2017

Peter J. Mooney
WHITE & WILLIAMS LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Telephone: (215) 864-7164
Facsimile: (215) 789-7664
Email: mooneyp@whiteandwilliams.com

Margaret M. Zwisler (*pro hac vice*), DC245951
Jennifer L. Giordano (*pro hac vice*), DC496746
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-1092
Facsimile:  (202) 637-2201
Email:  Margaret.Zwisler@lw.com
Email:  Jennifer.Giordano@lw.com

Alfred C. Pfeiffer, Jr. (*pro hac vice*)
CA120965
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095
Email:  Al.Pfeiffer@lw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of February, 2017, service of a true and correct copy of the foregoing document was made upon the counsel of record via FedEx overnight and electronic mail:

Daniel M. Petrocelli *(pro hac vice)*
David Marroso *(pro hac vice)*
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067
Tel. (310) 553-6800
dpetrocelli@omm.com
dmarroso@omm.com

John G. Harkins, Jr.
Neil C. Kling
4000 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel. (215) 851-6700
Fax (215) 851-6710
jharkins@harkinscunningham.com
nkling@harkinscunningham.com

Edward D. Hassi *(pro hac vice)*
Richard George Parker *(pro hac vice)*
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel. (202) 383-5336
thassi@omm.com
rparker@omm.com

*Attorneys for Defendant*

Peter J. Mooney

*Attorney for Plaintiff*