LATHAM & WATKINS LLP
  Margaret M. Zwisler (*pro hac vice*)
    *margaret.zwisler@lw.com*
  Jennifer L. Giordano (*pro hac vice*)
    *jennifer.giordano@lw.com*
  William M. Friedman (*pro hac vice*)
    *william.friedman@lw.com*
  David L. Johnson (*pro hac vice*)
    *david.johnson@lw.com*
555 Eleventh St. NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

  Alfred Pfeiffer (Bar No. 120965)
    *al.pfeiffer@lw.com*
  Andrew M. Gass (Bar No. 212731)
    *andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone:  +1.415.391.0600
Facsimile:  + 1.415.395.8095

  Adam S. Sieff (Bar No. 302030)
    *adam.sieff@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile:  + 1.213.891.8763

Attorneys for Plaintiff RADIO MUSIC
LICENSE COMMITTEE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RADIO MUSIC LICENSE COMMITTEE, INC. | CASE NO. 2:19-cv-03957-TJH-AS |
| Plaintiff, | |
| v. | **PLAINTIFF RADIO MUSIC LICENSE COMMITTEE, INC.'S SECOND AMENDED COMPLAINT** |
| GLOBAL MUSIC RIGHTS, LLC | |
| Defendant. | |

**SUMMARY OF CLAIMS**

1.     This is an antitrust lawsuit against Global Music Rights, LLC—an organization that was founded specifically to raise the price of pre-existing intellectual property (IP) rights.  The scheme has been brazen, effective—and flagrantly illegal.  "GMR," as the company is known, openly coordinated dozens of individual IP rights owners in concerted action to cause the precise harms that U.S. antitrust laws prevent: monopoly prices, for exactly the same thing consumers were able to buy for less before the anticompetitive conduct began.  The purpose of this action is to restrain those competition law violations and remedy the resulting imminent harm.

2.     The particular IP right that GMR traffics in is the exclusive right to publicly perform musical compositions.  This is the IP right that is implicated every time a copyrighted song is played over the radio, on television, in a bar or restaurant, and in a host of other everyday scenarios.  From the early 20th century, rights aggregators have sought to capitalize on the ubiquitous need for "public performance" licenses by acquiring the relevant rights in thousands or millions of songs, bundling them together, and selling licenses *en masse* to music users.

3.     Essentially from their inception, these "performing rights organizations," or "PROs" as they came to be known, have been recognized to be antitrust violators by their very nature: they fix a single price for works that would otherwise be licensed on different terms by different rights owners; assemble "must-have" catalogs that result in market power over people who play music; and engage in a wide variety of business practices that have proven irresistible to pursue, but that are plainly anticompetitive.  As a result, the two oldest PROs, known as ASCAP and BMI, have been governed by consent decrees (entered to settle antitrust lawsuits filed by the U.S. Department of Justice) since 1941.  A third PRO, called SESAC, managed to evade antitrust regulation until earlier this decade, but then succumbed after multiple courts found that its core commercial conduct likely violates the

Sherman Act.  *See Meredith Corp. v. SESAC, LLC*, 2011 WL 856266, at *1 (S.D.N.Y. Mar 9, 2011) (Buchwald, J.) (denying SESAC's motion to dismiss); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 197 (S.D.N.Y. 2014) (Engelmeyer, J.) (denying SESAC's motion for summary judgment); *Radio Music License Comm. v. SESAC*, 2013 WL 12114098, at *13-20 (E.D. Pa. Dec. 23, 2013) (Sitarski, M.J.) (finding RMLC likely to succeed on Section 2 claim); *Radio Music License Comm. v. SESAC*, 29 F. Supp. 3d 487, 502-03 (E.D. Pa. 2014) (Jones, J.) (denying SESAC's motion to dismiss RMLC's Section 2 claim).

4.     GMR came on the scene in 2013.  Its plan was straightforward: (A) target a select group of rights owners who historically offered public performance licenses through ASCAP and BMI—subject to antitrust consent decrees that made it more difficult to charge supracompetitive rates; (B) convince those rights owners to leave their old PROs and form a new one that would be the only way to license a "must-have" selection of well-known songs; and (C) extract radically higher rates from music users than before—for a "new product" that is in fact nothing more than a license to the same old songs, just sold by a new company that hasn't yet been determined to violate the antitrust laws.

5.     That gambit flouts antitrust law in multiple respects.  For one thing, the Supreme Court itself has held that one of the principal considerations that redeem ASCAP and BMI from outright illegality under the Sherman Act is that their consent decrees require them to license out rights on a *non-exclusive* basis.  *See Broadcast Music, Inc. v. Columbia Broadcasting Sys.* ("*BMI*"), 441 U.S. 1, 23-24 (1979).  GMR ignores that; the *exclusive* way to get permission to play *any* songs in its repertoire is by buying a license for *all* of them *only* from GMR.  Its anticompetitive conduct and intent are flagrant and shameless.

6.     But the core of GMR's antitrust violations is in its very *raison d'être*: the concerted action it engineered among rights owners to collectively decamp from

their pre-existing PROs *specifically to raise prices*.  If that doesn't violate the Sherman Act, then nothing does.

## I.        JURISDICTION AND VENUE

7.        RMLC brings its federal claims on behalf of its members pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin GMR's anticompetitive conduct and other violations of the law, and to recover the costs of this suit and reasonable attorneys' fees.  RMLC brings its state law claim pursuant to the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 & 16726.

8.        This Court has subject matter jurisdiction over the asserted federal claims under 28 U.S.C. §§ 1331 and 15 U.S.C. § 26.  This Court has supplemental jurisdiction over RMLC's state law claim under 28 U.S.C. § 1367 because the claim arises from the same common nucleus of operative facts as the federal antitrust claims.

9.        The Court has personal jurisdiction over GMR because GMR is headquartered in California and GMR's contacts with California are continuous and systematic.  The conduct giving rise to these claims took place in large part in this district.  And GMR has availed itself of this jurisdiction for its pending retaliatory lawsuit against RMLC.

10.        Venue is proper in this judicial district under 28 U.S.C. § 1391(b), 15 U.S.C. § 22, and 15 U.S.C. § 26.

## II.        THE PARTIES

11.        Plaintiff RMLC is a 501(c)(6) non-profit corporation organized and existing under the laws of Tennessee, with a principal place of business at 1616 Westgate Circle, Brentwood, Tennessee 37027.  RMLC's mission is to negotiate public-performance licenses with performing rights organizations for the benefit of its members and the commercial radio industry (some 10,000 radio stations).

LATHAM&WATKINS LLP

12.     Defendant GMR is a for-profit limited liability company organized and existing under the laws of the state of Delaware and is registered as an LLC with the state of California, with a principal address of 1100 Glendon Avenue, Suite 2000, Los Angeles, California 90024.  GMR's registered agent in Delaware is National Registered Agents, Inc., 160 Greentree Dr., Suite 101, Dover, Delaware 19904. GMR's registered agent in California is National Registered Agents, Inc., 818 West Seventh Street, Suite 930, Los Angeles, CA 90017.

## III.   BACKGROUND

### Performing Rights Organizations and the Licensing of Copyrighted Music

13.     In the late 1800s, Congress conferred on songwriters and composers the exclusive right to perform their works publicly.  As a result, a bar or restaurant that plays music for its patrons needs a license to do so from rights holders in the musical compositions being heard, as do music users such as hospitals, office buildings, and, as relevant here, radio stations.  Under the current copyright regime, statutory damages run up to $150,000 per infringed work should a music user fail to secure a license when one is required.

14.     In the early 20th century, not long after Congress created the public performance right for musical compositions, a group of songwriters and composers formed the American Society of Composers, Authors and Publishers ("ASCAP"), which was the first U.S. "performing rights organization," known colloquially as a "PRO."  ASCAP's stated purpose was to aggregate the public performance rights of musical works in order to (1) facilitate the detection of unauthorized usages of those works and (2) serve as an intermediary between consumers and copyright holders and offer "one-stop shopping" for the suite of public performance rights under its control (its "repertory").

15.     Since ASCAP's early days, the PRO model has been recognized as anticompetitive, essentially by its very nature.  By assembling songwriters' works into a large pool, PROs are effectively ringleaders of a massive price-fixing

conspiracy that wields tremendous market power over would-be licensees.  In 1940, ASCAP unilaterally sought to double the royalty fees it demanded from radio stations.  In response to ASCAP's quintessentially monopolistic demands, radio stations formed their own PRO, Broadcast Music, Inc. ("BMI"), which they hoped (in vain) would provide an alternative to dealing with ASCAP.  In 1941, the U.S. Department of Justice ("DOJ") sued both ASCAP and BMI, alleging that the PROs' licensing practices violated the Sherman Act.  The PROs shortly thereafter settled the antitrust suits by entering into consent decrees.

16.     Even subject to the consent decrees, the PRO model, with the virtually inevitable accumulation of market power it entails, has invited anticompetitive behavior.  Within months of entering its antitrust consent decree, ASCAP ended up in litigation with hundreds of movie theaters who alleged ASCAP attempted to raise their fees by up to 1500%.  The court overseeing that litigation concluded that, even subject to that decree, "[a]lmost every part of the Ascap [*sic*] structure, almost all of Ascap's activities in licensing . . . involve a violation of the anti-trust laws." *Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers*, 80 F. Supp. 888, 893 (S.D.N.Y. 1948).  The reasons why are straightforward.  Individual composers, authors, and publishers of music are actual or potential horizontal competitors in licensing rights to their songs.  In consolidating these separate rightsholders' licensing decisions and charging a single all-in rate, PROs necessarily restrict price competition between horizontal competitors.  *Cf.* Antitrust Guidelines for the Licensing of Intellectual Property, the Dep't of Justice & The Fed. Trade Comm'n at 26-27 (Jan. 12, 2017), (explaining that under the present federal antitrust enforcement regime, "the Agency may conclude that the joint marketing of competing patent rights constitutes horizontal price-fixing and could be challenged as a per se unlawful horizontal restraint of trade"), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf.  And by agglomerating rights into "must have" bundles that are

complements rather than substitutes, PROs derive—and frequently seek to exploit—market power over music users.

17.   Over the years, DOJ has modified the ASCAP and BMI consent decrees to attempt to more effectively limit the extent to which the PROs can act anticompetitively.   ASCAP's was last amended in 2001, BMI's in 1994.   Those consent decrees still endure today.   The central features of the consent decrees are that ASCAP and BMI:

- Must not be the exclusive channel through which a music user can seek a license to use the songs in their repertories.   Thus if a licensee wants only the rights to a particular set of compositions, the PRO cannot prevent that direct licensing from taking place.   This means individual copyright holders can still compete against each other, and against the PRO, on price and other terms;

- Must issue licenses on request, even if final deal terms have not been hammered out, so that ASCAP and BMI cannot use the threat of imminent copyright infringement claims to extract eleventh-hour concessions from licensees;

- Must offer economically viable alternatives to a single, blanket license to use all the songs in their repertories for a set price, so that licensees who use very little music, like talk radio stations, pay an appropriately reduced rate, and so that music users are not disincentivized from entering into direct licenses with individual copyright owners by paying twice for a license to use the same works (once to the PRO, and again to the rights owner); and

- Must litigate in the courts overseeing their consent decrees if either PRO and a prospective licensee cannot agree on a rate.   The court, after a bench trial, will then determine a reasonable rate.

18.     In practice, these protections have proven critical for music users and for songwriters. "Must-have" licenses are reliably available at rates lower than the full monopoly rents ASCAP and BMI would otherwise extract. As a result, people tend to play more music. For example, radio stations historically could "break" new sound recordings and make them hits by including them on their playlists just as they are released to the public without worrying that public performances of those songs were unlicensed.[5]

19.     It was against the backdrop of the consent decrees that the Supreme Court famously rejected a lower-court finding that BMI was a *per se* unlawful horizontal price-fixing conspiracy. *BMI v. CBS*, 441 U.S. 1 (1979). Although recognizing that PROs "plainly involve concerted action in a large and active line of commerce" to which the *per se* rule would ordinarily apply, the Court held that blanket licenses issued by PROs should be assessed under antitrust's "rule of reason." *BMI*, 441 U.S. at 24. The Court reached that conclusion largely on the basis that BMI was not—and under the consent decree could not lawfully be—the exclusive channel through which licensees could obtain permissions to publicly perform the songs in its repertoire. *See id.* at 23-24; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("Areeda and Hovenkamp") ¶ 1908h (online ed. Sept. 2018).

20.     Indeed, the foremost antitrust treatise concludes that the lack of exclusivity in *BMI* was critical for rejecting the *per se* rule:

> [O]ur fears in the *BMI* case are alleviated by two facts; any performance right holder who wished was entitled to participate in the venture, and the venture itself was nonexclusive; that is, any participant was free to make as many sales outside the arrangement as it pleased. As long as the venture

---

[5] It often takes months or even years after a recording is released for publishers and songwriters to resolve ownership disputes regarding the underlying musical composition. *See* U.S. Copyright Office, *Copyright and the Music Marketplace* 194, n.954 (2015). This can affect which PROs are able to license that composition. As a result, radio stations have no choice but to take a license from all the PROs, to ensure that they are fully licensed to play new songs, regardless of the outcome of any ownership disputes.

admitted everyone who wished to join and as long as each member was permitted to make unlimited non-venture sales, the non-venture market would always act as a check on the market power of the venture.

Areeda and Hovenkamp ¶ 2103b; *id.* ¶ 1908h ("[In *BMI*], the right of the copyright holders to sell outside the blanket licensing arrangement ensured the presence of potential competition to inhibit the exercise of market power by the performing rights societies." ). Here, as will be discussed, GMR explicitly prohibits its affiliates from entering into the sorts of deals that the Court found counseled against application of the *per se* rule.

## SESAC Attempts to Gouge Licensees

21.     A third PRO, SESAC, had historically been a small player in the industry, focusing on a limited number of often esoteric genres of music. Likely owing to this niche focus, DOJ never targeted it, and it has never been subject to a government consent decree. However, when new owners took it over in the 1990s, SESAC identified a business opportunity. If SESAC abandoned its narrow genre focus and instead collected an indispensable repertory of works, it could charge licensees whatever it wanted because, unlike ASCAP and BMI, it was unconstrained by any regulatory decree. Thus, SESAC recruited high-profile songwriters like Bob Dylan and Neil Diamond, eliminated the potential for price competition among its affiliates, and willfully obtained a monopoly of its own. SESAC's repertory, as measured by share of public performances on radio, was in the same ballpark as GMR's—an order of magnitude lower than ASCAP and BMI's. But once it amassed a collection of rights that music users effectively could not do without, SESAC began a shakedown of radio stations and other licensees. It sought massive fee hikes, threatened licensees with copyright infringement penalties if they did not purchase a license, and refused to offer any type of license other than a blanket license to the works in its repertory. Moreover, SESAC entered into *de facto* exclusive agreements

1  with its affiliates that made it financially impractical for those copyright owners to

2  directly license their works.

3      22.    Both television stations and radio stations brought antitrust claims

4  against SESAC in separate suits.  In those cases, four different judges concluded that

5  SESAC's conduct likely or potentially violated the antitrust laws.  *Radio Music*

6  *License Comm. v. SESAC* ("*SESAC I*"), 2013 WL 12114098, at *13-20 (E.D. Pa.

7  Dec. 23, 2013) (Sitarski, M.J.) (finding RMLC likely to succeed on Section 2 claim);

8  *Radio Music License Comm. v. SESAC*, 29 F. Supp. 3d 487, 502-3 (E.D. Pa. 2014)

9  (Jones, J.) (denying SESAC's motion to dismiss RMLC's Section 2 claim); *Meredith*

10  *Corp. v. SESAC, LLC*, 2011 WL 856266, at *1 (S.D.N.Y. Mar. 9, 2011) (Buchwald,

11  J.) (denying SESAC's motion to dismiss); *Meredith Corp. v. SESAC LLC*, 1 F. Supp.

12  3d 180, 197 (S.D.N.Y. 2014) (Engelmeyer, J.) (denying SESAC's motion for

13  summary judgment).

14      23.    In both cases, the courts held that the relevant product market plausibly

15  could be for licenses to SESAC's repertory—rather than something broader like

16  public performance licenses to all musical compositions.  *Meredith*, 1 F. Supp. 3d.

17  at 196 ("[T]he Court, applying the rule of reason to the § 1 claim, holds that the

18  relevant market is fairly defined as that for performance licenses of the music in

19  SESAC's repertory, as plaintiffs propose."); *RMLC v. SESAC*, 2013 WL 12114098,

20  at *15 ("[T]his Court finds that RMLC has produced sufficient evidence to make a

21  prima facie showing that the relevant product market is the market for SESAC's

22  blanket license.").  Just as GMR does here, SESAC protested that it could not

23  possibly hold market power in any relevant market because it was so much smaller

24  than ASCAP and BMI.  But the courts concluded that licensees likely had no

25  meaningful alternative to purchasing a SESAC license—a relevant holding here

26  because GMR licenses a similar share of radio "spins" as SESAC.  *SESAC I*, 2013

27  WL 12114098, at *11 ("[T]he practical result [is] that a radio station must buy a

28  SESAC license"); *SESAC II*, 29 F. Supp. 3d at 501 ("SESAC excludes competitors

by obtaining a critical mass of must-have works, selling them exclusively in the blanket license format, discouraging direct licensing by refusing to offer carve-out rights and obscuring the works in its repertory."); *Meredith*, 1. F. Supp. 3d at 218 ("Thus, based on the summary judgment record, a jury could find that a local station cannot avoid SESAC's blanket license, because no alternative to it is realistically available."). And in both cases, the courts concluded that the lack of a consent decree constraining SESAC from imposing anticompetitive abuses on licensees likely deprived consumers of the procompetitive benefits that a blanket license may produce. *SESAC I*, 2013 WL 12114098, at *18-19; *Meredith I*, 2011 WL 856266, at *13; *Meredith II*, 1 F. Supp. 3d at 217.

24. Following these decisions, SESAC agreed to a set of restrictions resembling those in the ASCAP and BMI consent decrees. Under the RMLC settlement agreement, SESAC and RMLC agreed to negotiate in good faith to set rates and licensing terms through the year 2034. If negotiations fail, either party may elect to determine rates through binding arbitration, much like the rate court provided under the consent decrees governing BMI and ASCAP. Additionally, SESAC committed to provide greater transparency regarding the songs in its repertory and to cease entering into agreements with affiliates amounting to *de facto* exclusive licenses through 2037. SESAC agreed to a similar settlement agreement with the television industry.

25. In 2017, after RMLC and SESAC arbitrated a rate dispute concerning a reasonable rate to publicly perform the contents of SESAC's repertory, an arbitration panel determined that the monopolistic prices SESAC had previously been demanding from radio stations were over **60%** too high.

## IV. GMR'S ANTICOMPETITIVE AMBITION AND SCHEME

26. Given the historic, overwhelming consensus that unregulated PROs violate the antitrust laws, it was surprising that anyone in the music industry thought creating a new, unregulated PRO was a viable option. Yet, in 2013, industry

powerbroker Irving Azoff, long-time ASCAP executive Randy Grimmett, and a handful of songwriters founded GMR.  GMR was initially owned by Azoff MSG Entertainment, a joint venture between Azoff Music Management and the Madison Square Garden Company, and Mr. Grimmett, its Chief Executive Officer.  Azoff MSG Entertainment LLC is now known as The Azoff Company, LLC.  Notably, GMR is also owned by some of GMR's affiliated songwriters.

**GMR's Anticompetitive Purpose and Creation**

27.   GMR was founded explicitly to extract greater license fees from music users.  This was no secret; Irving Azoff trumpeted the plan to the world, stating, "We at GMR believe in higher rates."  According to Azoff, rights holders were supposedly being underpaid by the incumbent PROs—he believed that ASCAP and BMI were charging less than they could or should be.  Thus, he and Grimmett devised a plan to persuade a number of high-profile songwriters to leave ASCAP and BMI and allow GMR to start wielding their musical composition public performance rights.  In order to fund this promise, GMR needed to be sure of two things.  First, it needed to be sure to aggregate a collection of musical works that almost everyone in the business of publicly performing music had to purchase.  Second, it needed to force these music users, including radio stations, to pay exorbitant rates.

28.   Given the positions that Azoff and Grimmett occupied in the industry, they had ready access to a group of songwriters that they recruited and who collectively and together decided to join GMR *en masse*.  Among many other roles, Mr. Azoff is a high profile "artist manager," who oversees the professional undertakings of many premier artists.  He is the artist manager for likes of the Eagles, Jon Bon Jovi, Fleetwood Mac, John Mayer, Journey, and many others.  Mr. Grimmett, for his part, spent nearly two decades working for ASCAP before joining GMR as its CEO.  He worked on the membership side of the business—and

1   as such, was closely involved in building and maintaining ASCAP's repertory.  In

2   this capacity, he worked directly to recruit and retain songwriters.

3       29.   Thus, it is no surprise that the songwriters who joined GMR were

4   disproportionately former ASCAP affiliates represented by Azoff.  For example, the

5   following songwriters joined GMR who were or continue to be managed by Azoff:

6   Joe Walsh (Eagles), Don Henley (Eagles), JD Souther (Eagles), Jon Bon Jovi,

7   Lindsey Buckingham (Fleetwood Mac), Jonathan Cain (Journey), Neil Schon

8   (Journey), Steve Perry (Journey), Travis Scott, and John Mayer.  This list is not

9   exhaustive, and Mr. Azoff's relationships with the other songwriters and publishers

10  in GMR's repertory is not completely known.  Similarly, when GMR shared its list

11  of songwriters with RMLC in 2015, 41 out of 47 were formerly affiliated with

12  ASCAP, Mr. Grimmett's former employer.

13      30.   Azoff and Grimmett were essentially successful in the pursuit of their

14  fundamentally anticompetitive goals.  As Azoff himself put it, GMR assembled a

15  "full roster of songwriters that nobody can, shall we say, comfortably exist without."

16  GMR was able to lure these songwriters away from ASCAP and BMI with a promise

17  to pay them rates of 30% more than ASCAP or BMI had paid them during their

18  highly successful and already lucrative careers, as well as the promise (as advertised

19  by Azoff and others) that they would be joined at GMR by other premier artists of a

20  similar caliber.

21      31.   The songwriters' decisions to join GMR were clearly the product of

22  coordinated activity.  Not only were they all plainly made with knowledge of what

23  the others were doing, but from first principles, the decisions would have made no

24  economic sense otherwise.  Leaving an established PRO whose leverage in licensing

25  negotiations derives from the breadth of its catalog for a new PRO with an uncertain

26  repertory is a decidedly risky proposition.  No individual songwriter-performer of

27  the caliber GMR recruited would have taken the plunge without knowing other

28  songwriters were doing the same.  And none had to.  It was widely publicized,

through Azoff, Grimmett, and the media alike, that a substantial collection of already-wealthy songwriters were collectively decamping to GMR. *See* Ed Christman *et al.*, "[Pharrell to leave ASCAP for Irving and Grimmet's Global Music Rights](#)," *Billboard* (July 25, 2014) ("Global Music Rights' roster is expected to encompass between 30 and 60 writers, with about half of them expected to be drawn from the Azoff Management portfolio.").

32.    As for the "product" that Azoff and company were jointly creating, essentially nothing GMR sells is "new" in any meaningful sense (except for the occasional newly written song included in its repertoire). Rather, everything that GMR sells is something that was previously available, in bundled form, through pre-existing PROs. What GMR has done is take existing assets, unbundle them from their prior sellers, rebundle them as an independent product with less value to music users, and charge more.

**The Exclusive Licensing Funnel and Obscured Repertory**

33.    GMR has all the attributes that led multiple courts to conclude that SESAC likely violated the antitrust laws. However, GMR has done certain things that even SESAC did not do. For starters, whereas SESAC was condemned for having *de facto* exclusive deals with its affiliates (*i.e.*, the songwriters and publishers who own the underlying copyrights), GMR has admitted in this litigation that it has *explicit* exclusive deals preventing its affiliates from directly licensing their works to music users. As mentioned, the consent decrees prohibit ASCAP and BMI from restricting their affiliates from directly licensing. This was the key reason the Supreme Court concluded that BMI should not be subject to *per se* condemnation. *BMI*, 441 U.S. at 23-24. And, unlike SESAC, GMR was founded by and actually *owned* by the very songwriters who have agreed to sell their works exclusively through a GMR blanket license.

34.    Like SESAC before it, GMR intentionally made it impossible for radio stations to determine the necessary details about the works in its repertory. Prior to

LATHAM&WATKINS LLP

RMLC's filing of this suit in Philadelphia, GMR refused to identify definitively the works that were in its repertory.  GMR made available a partial list, but it was caveated to the point that no prudent music user could rely on it:  GMR warned that the list may not be up to date, and that it changed regularly to reflect newly added songs; yet GMR declined to assure radio stations and others that it would not pursue infringement claims over works not included on even the latest version it had released—at least against broadcasters who refused a GMR license and sought to work around its repertory.  And GMR made clear that its repertory changes on a continual basis.  Indeed, it is continuing to add new songwriters.

35.  Because GMR refused to provide any guarantee or warranty concerning the accuracy, completeness, timeliness, or reliability of the repertory information that it provided and because it has told music users that they proceed at their own risk of copyright infringement if they try to rely on GMR's repertory information, GMR made it effectively impossible for radio stations to avoid the risk of copyright infringement claims absent taking a license from GMR.  Even the few stations that could have attempted to avoid a GMR license by trying to avoid GMR music could never have had complete confidence due to GMR's failure to provide accurate and up-to-date data and other factors beyond the stations' control, and thus would have operated under a continuously looming infringement threat.

36.  After RMLC sued GMR and complained of this lack of transparency, GMR made changes to its website that purport to increase transparency, effectively conceding that its previous conduct was wrongful.  GMR's website now states that it will provide a digital copy of its repertory and warrants that it will not sue anyone for copyright infringement unless the work appears in the catalog at the time of performance.  However, its website's terms and conditions appear to nullify this warranty by stating: "[GMR] makes no guarantees, warranties or representations of any kind with regard to and cannot ensure the accuracy, completeness, timeliness, quality or reliability of any information made available on and through the Company

1   Database."  And critically, nothing prevents GMR from going back to the way it

2   used to do things and using this lack of transparency as a point of leverage over

3   licensees.

4   **Use of Fractional Licensing for Anticompetitive Ends**

5   37.   One might think that obtaining a blanket license to publicly perform the

6   works in GMR's repertory would give a licensee the right to publicly perform any

7   work in GMR's repertory without fear of infringement.  Unfortunately for licensees,

8   that common-sense assumption is not true when it comes to GMR's blanket license.

9   GMR offers only what is known as a "fractional" license.  The phenomenon of

10  fractional licensing arises when a song is written by two or more songwriters.  The

11  default rule in copyright law is that songwriters are tenants in common, meaning that

12  the co-owners may have differing fractional shares in a work, but they own those

13  shares as undivided interests in the unitary work.  Thus, like a tenant in common of

14  real property, each co-owner of the song is free to make entire use of the property

15  on a non-exclusive basis—meaning that obtaining a license from one co-owner

16  confers on the licensee the right to publicly perform the work, without the need for

17  a license from the other co-owners.

18  38.   Consistent with the default tenancy-in-common rule under copyright

19  law, ASCAP and BMI long provided "full-work" licenses, meaning that, so long as

20  one co-author of a work was affiliated with the PRO, that PRO's blanket license

21  conferred the right to publicly perform that work.  GMR, however, has upended this

22  long-established understanding of the PRO marketplace.  GMR purports to issue a

23  license only covering rights corresponding to the percentage ownership that its

24  affiliated songwriter controls—that is, it provides only a "fractional" license.  This

25  means that obtaining the right to publicly perform a co-written song from GMR

26  where any of the song's co-writers is not represented by GMR does *not* confer the

27  public performance right on the licensee.  For example, the Beatles song "Eight Days

28  A Week" is in GMR's repertory.  Because that song was co-written by John Lennon

and Paul McCartney, and GMR has the rights only to John Lennon's ownership share (via his estate), GMR avers that its license does not grant licensees the right to publicly perform "Eight Days A Week" without *also* purchasing a license from whoever controls Paul McCartney's public performance right.

39.    GMR's business model depends substantially on fractional licensing. Amassing a significant catalog of wholly controlled works would have been expensive and time consuming.  Rather than going that route, GMR poached a relatively small number of top songwriters with fractional interests in thousands of popular works.  Thus, many, if not a majority, of the "works" in GMR's repertory, are in fact only *fractional interests* in works.  Moreover, since GMR's formation, ASCAP and BMI have claimed for the first time that they do *not* have the right to agree to full-work license grants.

40.    The Department of Justice has recognized the obvious anticompetitive impact of such conduct.  In explaining its decision not to seek an amendment to the ASCAP and BMI consent decrees explicitly permitting fractional licensing, DOJ observed that if an "owner[] of [a] fractional interest[] in a song" withdrew from ASCAP or BMI, "[a] user with a license from ASCAP or BMI would then be unable to play that song unless it acceded to the hold-out owner's demands, *providing the hold-out owner substantial bargaining leverage to extract significant returns*."[6] That describes GMR's business model to a T.

41.    Indeed, a blanket license from GMR has little or no value standing alone.  Because GMR's repertory largely features fractional shares of works, a GMR blanket license would not protect a station from an infringement lawsuit by the owners of the remaining fractions.  Even if a station pays for a GMR license, it still cannot play most of the "works" in GMR's repertory without fear of copyright

---

[6] *See* U.S. Dep't of Justice, *Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees* at 3 (Aug. 4, 2016) ("DOJ Statement") (emphasis added), *available at* https://www.justice.gov/atr/file/882101/download.

infringement.  Thus, the primary value of a GMR license is as ransom: it gives music users the ability to play songs that they are already paying other PROs for.

42.     GMR's conduct has undermined the procompetitive benefits of the blanket licensing regime.  The DOJ rejected the claim that fractional licensing is allowed by the ASCAP and BMI consent decrees in the first instance.  And while BMI successfully brought a declaratory judgment action to establish that the consent decrees did not expressly prohibit fractional licensing, the Second Circuit, in affirming, left open the possibility that fractional licensing by PROs may violate the Sherman Act itself.  As the DOJ explained, "only full-work licensing can yield the substantial procompetitive benefits associated with blanket licenses that distinguish ASCAP's and BMI's activities from other agreements among competitors that present serious issues under the antitrust laws."  *See* DOJ Statement at 3.   It continued to state,

> [T]he Supreme Court explained that the ASCAP and BMI blanket license "allows the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations*, and great flexibility in the choice of musical material. *BMI*, 441 U.S. at 21-22. (emphasis added).  In so doing, they provide, "unplanned, rapid, and indemnified access" to the works in ASCAP's and BMI's repertories. *Id.* at 20.  If the licenses were fractional they would not provide *immediate* use of covered compositions; users would need to obtain additional licenses before using many of the covered compositions.  And such fractional licenses would *not* avoid the delay of additional negotiations, because users would need to clear rights from additional owners of fractional interests in songs before performing the works in the ASCAP and BMI repertories. *Id.* at 12.

43.     Because GMR does not offer a "full-work" license, it does not "allow[]" the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations . . . ."  BMI*, 441 U.S. at 21-22 (emphasis added).

# V.   GMR'S SHAKEDOWN OF RADIO STATIONS

**Industry Licensing Practices**

44.   A brief background regarding how radio stations historically have licensed music provides important context for the licensing discussions between GMR and RMLC.  Radio stations use a vast array of musical works.  They play feature music for the purpose of entertaining their listeners; they use theme music and "bumpers" as background material and as bridges between programming segments; they air third-party programming and advertisements that may or may not contain feature music; they introduce programs with musical themes; and they sometimes make use of ambient, or background, music, such as music broadcast during intermissions at live sporting events.  Radio stations often do not know what songs will appear on their programming, and certainly do not control the choice of music that they broadcast in a wide range of scenarios.

45.   To broadcast music without infringing public performance rights, radio stations obtain licenses from PROs, which have historically offered a range of different licenses.  The basic "blanket license" provides a licensee with the right to use any piece of music in the PRO's repertory without having to account for actual usage.  If a PRO charges a set periodic fee for such a license, "carve-out rights" would entitle licensees to discounts if they secure separate permissions directly from the copyright owners to musical works subsumed within the blanket license.  One alternative license form known as a "per-program license" permits a licensee to use all songs in a PRO's repertory, but only for the purpose of specific radio programming that is generally associated with an "all-talk" format.  Fees for per-program licenses derive only from revenues associated with the relevant program, which allows radio stations to reduce their licensing costs by reducing the number of programs that make feature performances of music from a particular PRO's

repertory.[7]   More recently, adjustable-fee blanket licenses, or "AFBLs", entitle licensees to discounts if they secure separate permissions directly from the copyright owners to musical works included in the PRO's repertory.

46.    Plaintiff RMLC is an association that represents the interests of the commercial radio industry with respect to obtaining public-performance licenses to copyrighted music.   To this end, RMLC currently negotiates license fees with ASCAP and BMI, whose consent decrees provide for a definitive, time-tested, rate-setting process in federal court.  RMLC likewise negotiates license fees with SESAC on behalf of RMLC's members, subject to a binding arbitration process required under a 20-year settlement agreement that resolved substantially similar claims to those alleged here.  RMLC seeks to obtain fair and reasonable license fees from PROs on behalf of radio stations, negotiates for per-program licenses that allow talk radio stations to achieve further fee discounting, and aims to achieve the broadest possible licenses covering new-media applications, including HD multicasting and streaming.  Approximately 10,000 terrestrial radio stations in the United States are currently licensed in accordance with RMLC-negotiated industry licenses with ASCAP and BMI, and over 7,000 participated in RMLC's first-ever binding rate arbitration with SESAC.

## GMR Targets the RMLC

47.    GMR sought out RMLC to discuss licensing terms and rates that GMR could offer to RMLC's radio station members.  It became clear that GMR intended to perpetuate the exact harms that SESAC previously wrought on the industry.  In particular, in the two months preceding RMLC's original complaint in the Eastern District of Pennsylvania, *see Radio Music License Committee, Inc. v. Global Music*

---

[7] Such discounts are critically important to make it economically rational for music users to enter direct licensing deals with rights owners. If the price of a PRO license were unchanged irrespective of whether a radio station had a license agreement in place straight with the songwriter, then there would be no incentive for the station to enter such deals, and thus no competition with the PRO from the individual rights owners.

*Rights*, 2:16-cv-06076-CDJ (E.D. Pa. Nov. 18, 2016), ECF No. 1, GMR implicitly threatened to sue radio stations that did not quickly agree to its terms and purchase a license. GMR emphasized January 1, 2017, as the deadline for obtaining a license because, as of that date, the stations' "licenses-in-effect" with ASCAP and BMI would cease to cover songs (or fractional interests in songs) that had moved to GMR's repertory.

48. As discussed, before joining GMR, all or virtually all of GMR's affiliates were members of ASCAP or BMI. When a writer or publisher withdraws from ASCAP or BMI, the PRO does not automatically lose the right to license radio stations for that writer's or publisher's works. If that were the case, stations that purchase ASCAP or BMI licenses would need to verify the contents of ASCAP or BMI's repertory every day to learn if the rights owners had withdrawn a work from the PRO repertory. To prevent that unmanageable situation, ASCAP and BMI granted the right to RMLC stations to continue to perform all works that were in PROs' repertories at the time their "licenses-in-effect" with RMLC were created, and any works added to their repertories during the term, even if the songwriter or publisher purports to withdraw during the term of the RMLC license. Through this arrangement, radio stations were temporarily able to perform works controlled in whole or in part by a GMR affiliate, even without obtaining a GMR license, because the works were covered by the station's license-in-effect with the affiliate's prior PRO, *e.g.*, ASCAP or BMI. The artists would still be paid through their former PRO during that time. For a short time period, these licenses-in-effect largely shielded radio stations from the risk of infringing the works in GMR's repertory. But GMR indicated to RMLC during the parties' licensing negotiations that, after these licenses-in-effect expired on December 31, 2016, GMR intended to pursue its remedies against radio stations that had not signed a license with GMR, meaning that stations without GMR licenses by January 1, 2017, would have been at risk of

1   potential infringement penalties up to $150,000 per infringed GMR work that aired

2   on their stations.

3       49.    GMR simultaneously demanded (and continues to demand) a

4   supracompetitive price to perform its works.  The DOJ noted in August of 2016 that

5   ASCAP and BMI historically charged "fees based roughly on their respective market

6   share accounting for partial interests in the songs in their repertories."   DOJ

7   Statement at 11.  GMR, in contrast, has demanded stations pay rates multiples higher

8   than they would pay if ASCAP, BMI, or even SESAC licensed the exact same

9   number of works of exactly the same popularity: first, by calculating a "spin share"

10  of U.S. radio music (i.e., the percentage of *plays* of works that GMR controls, rather

11  than the percentage of total works), and second, by multiplying that "spin share" by

12  various undisclosed factors to create a claimed "value share" of roughly *double* (or

13  more) its actual spin-share.  That is the only way that GMR can keep its promise of

14  paying affiliates at least 30% more than they earned at ASCAP and BMI, while

15  generating a profit for itself, all without the efficiencies and economies of scale

16  enjoyed by ASCAP and BMI.  GMR has also stated that it views its share of royalties

17  as roughly 3x or 4x of SESAC's despite the fact that it has a roughly comparable

18  spin-share to SESAC.

19      50.    Based on these assertions, GMR demanded over $42 million for 2017

20  alone from a subset of RMLC's member stations representing only about 75-80% of

21  total U.S. radio revenues.   (At that time, GMR had already signed a license

22  agreement with iHeartMedia, the largest radio broadcaster in the United States, with

23  over 850 radio stations and representing an estimated 20-25% of radio industry

24  revenues.)  Thus, GMR's fee demand translates to more than 15% of music royalties

25  paid by commercial U.S. radio stations in the aggregate.  But GMR has nowhere

26  near a 15% share of the total music "spins" by those stations—irrespective of

27  whether those "spins" are weighted to count broadcasts with more listeners more

28  heavily than broadcasts with fewer listeners, or tempered by other industry-standard

1  data analysis techniques.  The royalties GMR was demanding were by any available
2  measure radically disproportionate to the actual use of GMR's music.  Its approach
3  was, and remains, "take it or leave it" pricing fully divorced from market constraints.

4      51.    GMR also promised to ratchet up its already supracompetitive prices
5  by demanding annual rate increases.  The increases would occur regardless of
6  whether GMR's repertory contained less frequently played works, or a smaller
7  percentage of works controlled 100% by GMR.

8      52.    In addition to these abusive pricing demands, during discussions with
9  RMLC, GMR also would not commit to allowing its affiliates to enter into direct
10 licenses with radio stations; offering blanket-license carve outs for direct-licensing
11 affiliates or for affiliates removed from stations' playlists; or offering per-program
12 licenses or other alternatives to its blanket license.

13     53.    In early November 2016, GMR definitively refused RMLC's offer to
14 set an interim, reasonable royalty rate and have a neutral arbitrator set final rates.

15     54.    In sum, GMR refused to negotiate terms consistent with core
16 protections in the antitrust consent decrees and antitrust settlement agreement
17 governing the other three PROs.  Because of the tremendous market power GMR
18 wields, GMR's refusal left RMLC no choice but to file suit and seek emergency
19 injunctive relief before the December 31, 2016 deadline.  RMLC did so on
20 November 18, 2016.  *See* Mot. for Prelim. Inj., *Radio Music License Committee, Inc.*
21 *v. Global Music Rights*, 2:16-cv-06076-CDJ (E.D. Pa. Nov. 18, 2016), ECF No. 3.

22     55.    To obviate RMLC's pending preliminary injunction motion, GMR
23 ultimately agreed to offer radio stations an interim license that would last for nine
24 months while the litigation played out, but that would not prejudice either side (nor
25 RMLC member stations) from seeking relief based on a claim that the interim license
26 rates are too high or too low.  RMLC and GMR expressly agreed that despite the
27 agreement, they each "reserve their respective right to seek a retroactive fee
28 adjustment in future licenses or as a result of the current litigations."

56.    On December 24, 2016, RMLC announced to its members the terms of the interim license that GMR had agreed to offer them, and thereafter withdrew its preliminary injunction motion without prejudice. Under the terms of the interim license, GMR gave radio stations until January 31, 2017, to sign up for the license and stated that it would not pursue copyright infringement claims against any stations before January 31. Since that original interim license, RMLC and GMR have agreed to terms for GMR to offer radio stations subsequent interim licenses.

57.    Apart from those interim licenses, more than 1,100 radio stations across the country owned by iHeartMedia, Inc. and Townsquare Media (both RMLC members) have signed longer-term, non-interim licenses with GMR. GMR signed those license agreements before GMR offered the interim license to the rest of RMLC's members on December 24, 2016, and those agreements likewise reflect the exercise of GMR's market power. GMR has stated that the terms of both the iHeart and Townsquare contracts contain provisions that would permit both iHeart and Townsquare to obtain the benefits of any remedies that RMLC is able to achieve through this lawsuit.

58.    On March 29, 2019, the Eastern District of Pennsylvania transferred this case to the Central District of California.

## VI.    THE ECONOMICS OF GMR'S CONDUCT

59.    GMR did not go out and build a better mousetrap. In fact, it didn't build anything at all. It took pre-existing IP rights, which radio stations previously had to obtain in three transactions (i.e., purchasing an ASCAP, BMI, and SESAC license), lumped them together into a fourth point of hold-up, and charged more for them on a pro-rata basis. ***There is nothing pro-competitive about that***. Compared to the *status quo ante*, GMR has increased costs and inefficiencies while offering nothing to consumers in return.

**Licenses to PRO Repertories Are Complements, Not Substitutes**

60.     For the vast majority of radio stations, in order to broadcast music without fear of infringement liability, the radio station must purchase a license from any entity that controls a critical mass or "must-have" set of public performance rights.  All four of the major U.S. PROs—ASCAP, BMI, SESAC, and now GMR— control collections of public performance rights that most commercial radio stations effectively cannot avoid.  Because licensees must acquire all four sets of rights, licenses to PRO repertories are complements, not substitutes.  That complementarity means PROs do not compete against each other regarding licenses to their repertories.  This is the same conclusion that the Federal Trade Commission reached in determining that the major record labels' catalogs of sound recording rights were each "must have" for digital streaming services, and therefore were complements, not substitutes.  *See* Sept. 21, 2012 Statement of Bureau of Competition Director Richard A. Feinstein *In the Matter of* Vivendi, S.A. and EMI Recorded Music Broadcasters, *available at* https://www.ftc.gov/sites/default/files/documents/closing_letters/proposed-acquisition-vivendi-s.a.emi-recorded-music/120921emifeinsteinstatement.pdf.  Thus, because PRO repertories are complements, there was no reasonably interchangeable substitute to turn to when GMR demanded its extortionate rates.  Radio stations could not choose to license only the works in ASCAP, BMI, and SESAC's repertories.  For example, neither iHeart nor Townsquare were able to stop purchasing licenses from SESAC, ASCAP, or BMI just because they purchased a license from GMR.

61.     That is because GMR assembled a collection of works that at least the vast majority of radio stations, as a practical matter, cannot avoid playing.  There are several reasons for this.  First, many radio stations do not have total control over the songs that they play.  For example, advertisements and programming frequently come pre-packaged with music the station cannot remove.  Second, the works in GMR's repertory were too prolific and numerous for most radio stations to avoid playing them.  While it may be possible in theory for a radio station to avoid playing

songs written by one or two big names like Drake or Smokey Robinson without upsetting listener expectations, the same cannot be said of failing to play songs written by Drake and Smokey Robinson along with those written by John Lennon, Bruce Springsteen, Bruno Mars, Fleetwood Mac, John Mayer, Jon Bon Jovi, Prince, Pharrell Williams, The Who, and the 70 remaining songwriters who joined GMR. This is particularly so because, as noted above, a GMR license is even required to perform all songs that GMR songwriters *co*-wrote, even if the co-writers are not GMR affiliates. And GMR deliberately structured its holdings to include rights to songs across genres, acquiring rights to songs performed by the Steve Miller Band and the Eagles (seminal classic rock acts from the 1970s), Bruno Mars and Taylor Swift (contemporary pop stars), Jay-Z and Drake (notable hip-hop artists), and other performers whose songs would be certain to get airplay across a wide array of programming formats—from Madonna to Bruce Springsteen to Ira Gershwin. GMR touts on its website that its repertory contains **131** Billboard Hot 100 songs. Indeed, that was the goal Mr. Azoff announced to the world: "We have a full roster of songwriters that nobody can, shall we say, comfortably exist without."[8]

62. Licenses to the four PRO repertories are essential inputs into a downstream product—i.e., broadcast radio. This space exhibits a phenomenon that plagues markets containing multiple complementary inputs for a downstream product: The aggregate price of the complementary inputs increases each time an additional point of hold-up is introduced. This is a problem that occurs often in intellectual property markets where a downstream product must acquire multiple patents in order to function. With each additional, required intellectual property right, the aggregate price the downstream supplier must pay becomes higher. Here, consistent with economic theory, GMR has added an additional choke-point for the

---

[8] Because GMR amassed a must-have repertory of works, radio stations are largely indifferent about each additional songwriter or publisher that joins GMR with respect to demand elasticity. Virtually all radio stations must purchase licenses from all four PROs.

1   sale of a critical complementary input.  That is anticompetitive.  It is bad for markets,

2   bad for radio stations, and bad for consumers.

3       63.   The relevant product market is for a license to publicly perform the

4   aggregated copyrighted musical compositions in GMR's repertory.  This market

5   definition is in keeping with both the legal and economic understanding of PRO

6   repertories.  From an economic standpoint, once a PRO repertory reaches a critical

7   mass and licensees cannot avoid taking a license without risking infringement

8   liability, the PRO repertory is its own product market.  The law confirms this

9   economic understanding.  *Every court to have addressed the question has concluded*

10   *that a given PRO's repertory constitutes its own product market.  See, e.g.*, *Meredith*

11   *II*, 1 F. Supp. at 196 ("[T]he Court, applying the rule of reason to the § 1 claim, holds

12   that the relevant market is fairly defined as that for performance licenses of the music

13   in SESAC's repertory, as plaintiffs propose."); *SESAC II*, 2013 WL 12114098, at

14   *15 ("[T]his Court finds that RMLC has produced sufficient evidence to make a

15   prima facie showing that the relevant product market is the market for SESAC's

16   blanket license."); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment*

17   *Services*, 746 F. Supp. 320, 326 (S.D.N.Y. 1990) ("Here, the relevant product market

18   is apparent: copyrighted musical compositions in BMI's repertoire.").

19   **GMR's Market Power**

20       64.   GMR has market power in the market for licenses to the musical

21   compositions in its repertory.  It has 100% of the market.  The only potential

22   competitors to GMR for these exclusive works are GMR's own affiliates.  By virtue

23   of being members of the GMR cartel and as a result of GMR's exclusionary

24   practices, however, those copyright holders will not and/or cannot compete with

25   GMR or each other; they will not directly license their copyrights to radio stations.

26   (And because, prior to this lawsuit, GMR refused to reliably disclose the contents of

27   its repertory in real time, and because GMR has no incentive or obligation to do so

28   absent this lawsuit, stations would not even know which direct licenses to seek

1    anyway.)  Thus, stations cannot substitute individual direct copyright licenses for a

2    license to the GMR repertory.

3         65.    Direct evidence of GMR's monopoly power is abundant.  GMR's

4    demands during negotiations with RMLC, to which almost all member stations

5    would have had to accede absent this lawsuit, are direct evidence of its monopoly

6    power.  Before GMR acquired its repertory of essential works, RMLC member

7    stations had the ability to play all or most of those works through their licenses with

8    ASCAP and BMI.  Because of GMR's unlawful practices, radio stations are forced

9    once again to license the same works, only this time for prices far greater than what

10   ASCAP, BMI, or SESAC could charge.  Instead of charging a comparable rate to

11   what radio stations were paying previously for the **exact same rights**, GMR

12   demands rates many multiples higher.  That is open and notorious evidence of

13   monopoly power—as well as evidence of harm to competition.  Moreover, GMR

14   demanded that stations' license fees increase on a yearly basis.  Those increases are

15   monopoly rents unassociated with any improvement in GMR's repertory or product

16   offerings.

17        66.    GMR is not constrained by any competitor because it has none.  If GMR

18   were to raise prices five to ten percent above marginal cost, consumers of GMR

19   licenses, including RMLC members, could not look to ASCAP's, BMI's, SESAC's,

20   or any others' licenses as substitutes.  Indeed, RMLC members are currently paying

21   interim license fees to GMR because ASCAP, BMI, and SESAC do not offer

22   licenses that confer the right to publicly perform the works in GMR's repertory.

23        67.    Even if it were possible from a competitive standpoint to forego a GMR

24   license (and it is not), radio stations are unable to shift their businesses entirely to

25   the other PROs because (1) many stations do not have total control over the songs

26   they play and thus may risk infringement from the inadvertent broadcast of music in

27   the GMR repertory; (2) GMR's exclusive contracts with its affiliates eliminate the

28   possibility that a station  could even try to buy only the rights it needs directly from

1   the owner of those rights; (3) stations have no guarantee that the exact contents of
2   GMR's repertory can be known at any given time so have no incentive (much less
3   ability) to even try to program around those songs; and (4) the risk of forgoing a
4   license to the GMR repertory is the real and imminent threat of an infringement
5   lawsuit.

6        68.    The barriers to entry into this market are insurmountable, by definition.
7   A new supplier of performance rights (i.e., some hypothetical *additional* PRO) could
8   not constrain GMR's monopoly power because only GMR has the exclusive ability
9   to license the essential musical works in its repertory.  Whatever that hypothetical
10  entrant might supply, it cannot supply a substitute for what GMR sells, even if it
11  succeeded in luring some subset of GMR's affiliates away.  Ultimately, the only
12  potential competitors to GMR are its affiliates, but because GMR shares its
13  monopoly profits with those affiliates and has exclusive deals with them, those
14  affiliates are bound to the cartel and have no incentive to leave and compete
15  separately.   GMR's monopoly is consequently completely immune from
16  competition.

17       69.    Absent relief from this Court, radio stations will have little choice but
18  to agree to a licensing agreement and pay the extortionate rates that GMR demands.
19  As GMR states publicly and has repeatedly made clear to RMLC, an infringement
20  suit is a course of action that GMR will pursue, and any station that does not agree
21  to its demands may be subject to statutory damages of up to $150,000 for each GMR
22  work performed.

23  **Harm To Competition**

24       70.    GMR harms competition and causes substantial anticompetitive effects
25  in myriad ways detailed throughout this complaint, including without limitation
26  (1) demanding supracompetitive prices, (2) restricting the ability for consumers to
27  have a choice of alternative licensing options and sources of licenses, and
28  (3) reducing consumer efficiency.

71.    GMR's songwriter affiliates are actual or, at least, potential competitors.  In a competitive market, a radio station or other licensee should be able to negotiate with songwriters for the rights to their works, and those songwriters would compete with each other on price and quality.  Within the meaning of the antitrust laws, GMR's affiliates are horizontal competitors.  GMR has explicitly prohibited its affiliates from entering into direct deals with radio stations, and GMR's refusal to allow carve-out rights or per-program licenses makes it so there is little incentive to do a direct deal anyway.  This conduct ensures that the only way to obtain a license to any of the works in GMR's repertory is by dealing with GMR, which restricts consumer choice and inflates the price that licensees, including RMLC members, must pay.  These are paradigmatic harms to competition.

72.    The consent decrees and SESAC settlement agreement prohibit ASCAP, BMI, and SESAC from restricting their affiliates' abilities to enter into direct licenses with consumers.  The mere availability of direct licensing places competitive pressure on the rates ASCAP, BMI, and SESAC can command.  For example, in May 2016, ASCAP paid a $1.75 million fine to settle a contempt proceeding brought by the Department of Justice for ASCAP's violation of its consent decree.  *See* U.S. Dep't of Justice, *Justice Department Settles Civil Contempt Claim against ASCAP for Entering into 150 Exclusive Contracts with Songwriters and Music Publishers* (May 12, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-settles-civil-contempt-claim-against-ascap-entering-150-exclusive.  In order to try to compete more effectively for songwriter members, ASCAP had paid bonuses and incentives to a select group of 150 members and, in order to protect that investment, required those members to license their rights exclusively through ASCAP.  The DOJ concluded that this violated provisions in the consent decree that preclude any interference with a music user's right to directly license from the copyright owner without having to go through a PRO.  *See, e.g.*, Mem. in Supp. of United States' Unopposed Mot. to Enter

Proposed Settlement Agreement & Order, *United States v. Am. Soc'y of Composers, Authors & Publishers*, Suppl. Case No. 41-1395 (DLC) (S.D.N.Y. May 12, 2016), ECF No. 750. ASCAP had to void its exclusive contract provisions and pay a fine for its contempt. GMR's CEO Grimmett was at ASCAP and upon information and belief supervised the contracting practices that violated the consent decree.

73. GMR's refusal to provide carve-out rights or to offer per-program licenses to RMLC stations further makes it uneconomical for consumers to acquire licenses directly from copyright holders. Therefore, to the extent that any of GMR's affiliates could possibly engage in direct deals under their affiliation agreements, GMR's conduct has intentionally destroyed any economic incentive to do so. This has the effect of limiting consumers' choices and degrading the quality of licensing options available, as radio stations had those direct-licensing and alternative-licensing options prior to GMR's entry into illegal agreements with its affiliates.

74. GMR and its affiliates have agreed to raise the prices for pre-existing IP rights without offering any corresponding pro-competitive value. Market prices that increase directly because of price-fixing, monopolization, or attempted monopolization constitute another paradigmatic injury to competition. GMR explicitly announced that it would be raising prices by at least 30% for assets that were already sold. But GMR also created a fourth point of hold-up for radio stations acquiring public performance rights. This creates additional transaction costs and also creates the complementarity problem referenced above at paragraph 62.

75. Further, due to the fact that GMR sells only a fractional license, it does not provide "one-stop shopping" for the public performance rights for the works contained in its repertory. Thus, the pro-competitive efficiencies the Supreme Court found important in *BMI* are not present. GMR's blanket license does not "allow[] the licensee *immediate use* of covered compositions, *without the delay of prior individual negotiations* and great flexibility in the choice of musical material." *BMI,*

LATHAM&WATKINS LLP

441 U.S. at 21-22.  (emphasis added).  GMR's blanket license does not provide "unplanned, rapid, and indemnified access" to the works in its repertory.  *Id.* at 20.

76.    In addition, GMR's previous conduct did not provide radio stations a way to determine reliably what was in its repertory of works at a given time.  Prior to RMLC suing GMR, GMR provided very little information about the contents of its repertory.  It refused to provide a definitive list of the works that were in its repertory; it refused to warrant that it would not sue a music user if it played a song that GMR did not list on its website without a GMR license, but also stated that its repertory changed on a continual basis; and it refused to indicate which interests in works were fractional and which were "full-work."  Thus, to the extent that a radio station could even attempt to avoid buying a GMR license, GMR did not make it feasible to know which songs should be avoided.  This was a deliberate attempt to destroy any potential alternatives to buying a GMR license, ensuring that GMR was another toll on the road to being able to publicly perform musical compositions.  Only after RMLC's lawsuit did GMR purport to provide a public "catalog" of the works in its repertory and warrant that it would not sue music users for infringement for playing a work that was not listed in its repertory, essentially admitting that its previous practices were anticompetitive.  These changes, however, which GMR implemented only after RMLC filed its lawsuit, do not eliminate the need for the injunctive relief that RMLC seeks.  If GMR prevails in this litigation, nothing would stop it from going back to the way it did things before.  And even its new catalog is insufficient to protect music users from inadvertent infringement, since it appears to explicitly disclaim that music users can rely on the catalog in any way:  "[GMR] makes no guarantees, warranties or representations of any kind with regard to and cannot ensure the accuracy, completeness, timeliness, quality or reliability of any information made available on and through the Company Database."

**Geographic Market**

LATHAM&WATKINS LLP

77.     The relevant geographic market is the United States.  GMR does not limit its sales to any one part of the country, but sells licenses to RMLC members and to other consumers all over the United States.

## VII.    ANTITRUST INJURY TO RMLC'S MEMBERS

78.     RMLC's members have suffered or imminently will suffer injury of the type that the antitrust laws were intended to prevent and that flows from that which makes GMR's acts unlawful.

79.     Price-fixing and monopolization that eliminate competition between rivals and that cause consumers to pay supracompetitive prices epitomize the kind of injury that the antitrust laws were intended to prevent.  That injury is even more contemptible where, as here, the monopolist or co-conspirators charge higher prices for an inferior product and deprive consumers of previously available options for licensing the works in GMR's repertory, such as direct licensing, per-program licenses, and AFBLs.  Absent injunctive relief, RMLC's members will be forced either to attempt to remove an essential set of works from their playlists, causing significant business disruption and irreparable loss of goodwill and a reduction of choice to their own consumers, or to continue to purchase licenses directly from GMR and pay monopoly prices on account of GMR's anticompetitive conduct. Moreover, absent injunctive relief, even if RMLC's members continue to obtain licenses from GMR, those licenses only confer partial public performance rights to many of the works in GMR's repertory and require RMLC's members to obtain additional licenses to play those works or risk catastrophic infringement suits. RMLC's members' injury therefore flows from that which makes GMR's behavior unlawful.  Absent an injunction, RMLC's members face an unabated imminent threat of continued future injury in the form of having to pay supracompetitive prices, being subjected to a risk of copyright infringement liability, and/or having to radically change the programming on their stations, to the detriment of their businesses, listeners, goodwill, reputation, and other interests.

## VIII. ASSOCIATIONAL STANDING

80.     RMLC is a trade association whose objective is to achieve fair and reasonable license fees from PROs (including ASCAP, BMI, SESAC, and GMR) on behalf of its radio station members.  As such, RMLC has standing to bring the present action on behalf of its members.

81.     As of November 2016, RMLC's members consisted of approximately 7,300 U.S. radio stations involved in the business of terrestrial radio broadcasting.  Another approximately 2,500 stations were "bound" by the terms of RMLC-negotiated licenses with ASCAP and BMI and, thereby, also paid RMLC fees to assist with operational expenses.  Rate courts in the Southern District of New York historically have approved these fees.  Some 7,300 radio stations were represented by RMLC in its first binding rate arbitration with SESAC.  RMLC's membership is open to all U.S. terrestrial radio stations or groups of radio stations "under direct or indirect common control."  RMLC's member stations pay dues to RMLC and have the right to resign their membership.  RMLC's membership fluctuates but is similar today to what it was in November 2016.

82.     Many of RMLC's members face an imminent, concrete, and particularized injury in the form of being forced either to attempt to forgo essential works or to continue to contract with GMR and pay artificially high licensing fees for performance rights to the GMR repertory due to GMR's anticompetitive behavior.  If a station does not purchase a license from GMR, its only options are to (1) attempt to stop playing works in GMR's repertory, which is not an option for at least the vast majority of radio stations for reasons discussed above; or (2) continue playing the works and face the imminent prospect of enterprise-threatening infringement lawsuits.  When SESAC imposed the exact same Hobson's choice on RMLC's member stations only five years ago, Judge Sitarski recognized that "a radio station must buy a SESAC license."  *SESAC I*, 2013 WL 12114098, at *10.  The same is true here, where virtually all radio stations must continue to purchase a

GMR license.  As described above, GMR has consistently demanded prices far in excess of what a radio station would pay to license the same works at competitive prices from other PROs.  GMR has demanded rates that are not reasonably tethered to the quantity or quality of songs in its repertory; worse, many of those songs are partially licensed by GMR, which provides no assurance against the threat of infringement of those works at any price.  Furthermore, GMR demands licenses that will increase in rate yearly, regardless of the quantity or quality of songs in GMR's repertory, and regardless of how often GMR's songs are played on radio.  If RMLC does not receive any relief, radio stations will have to choose between continuing to accede to GMR's demands by continuing to enter into anticompetitive licensing agreements, attempting to remove essential works from their repertories (which is likely impossible for most if not all) and suffering irreparable losses of customer goodwill, or risking suit for copyright infringement.

83.    Injunctive relief prohibiting GMR's anticompetitive conduct and establishing a negotiation process through which the parties could agree upon a fair and reasonable licensing fee (and affording the other protections described herein) would prevent continued injury to RMLC's members.

84.    This suit is germane to RMLC's purpose.  RMLC has been negotiating licenses with PROs on behalf of the radio industry since 1935, when it was still a part of the National Association of Broadcasters, and negotiated the first industry-wide licensing agreement between ASCAP and radio stations.  RMLC's mission statement declares that one of its objectives is "to achieve fair and reasonable license fees with the music licensing organizations . . . on behalf of radio stations."  RMLC's bylaws also authorize it to negotiate licenses and "to perform such acts to accomplish its purposes as the Corporation may determine to be appropriate."  Additionally, RMLC's corporate charter declares as the first of the "purposes for which the corporation is formed" "[t]o promote the common business interests of commercial

radio stations . . . and, in particular, to represent the interests of the commercial radio industry on music licensing matters."

85.     RMLC's claims do not require the individual participation of each of its members to obtain the relief that it seeks.  RMLC seeks only injunctive relief, not damages.  GMR has violated and imminently threatens to continue to violate the antitrust laws by employing common licensing practices that affect virtually all of RMLC's members.  RMLC can establish the illegality of these practices through evidence of GMR's conduct that is common to its members.

<u>**COUNT I**</u>

**<u>Combination in Restraint of Trade</u>**

**<u>in Violation of Section 1 of the Sherman Act</u>**

86.     RMLC repeats and realleges each and every allegation of this complaint.

87.     Since its very formation in 2013, GMR has been a continuing conspiracy of its songwriter and publisher affiliates.  Potential horizontal competitors that each own separate copyrights agreed with each other to form GMR for the purpose of fixing a supracompetitive price for their own rights by implementing the anticompetitive scheme described herein.  GMR then went on to obtain exclusive agreements with each individual affiliate that were designed to achieve the same purpose.[9]

88.     The affiliates did not sell or transfer any copyright assets to GMR; rather the affiliates merely agreed to allow GMR to have exclusive licensing rights to their copyrights so that GMR could pool those licensing rights together with the exclusive licensing rights from other copyright owners into a critical must-have

---

[9] GMR's anticompetitive conduct remains ongoing as it continues to add new affiliates and take steps to capitalize on the cartel it has orchestrated.  For example, when Travis Scott publicly hired Irving Azoff to be his manager in 2018, he shortly thereafter became an affiliate in the GMR cartel.  GMR further continues to seek to extract supracompetitive prices and otherwise engage in unlawful conduct pursuant to the operative conspiracy to this day, as described herein.

bundle.  The agreements between and among GMR and its affiliates to unbundle their works from other PROs, in order to charge more for them on an exclusive basis, violate Section 1 of the Sherman Act under either the *per se* rule or rule of reason.

89.   As the Supreme Court noted in *BMI*, PROs "plainly involve concerted action in a large and active line of commerce."  *BMI*, 441 U.S. at 10.  It is hornbook law that agreements between horizontal competitors to fix prices are typically *per se* violations of Section 1 of the Sherman Act.

90.   GMR's affiliates are horizontal competitors who have all agreed with GMR and with each other to pool their copyrights with the knowledge and conscious commitment that there will be a single price for their product not set by competition between the affiliates.  GMR's affiliates both understand and consent to the purpose of GMR's scheme—that is, to obtain and share among GMR and its affiliates supracompetitive fees through the sale of GMR's blanket license that those affiliates could not otherwise obtain.  These affiliates understand that each other affiliate's mutual participation is key to the success of GMR's anticompetitive conduct.

91.   GMR and its affiliates have formed a combination that fixes the prices for the products it sells.  Mr. Azoff unabashedly admitted that the goal of this concerted action was to raise prices—the very paradigm of an anticompetitive effect under Section 1.  But GMR offers no procompetitive benefits compared with the *status quo* before GMR's formation.  It is simply another point of hold-up for licensees, which *decreases* efficiency.

92.   Nor does GMR have any of the ameliorating qualities the Supreme Court identified in *BMI*.  Specifically, GMR (1) does not permit individual artist affiliates to sell their licenses directly to purchasers; (2)  is not required to sell to any purchaser who wishes to obtain a license on non-discriminatory terms; (3) is able to, and does, only sell the blanket license as opposed to targeted copyrights within the pool; (4) does not provide immediate access or "one-stop shopping" for the works

1  contained in its blanket license; and (5) is not subject to DOJ oversight by virtue of
2  a consent decree.

3       93.    The absence of these redeeming pro-competitive effects, and its sole
4  purpose to raise prices for pre-existing assets, means that GMR's blanket license is
5  nothing more than a naked restraint of trade subject to *per se* condemnation under
6  Section 1 of the Sherman Act.  But even if the Court applied the rule of reason, the
7  absence of pro-competitive effects is dispositive and GMR should be condemned
8  under that rule as well.

9       94.    As alleged above, the GMR cartel has market power in the market for
10  licenses to the musical compositions in its repertory.  *See, e.g.*, *supra* ¶¶ 59-77.  It
11  and its affiliates have harmed competition by, *inter alia*, agreeing not to compete
12  and charging more for pre-existing assets.  *Id.*  Thus, under the rule of reason, GMR
13  violates Section 1 of the Sherman Act.

14       95.    GMR's conduct has had a substantial effect on interstate commerce.

15       96.    GMR's conduct has injured and imminently threatens further injury to
16  RMLC's members in their business or property as set forth above.

17       97.    An injunction is necessary to remedy the continuing violation.

18  **COUNT II**
19  **Combination in Restraint of Trade**
20  **in Violation of Section 1 of the Sherman Act**

21       98.    RMLC repeats and realleges each and every allegation of this
22  complaint.

23       99.    GMR also violated Section 1 by orchestrating a hub and spoke
24  conspiracy between and among the affiliates who collectively agreed to leave their
25  former PROs and join GMR for the sole purpose of giving GMR the original critical
26  mass of works that GMR needed to amass to make its scheme work.

27
28

100.   GMR and these affiliates have a conscious commitment to a common scheme designed to achieve the unlawful objective of fixing the prices for their copyrights.

101.   GMR's affiliates did not just conspire with GMR; they also each conspired with each other when they collectively agreed to leave their former PROs and join the then newly formed GMR, *en masse,* and to give GMR the exclusive ability to license their copyrights.   Mr. Azoff himself manages many of these songwriter-performers who were part of the initial wave that joined GMR to form the critical mass, which includes but is not limited to: Joe Walsh, Don Henley, JD Souther, Jon Bon Jovi, Lindsey Buckingham, Steve Perry, and Neil Schon.   And, upon information and belief, Mr. Grimmett leveraged his relationships at ASCAP to engineer the joint departure of the over 40 members that joined GMR from ASCAP by mid-2015.

102.   It was against the individual self-interest of each affiliate to have left its existing PRO to join the newly-formed GMR unless each did so on the condition, and with the understanding, that other affiliates would do so too, because each affiliate knew and understood that GMR would need a critical mass of works to be able to pay each affiliate the promised 30% more than the affiliate's existing PRO.

103.   There can be no question that the stampede of departures to GMR was the product of concerted action because, otherwise, the decisions would make no economic sense.   In order to fund the promised 30% premium these established songwriters expected, GMR needed to create a must-have repertory.   No individual songwriter-performer of the caliber GMR recruited would have taken the plunge without knowing other songwriters were doing the same.   By August 2015, before the BMI and ASCAP licenses in effect terminated, 47 songwriters had joined GMR. The relationships with Azoff and Grimmett provide the conduit through which this understanding was communicated.   Each affiliate that thereafter joined the conspiracy did so with a conscious commitment to the same common scheme, *i.e.,*

1  to obtain higher prices for its copyrights by collusion than it could obtain through

2  legitimate competition.

3      104.   This naked price fixing among horizontal competitors through a central

4  hub constitutes a *per se* violation of the antitrust laws.

5      105.   Alternatively, at a minimum, this conduct violates the rule of reason

6  for the same reasons discussed throughout this complaint and in Count I above:

7  GMR has market power in the market for licenses to the musical compositions in its

8  repertory and its conduct has harmed competition by eliminating competition among

9  horizontal competitors and charging supracompetitive prices.

10     106.   GMR's conduct has had a substantial effect on interstate commerce.

11     107.   GMR's conduct has injured and imminently threatens further injury to

12  RMLC's members in their business or property as set forth above.

13     108.   An injunction is necessary to remedy the continuing violation.

14                          **COUNT III**

15                          **Monopolization**

16            **in violation of Section 2 of the Sherman Act**

17     109.   RMLC repeats and realleges each and every allegation of this

18  complaint.

19     110.   Unconstrained by any regulatory decree or court-approved settlement

20  agreement, GMR has built an indispensable repertory, *inter alia* by strategically

21  constructing its affiliate base (and via the other means described herein), has

22  eliminated price competition among its affiliates, and has willfully obtained a

23  monopoly that it effectively precludes licensees from avoiding.  Purporting to be the

24  sole purveyor of rights to essential copyrighted works, GMR has exploited and

25  maintained this monopoly by forcing radio stations and other consumers to enter into

26  licensing agreements from which GMR has extracted and will continue to extract

27  monopoly prices.   GMR's construction of an artificial bottleneck creates no

28  offsetting benefits to consumers or to larger society.

LATHAM&WATKINS LLP

PL.'S SECOND AM. COMPL.
CASE NO. 2:19-cv-03957-TJH-AS

111.  GMR has willfully acquired and imminently threatens to maintain monopoly power in the market for licensing the copyrighted musical works in its repertory.  It has not done so on the basis of growth or development as a consequence of a superior product, business acumen, or historic accident; it has done so through a series of exclusionary practices that are capable of foreclosing, and that have in fact foreclosed, equally or more efficient competitors.

112.  **Foreclosing licensing competition with constituent affiliates:**  GMR has willfully acquired and imminently threatens to maintain monopoly power by effectively refusing to deal at any reasonable, market-based price with radio stations and other consumers that wish to purchase anything other than a fixed-fee blanket license.  GMR either expressly prohibits direct licensing or, at a minimum, ensures that it will not happen by refusing to allow carve-out rights or to offer per-program licenses, which makes it uneconomical for consumers to acquire licenses directly from copyright holders.  Its refusal to deal creates a monopoly bottleneck, through which GMR has charged and will continue to charge monopoly prices.

113.  **Exclusive dealing:**  GMR has willfully acquired and imminently threatens to maintain monopoly power by entering into exclusive contracts with its affiliates, and thus acquiring sole licensing rights to indispensable musical works.  By restricting competition between the copyright holders of such works, GMR can and does threaten to charge monopoly prices, thus enabling GMR to pay its affiliates greater average royalties than the consent-decree-limited ASCAP and BMI, or settlement-agreement-constrained SESAC, can offer, all while generating a profit for itself (unlike ASCAP and BMI).

114.  **Repertory obfuscation:**  GMR has willfully acquired and imminently threatens to maintain monopoly power because it has taken steps to assemble a "must have" catalog and to ensure that radio stations can never know, with confidence, precisely which works are in the GMR repertory at any given time.

115.   **Refusing to deal on other than blanket terms:** GMR has not offered to deal with RMLC members that wish to purchase music from its repertory other than on a blanket basis.  GMR has ignored RMLC's request to negotiate for blanket-license carve-out rights or per-program licenses.  GMR also will not deal with RMLC or its members unless those potential licensees pay monopolistic prices resulting from its anticompetitive conduct, as opposed to competitive prices.  These refusals constitute an exclusionary practice, foster GMR's monopoly, and harm competition.

116.   Since GMR's creation in 2013, commercial radio stations generally have not felt the need to enter into direct licenses with copyright holders because the rates that they have paid ASCAP and BMI have been established under the protections of the ASCAP and BMI consent decrees.  And, with respect to SESAC, the litigation that RMLC filed in 2012 was designed to, and ultimately achieved, similar mechanisms to help assure that radio stations would pay reasonable rates for access to SESAC works.  Because GMR is not subject to any similar type of rate-court oversight and is demanding supracompetitive fees for its blanket license, and because GMR refuses to offer any alternative to its blanket license, such as the per-program or All Talk licenses that ASCAP, BMI, and SESAC offer to stations, the prospect of direct licensing or an adjustable fee blanket license are options that radio stations need and that should be available to them.

117.   As an example, during RMLC's negotiations with ASCAP and BMI that resulted in court-approved settlements in 2012, RMLC agreed to forgo the option of an adjustable-fee blanket license for stations in exchange for price concessions on ASCAP and BMI blanket licenses.  ASCAP and BMI both did not want to add the adjustable fee blanket license to their licenses because they believed that new technology would make it much easier for radio stations to negotiate direct licenses with songwriters and they were afraid of the growth potential of direct licenses.  (The ASCAP and BMI consent decrees forbid the PROs from prohibiting

direct licensing.)   The ASCAP and BMI court-approved blanket license prices effective as of January 1, 2010, through December 31, 2016, show that the ability to direct license, and the option of an adjustable fee blanket license, have value to radio stations and that direct licensing is a credible potential avenue of competition between and among a PRO and its affiliates.  GMR has foreclosed both the ability of its affiliates to direct license their works and also the option for radio stations to purchase an adjustable fee blanket license (or another alternative to the blanket license), and thus has foreclosed competition.

118.  As detailed in paragraphs ¶¶ 59-77 and throughout this complaint, GMR's monopolization harms competition.   If left unchecked, GMR's anticompetitive conduct will continue to cause RMLC's members and other consumers to pay monopoly overcharges for musical compositions that would otherwise be available at more competitive prices, and will continue to deprive consumers of choice and efficiency.   Such supracompetitive fees will generate unjustified wealth transfers from consumers to cartel members, and inefficiently distort behavior both in the market for GMR's repertory of copyrighted music and beyond.   The pro-competitive benefits, if any, do not offset the harm to competition GMR has caused.

119.  GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.   Among other things, RMLC's members must continue to choose between attempting to forego essential musical works (which is likely impossible for most if not all) and suffering the loss of customer goodwill, or continuing to contract with GMR to pay higher fees for access to copyrighted works in the GMR repertory than they otherwise would have paid in the absence of GMR's unlawful conduct.

120.  An injunction is necessary to remedy the continuing violation.

## **COUNT IV**

### **Attempted Monopolization**

**in Violation of Section 2 of the Sherman Act**

121. RMLC repeats and realleges each and every allegation of this complaint.

122. GMR has attempted to monopolize the market for licensing the copyrighted musical works in its repertory by engaging in predatory and anticompetitive conduct with a specific intent to monopolize that market, and there is a dangerous probability that GMR will achieve monopoly power.

123. GMR has engaged in a variety of predatory and anticompetitive conduct. It has strategically acquired rights to must-have works to ensure that radio stations must agree to its anticompetitive and predatory licensing demands. GMR has further destroyed competition by committing its affiliates to express and/or *de facto* exclusive licensing terms. At the same time, GMR does not reliably make available information for licensees to allow them to determine which works fall within GMR's repertory. As a result, GMR has demanded and threatens to extract supracompetitive licensing fees far in excess of the actual value of its affiliates' aggregate share of public performances.

124. GMR has a specific intent to monopolize. None of its practices have any legitimate business justification other than to foreclose competition with other PROs and their affiliates and to extract supracompetitive licensing fees from radio stations that have no practical or viable alternative to accepting GMR's blanket license. In refusing to deal with consumers who seek blanket-license carve-out rights or per-program licenses, in entering into exclusive contracts with its affiliates, and in imminently threatening to continue to extract monopoly rents from consumers, GMR has been motivated by neither efficiency nor any other procompetitive factor. GMR's principal objective is willfully to acquire and to maintain monopoly power. Indeed, GMR's founder has admitted that it has gathered a "full roster of songwriters that nobody can, shall we say, comfortably exist without," and that "[w]e at GMR believe in higher rates." And GMR has been public

about its intention to extract monopoly rents from licensees so that it can fund its promise to pay its affiliates at least 30% more than any other PRO, while generating a profit for itself.

125.   GMR and its affiliates strategically pool the copyrights of a relatively small number of affiliates simultaneously to create an essential repertory of musical works and to maintain a sufficiently small profile to avoid regulatory oversight. GMR undertakes these actions with the specific intent of achieving and maintaining a monopoly.

126.   To the extent GMR has not already achieved monopoly power, there is a dangerous probability that it imminently will do so.  GMR has achieved a 100% market share in the relevant market for the works in its repertory, and it has also engaged in a variety of anticompetitive practices by creating a repertory of indispensable works that GMR refuses to license except on a blanket basis.  GMR has ensured that there are insurmountable barriers to entering its market because it has engaged in practices designed to pay its affiliates more than any rate-regulated PRO can afford.  Radio stations face the imminent threat that GMR will be able successfully to exercise its market power by forcing them to enter into anticompetitive licensing agreements or suffer the devastating consequences of refusing such a license.

127.   GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.

128.   An injunction is necessary to remedy the continuing violation.

## COUNT V
## Violation of the California Cartwright Act
## Cal. Bus. & Prof. Code § 16720 *et seq.*

129.   RMLC repeats and realleges each and every allegation of this complaint.

130. GMR and its affiliates constitute a prohibited trust under California Business and Professions Code Sections 16720 and 16726.

131. The GMR trust has conspired to fix prices on the copyrights to the works in GMR's repertory.  Such a conspiracy is a *per se* violation of the Cartwright Act.

132. The GMR trust also violates the Cartwright Act according to the rule of reason.

133. As alleged in this complaint, the conduct of GMR and its affiliates has had an anticompetitive effect in the relevant market for works in GMR's repertory.

134. GMR's conduct has no legitimate business purpose or procompetitive effect.

135. GMR's conduct has injured and imminently threatens further injury to RMLC's members in their business or property as set forth above.

136. GMR's unlawful and anticompetitive conduct took place in substantial part in the State of California.

137. GMR resides and continuously operates in California.

138. An injunction is necessary to remedy the continuing violation.

## **PRAYER FOR RELIEF**

WHEREFORE, RMLC respectfully requests the following relief:

A.   That GMR's unlawful conduct be declared, adjudicated, and decreed a violation of Section 1 of the Sherman Act.

B.   That GMR's unlawful conduct be declared, adjudicated, and decreed a violation of Section 2 of the Sherman Act.

C.   That GMR's unlawful conduct be declared, adjudicated, and decreed a violation of the California Cartwright Act.

D.   That RMLC be awarded mandatory injunctive relief in the form of: (i) requiring GMR to issue licenses on application and to submit to a judicial rate-making procedure comparable to what the consent decrees

LATHAM&WATKINS LLP

regulating ASCAP's and BMI's behavior impose; (ii) establishing a process by which GMR is required to offer a license at a comparable fee to all other similarly situated music users who request a license from GMR, after a judicially determined rate has been established; (iii) establishing a process, during the judicial rate-making procedure, for the court to enter an appropriate order of restitution and/or disgorgement from GMR into a constructive trust of all moneys received from licensees above the judicially determined reasonable rate, and for distribution of that money *pro rata* to impacted radio stations; (iv) enjoining GMR from entering into express and *de facto* exclusive contracts with copyright holders; (v) requiring GMR to make available economically viable alternatives to blanket licenses, such as per-program licenses, blanket carve-out fees, and commercial-only licenses; (vi) requiring GMR to offer only full-work licenses; and (vii) prohibiting GMR from instituting (in its own name or that of its affiliates) any copyright infringement proceedings against any U.S. commercial radio station during the pendency of its copyright misuse, i.e., until such time as GMR has offered, and stations have had a full and fair opportunity to consider, a license from GMR at a rate determined to be reasonable pursuant to judicial rate-making procedures comparable to what the consent decrees regulating ASCAP's and BMI's behavior impose.

E.   That RMLC be awarded expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

F.   That RMLC be awarded such additional relief as the Court may deem proper.

1    Dated:  June 20, 2019                Respectfully submitted,

2

3                                      /s/ Margaret M. Zwisler

4                                        Margaret M. Zwisler (*pro hac vice*)
Jennifer L. Giordano (*pro hac vice*)
William M. Friedman (*pro hac vice*)

5 David L. Johnson (*pro hac vice*)

6 LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000

7 Washington, D.C. 20004-1304
Telephone: (202) 637-2200

8 Facsimile: (202) 637-2201

9 Email: Margaret.Zwisler@lw.com
Email: Jennifer.Giordano@lw.com

10 Email: William.Friedman@lw.com
Email: David.Johnson@lw.com

11

12

13 Alfred C. Pfeiffer, Jr. (Bar No. 120965)
Andrew M. Gass (Bar No. 259694)

14 LATHAM & WATKINS LLP

15 505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538

16 Telephone: (415) 391-0600

17 Facsimile: (415) 395-8095
Email: Al.Pfeiffer@lw.com

18 Email: Andrew.Gass@lw.com

19

20 Adam S. Sieff (Bar No. 302030)
LATHAM & WATKINS LLP

21 355 South Grand Avenue, Suite 100

22 Los Angeles, CA 90071-1560
Telephone: (213) 485-1234

23 Facsimile: (213) 891-8763

24 Email: Adam.Sieff@lw.com

25

26

27

28